UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ORIGINAL

- - - - - - - - - - - - - - - x
                   :

UNITED STATES OF AMERICA     :    **SEALED INDICTMENT**

        - v. -          :    S1 15 Cr. 536

                   :

KALEIL ISAZA TUZMAN,       :

     Defendant.        :

- - - - - - - - - - - - - - - x

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED: 8\12\15

## COUNT ONE

(Conspiracy To Commit Securities Fraud: Market Manipulation)

     The Grand Jury charges:

### RELEVANT PERSONS AND ENTITIES

     1.   At all times relevant to this Indictment, KIT digital, Inc. ("KITD") was a provider of end-to-end video asset management software and related services, with a focus on Internet Protocol-based interactive media, headquartered in Prague, Czech Republic and New York, New York.

     2.   From in or about May 2008 to on or about August 12, 2009, KITD's common stock was traded on the OTC Bulletin Board, which is an electronic quotation system for over-the-counter securities that are not listed on a national securities exchange. Beginning on or about August 13, 2009, KITD's common stock was traded on the NASDAQ.

     3.   At all times relevant to this Indictment, KALEIL ISAZA TUZMAN, the defendant, was the Chairman of the Board of

Directors and Chief Executive Officer ("CEO") of KITD.   At all times relevant to this Indictment, TUZMAN signed the quarterly and annual financial statements that KITD filed with the United States Securities and Exchange Commission (the "SEC").

4.   At all times relevant to this Indictment, a co-conspirator not named as a defendant herein ("CC-1") was the Chief Financial Officer ("CFO") of KITD.   At all times relevant to this Indictment, CC-1 signed the quarterly and annual financial statements that KITD filed with the SEC.

5.   From at least in or about 2007 up to in or about September 2009, KITD employed Accounting Firm-1 as an independent auditor.   Accounting Firm-1 performed year-end audits of KITD's financial statements and quarterly reviews of selected KITD financial information.   Thereafter, from in or about October 2009 up to in or about 2012, KITD employed Accounting Firm-2 as an independent auditor.   Like Accounting Firm-1, Accounting Firm-2 performed year-end audits of KITD's financial statements and quarterly reviews of selected KITD financial information.

6.   From in or about October 2006 to in or about June 2012, a co-conspirator not named as a defendant herein ("CC-2") operated a hedge fund (the "Hedge Fund") in North Carolina.

## PUBLIC COMPANY REPORTING REQUIREMENTS

7.   At all times relevant to this Indictment, KITD was required to comply with the federal securities laws, which are designed to ensure that a company's financial information is accurately recorded and disclosed to the public. Specifically, at all times relevant to this Indictment, pursuant to the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, KITD was required to: (a) file with the SEC annual financial statements (on SEC Form 10-K) that had been audited by independent certified public accountants; (b) file with the SEC quarterly financial reports (on SEC Form 10-Q); and (c) make and keep books, records and accounts that accurately and fairly reflected KITD's business transactions.

8.   At all times relevant to this Indictment, KITD's quarterly and annual financial statements were transmitted to the New York, New York offices of Vintage Filings ("Vintage"), a filing agent that assisted companies in electronically filing periodic reports with the SEC, and were thereafter transmitted electronically by Vintage to the SEC for filing.

## THE SCHEME TO DEFRAUD

9.   Between in or about December 2008 and in or about September 2011, KALEIL ISAZA TUZMAN, the defendant, and CC-2 engaged in efforts to artificially inflate the share price and trading volume of KITD shares. During this time period, during

3

which KITD shares traded OTC and on the NASDAQ, CC-2, at TUZMAN's behest, purchased and sold shares of KITD through the Hedge Fund, at times for the purpose of manipulating the stock price and at times for the purpose of creating the illusion of greater volume in the trading for KITD shares. TUZMAN personally invested his own money into the Hedge Fund, and also arranged for KITD to invest money in the Hedge Fund, thereby using the Hedge Fund as a vehicle by which KITD, at Tuzman's direction, invested in itself, without disclosing that fact or the scheme to manipulate KITD's stock to the investing public.

### Trading In KITD Shares

10. In or about December 2008, KALEIL ISAZA TUZMAN, the defendant, entered into a written agreement with CC-2 and another co-conspirator not named as a defendant herein ("CC-3"), in which CC-2 agreed to purchase at least $400,000 of common stock in KITD in the open market over the next 30 days and to hold it for at least 90 days. In return, TUZMAN agreed in part to pay CC-2 money and make efforts to induce KITD to retain the Hedge Fund to provide various services. One of the purposes of this agreement was to increase the share price of KITD, in order to make KITD more attractive to potential buyers and to help KITD procure financing from potential investors.

11. Shortly after entering into the agreement in December 2008, CC-2 acquired over $400,000 worth of KITD shares.

4

12.   Over the subsequent years, with the knowledge and approval of KALEIL ISAZA TUZMAN, the defendant, CC-2 bought and sold additional KITD shares.  At times, those trades were made at the express request of TUZMAN and at times were funded with money from KITD and from TUZMAN, personally.  During the relevant time period, CC-2 repeatedly engaged in transactions in which CC-2 caused an account under CC-2's control to buy or sell KITD stock, and on the same day caused the same or another account under CC-2's control to take the opposite position.  The result of these transactions was that CC-2 was effectively taking both sides of a single transaction in KITD stock in order to artificially inflate the trading volume in KITD stock.  For instance:

a.   On or about March 9, 2009, CC-2 sold approximately 28,571 shares of KITD stock using one trading account used by the Hedge Fund and bought the same number of shares of KITD stock using another trading account used by the Hedge Fund.  CC-2 purchased and sold the KITD shares at the same price, approximately $7 per share.

b.   On or about December 4, 2009, CC-2 bought approximately 4,815 shares of KITD stock using one trading account maintained by the Hedge Fund and sold approximately 4,770 shares of KITD stock using the same trading account.  That same day, CC-2 bought approximately 5,885 shares of KITD stock

5

using one trading account maintained by the Hedge Fund and sold approximately 5,830 shares of KITD stock using the same trading account. The net effect of these transactions was that the Hedge Fund accumulated only 100 additional shares of KITD stock. Moreover, in both sets of transactions, CC-2 bought shares of KITD stock at a price of approximately $10.64 per share and sold the KITD shares at a price of approximately $10.60 per share. CC-2's trading activity in KITD shares on December 4, 2009 accounted for over approximately 30% of the entire trading volume in KITD that day.

c. On or about July 29, 2010, CC-2 sold approximately 16,072 shares of KITD stock using one trading account used by the Hedge Fund and bought 16,063 shares of KITD stock using the same trading account. The net effect of these transactions was that CC-2 sold only 47 shares of KITD stock. Moreover, CC-2 purchased the KITD shares at a price of approximately $9.62 per share and sold the KITD shares at a price of approximately $9.48 per share. CC-2's trading activity in KITD shares on July 29, 2010 accounted for over approximately 14% of the entire trading volume in KITD that day.

13. As a further part of the scheme, KALEIL ISAZA TUZMAN, the defendant, also directed CC-2 to make timely purchases of KITD stock in an effort to artificially inflate the price of KITD shares at certain critical moments. For example:

      a.   On or about March 12, 2009, TUZMAN sent an e-mail to CC-2.  In that e-mail, TUZMAN wrote, "Urgent: in with [financial firm], trying to close.  Where is stock right now?" CC-2 replied, "[n]ow 8.99 last – that is the ask."  TUZMAN replied in part, "[g]reat work."

      b.   On or about May 22, 2009, TUZMAN sent an e-mail to CC-2.  In that e-mail, TUZMAN wrote, "[w]here is stock trading?  Getting nervous notes from [a financial firm]."  CC-2 responded, "[i]t is because I was on plane on way to las vegas wher[e] I am until Sunday.  7.50 bid 8.1 ask.  Was 7.50 last till I hit ask.  Thing is heavy every day unless I support it. Sux."  On May 21, 2009, the day prior to this e-mail, CC-2 was responsible for approximately all of the trading activity in KITD stock for that day.

      c.   On June 8, 2009, CC-2 sent an e-mail to TUZMAN. In that e-mail, CC-2 wrote, "kdgl stock is 7.60 by 7.70 right now.  you need to find a friend with some deeper pockets to help the cause cuz i'm spent."  TUZMAN replied, "I understand."

      d.   On June 15, 2009, CC-2 sent an e-mail to TUZMAN. In that e-mail, CC-2 wrote, "btw I just spen[t] another 75k to buy kdgl stock – to take out the 7.75 offer.  this is why i'm dying here as we wait 4 weeks to get something done.  out of

bullets." TUZMAN replied in part, "[a]s soon as we file initial S-1, we should be in a much better position to address this."[1]

d. On June 22, 2009, TUZMAN sent an e-mail to CC-2. In that e-mail, TUZMAN wrote, "[w]e need stock to close as high as possible today."

e. On July 9, 2009, TUZMAN sent an e-mail to CC-2. In that e-mail, TUZMAN wrote, "[w]e desperately need the stock to stay strong during this process."

f. On or about August 12, 2009, which was the day before KITD shares began trading on the NASDAQ, TUZMAN invested $204,000 with the Hedge Fund with the understanding that it would be used in part to fund additional purchases of KITD shares. On that same day, CC-2 purchased additional shares of KITD. CC-2's trading in KITD stock on that day accounted for over approximately 40% of the total trading volume in KITD stock for that day.

14. As a further part of the scheme to manipulate KITD shares, in or about March 2011, CC-2 was on both sides of the purchase and sale of KITD stock on several occasions, including at prices that were not to CC-2's economic advantage.

---

[1] "S-1" refers to Form S-1, which is a regulatory filing made by companies in part to register their securities with the SEC in anticipation of a public offering of stock. A Form S-1 includes a prospectus which discloses information about the company that is available to potential investors. KITD's S-1 was filed on or about June 24, 2009.

## Inducing KITD Investments In The Hedge Fund

15.   In furtherance of the scheme to artificially inflate the share price of KITD, KALEIL ISAZA TUZMAN, the defendant, induced KITD to make further investments in the Hedge Fund of $200,000 in or about March 2009 and $700,000 in or about February 2010.   TUZMAN portrayed these investments as efforts to safely invest assets of KITD.   In reality, TUZMAN caused KITD to make these investments in order to help fund CC-2's purchases of KITD shares through the Hedge Fund, as part of an effort to manipulate the market for KITD shares.

16.   On March 10, 2009, CC-2 sent an e-mail to KALEIL ISAZA TUZMAN, the defendant.   In that e-mail, CC-2 wrote, "Kdgl still hasn't traded outside of me today – any progress there?   [CC-1] and I working out getting 200k in – should come today I think – tx."   TUZMAN replied, "How much vol today?   The steady trading action and market movement helps a lot.   Did [CC-1] get wire [sending funds from KITD to the Hedge Fund] done?"

17.   On or about March 10, 2009, KITD wired $200,000 to the Hedge Fund.

18.   On June 12, 2009, CC-2 sent an e-mail to KALEIL ISAZA TUZMAN, the defendant.   In that e-mail, CC-2 wrote, "one of the big incentives for me to buy stock -- give up economics etc -- was for you guys to put a couple million into my fund."

19. On January 29, 2010, KALEIL ISAZA TUZMAN, the defendant, sent an e-mail to CC-1 and CC-2. In that e-mail, TUZMAN wrote, "[CC-2] was incredibly helpful to us through the last offering and over the last year and a half. I'd like to put a bit more cash with him at this time -- maybe another $600 - 800k -- but with very strict and quick removal terms, audit rights, etc."

20. On or about February 3, 2010, KITD wired $700,000 to the Hedge Fund.

21. No disclosure was ever made to the public in KITD's SEC filings that a stock purchase agreement existed between KALEIL ISAZA TUZMAN, the defendant, and CC-2. Nor was any public disclosure made that KITD's investments in the Hedge Fund were made for the purpose of funding additional purchases of KITD stock.

## Hiding The Scheme

22. In an effort to conceal the scheme to manipulate KITD's stock price, KALEIL ISAZA TUZMAN, the defendant, misled KITD auditors about the true reason for KITD's investment in the Hedge Fund.

23. In or about August 2009, an auditor from Accounting Firm-1 ("Auditor-1") inquired about the $200,000 investment that KITD had made in the Hedge Fund in or about March 2009. After learning that the Hedge Fund also owned shares of KITD, Auditor-

10

1 raised concerns with KALEIL ISAZA TUZMAN, the defendant, and others at KITD about whether the KITD investment in the Hedge Fund should have been disclosed to investors in public filings as a related party transaction. In an attempt to assuage Auditor-1's concerns, TUZMAN misrepresented the nature of his relationship with the Hedge Fund and with CC-2.

24. For instance, on or about August 12, 2009, KALEIL ISAZA TUZMAN, the defendant, sent an email to Auditor-1 stating in part that "[t]here has never been any relationship with [CC-2], no understandings or agreements, implicit or explicit, of any buying or selling behavior of any stock, KIT digital otherwise." As demonstrated by, among other things, the December 2008 agreement between TUZMAN and CC-2, TUZMAN's representations to Auditor-1 were false and misleading.

## THE CONSPIRACY

25. From in or about December 2008 through in or about September 2011, in the Southern District of New York and elsewhere, KALEIL ISAZA TUZMAN, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated and agreed together and with each other to commit an offense against the United States, namely, fraud in connection with the purchase and sale of securities issued by KITD, in violation of Title 15, United States Code, Sections

78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## Object Of The Conspiracy

26.   It was a part and object of the conspiracy that KALEIL ISAZA TUZMAN, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon any person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## Overt Acts

27.   In furtherance of the conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about December 31, 2008, KALEIL ISAZA TUZMAN, the defendant, CC-2, and CC-3 executed an agreement pursuant to which CC-2 agreed that the Hedge Fund would buy at least $400,000 of KITD common stock.

b.   Between in or about January 2009 and in or about February 2009, CC-2 purchased over $400,000 of KITD common stock through the Hedge Fund.

c.   On or about March 10, 2009, TUZMAN induced KITD to invest approximately $200,000 with the Hedge Fund.

d.   Over the next 30 days, CC-2 accumulated over approximately 125,000 additional shares of KITD common stock.

e.   On or about August 12, 2009, TUZMAN invested approximately $204,000 with the Hedge Fund.

f.   Over the next 30 days, CC-2 accumulated over approximately 37,000 additional shares of KITD common stock, which at the time was traded on the NASDAQ.

g.   On or about February 3, 2010, TUZMAN induced KITD to invest approximately $700,000 with the Hedge Fund.

h.    In or about March 2011, CC-2 bought and sold KITD shares in an effort to artificially inflate the price of KITD shares.

i.    In or about July 2011, TUZMAN met with CC-2, CC-3 and others in Manhattan in part to discuss the Hedge Fund's KITD investment.

(Title 18, United States Code, Section 371.)

## COUNT TWO

### (Securities Fraud: Market Manipulation)

The Grand Jury further charges:

28.    The allegations contained in paragraphs 1 through 24, and 27 are repeated and realleged as though fully set forth herein.

### The Statutory Allegation

29.    From in or about December 2008 through in or about September 2011, in the Southern District of New York and elsewhere, KALEIL ISAZA TUZMAN, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to

14

defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon any person, to wit, TUZMAN engaged in efforts to artificially increase the share price and trading volume of KITD by causing CC-2 to buy and sell KITD shares that were in part funded by TUZMAN and KITD without disclosing that scheme to KITD shareholders or the investing public.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT THREE

### (Conspiracy To Commit Wire Fraud)

The Grand Jury further charges:

30. The allegations contained in paragraphs 1 through 24, and 27, are repeated and realleged as though fully set forth herein.

### THE SCHEME TO DEFRAUD

31. From in or about March 2009 through in or about March 2011, KALEIL ISAZA TUZMAN, the defendant, caused KITD to invest approximately $1,150,000 with the Hedge Fund but failed to disclose to KITD shareholders that KITD's investments with the

15

Hedge Fund were not part of an arms-length relationship.   In truth and in fact, KITD's investments with the Hedge Fund were for the purpose of assisting the Hedge Fund in its efforts to artificially increase the share price of KITD through the purchase and sale of KITD shares and, in one instance, to reimburse TUZMAN for a personal investment he made with the Hedge Fund.

## THE CONSPIRACY

32.   From at least in or about March 2009 up to in or about March 2011, in the Southern District of New York and elsewhere, KALEIL ISAZA TUZMAN, the defendant, and others known and unknown, willfully and knowingly, combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

### Object Of The Conspiracy

33.   It was a part and an object of the conspiracy that KALEIL ISAZA TUZMAN, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings,

16

signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Overt Acts

34. In furtherance of the conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about March 10, 2009, KALEIL ISAZA TUZMAN, the defendant, caused KITD to wire $200,000 from a bank account in New York, New York to a bank account associated with the Hedge Fund.

b. On or about August 12, 2009, in response to an inquiry from Accounting Firm-1 about KITD's $200,000 investment with the Hedge Fund and whether it reflected a quid pro quo for the Hedge Fund's investment in KITD stock, TUZMAN falsely represented that "[t]here has never been any other relationship with [CC-2], no understandings or agreements, implicit or explicit, of any buying or selling behavior of any stock, KIT digital or otherwise.  I have only met [CC-2] once in my life, and spoke to him only occasionally.  No one at KIT digital or anyone associated with KIT digital has any suasion of any kind over his investments."

c.   On or about February 3, 2010, TUZMAN caused KITD to wire $250,000 from a bank account in New York, New York to a bank account associated with the Hedge Fund.

d.   On or about February 22, 2011, TUZMAN sent an e-mail to CC-2.  In that e-mail, TUZMAN wrote, "I am really sorry to do this to you, but as part of our efforts to wrap up everything outstanding, I have reached a settlement . . . that requires me to pay out an additional $250k . . . .  This is a personal payment . . . and since I have no other available funds at this time, I need to ask you to redeem my personal investment . . . with [the Hedge Fund]."

e.   On or about February 24, 2011, TUZMAN sent an e-mail to CC-1.  In that e-mail, TUZMAN wrote, "[CC-2] has been extremely helpful with respect to our work with [a financial institution] and some Asian corp dev't in particular.  Obviously I don't feel comfortable pay him any commissions on this stuff, given [CC-2's] firm's mandate, the fact that [CC-2] is a shareholder, etc.  In recognition of this contribution, however, I think it makes sense for us to slightly up the amount we have under management with [the Hedge Fund], particularly given the overall percentage of our cash it currently represents and our strategy of cash management diversification.  I was thinking something quite small that sends a positive message, maybe $250k.  [The Hedge Fund] has been performing well also."

f.   On or about March 1, 2011, TUZMAN caused KITD to wire $250,000 from a bank account in New York, New York to a bank account associated with the Hedge Fund.

g.   On March 2, 2011, CC-2 sent TUZMAN a text message.  In that text message, CC-2 wrote, "Assumed 20% tax so 288 is num.  Can send u spreadsheet if u like."

h.   On March 2, 2011, TUZMAN sent CC-2 reply text messages.  In those text messages, TUZMAN wrote, "I trust you. That's fine.  Can you please send to my account?".

i.   On or about March 3, 2011, CC-2 wired approximately $288,101 to TUZMAN.

(Title 18, United States Code, Section 1349.)

## COUNT FOUR

### (Wire Fraud)

The Grand Jury further charges:

35.  The allegations contained in paragraphs 1 through 24, paragraph 27 and paragraph 34 are repeated and realleged as though fully set forth herein.

### The Statutory Allegation

36.  From at least on or about February 22, 2011 through on or about March 4, 2011, in the Southern District of New York and elsewhere, KALEIL ISAZA TUZMAN, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by

19

means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, TUZMAN induced KITD to wire $250,000 from a bank account in New York, New York to the Hedge Fund, ostensibly for a corporate purpose, knowing that the Hedge Fund would then send the money to TUZMAN to reimburse a purely personal investment, which wire the Hedge Fund sent to a bank account controlled by TUZMAN.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FIVE

**(Conspiracy To Commit Securities Fraud, Make False Statements In Annual And Quarterly SEC Reports And Make False Statements To Auditors)**

The Grand Jury further charges:

37. The allegations contained in paragraphs 1 through 8 are repeated and realleged as though fully set forth herein.

## RELEVANT PERSONS AND ENTITIES

38. At all times relevant to this Indictment, The Country Network ("TCN") was a digital multicast network that specialized in broadcasting country music videos.

39. At all times relevant to this Indictment, Sezmi Corporation ("Sezmi") was a cloud-based video delivery platform

company that helped television providers deliver content over
Internet Protocol connected devices.

## BACKGROUND

40.  Between in or about 2008, when KALEIL ISAZA TUZMAN,
the defendant, became Chairman and CEO of KITD, and in or about
the spring of 2012, when TUZMAN resigned his positions at KITD,
KITD, like many start-up technology companies, never reported a
profitable year in its annual financial statements.  Under
TUZMAN's leadership, however, KITD touted itself to the
investing public as a growing company that routinely met or
exceeded the so-called "guidance" that TUZMAN and other KITD
executives communicated to the investing public concerning
KITD's operational and financial results for upcoming reporting
periods.  However, as set forth more fully below, TUZMAN and CC-
1 used various false and deceptive means to misrepresent KITD's
true financial health to its shareholders and the investing
public.

41.  On or about November 21, 2012, after an internal
investigation led by KITD's audit committee, KITD filed a Form
8-K, which is a report that public companies must file with the
SEC to announce major events that shareholders should know
about.  In the Form 8-K, KITD announced to the investing public
that KITD had discovered various errors and irregularities in
its historical financial statements and that it would have to

issue restated financial statements. On the first trading day following this announcement, the price of KITD's common stock plummeted more than 64% from the previous day's closing price. In or about December 2012, KITD's stock was delisted from NASDAQ. KITD subsequently declared bankruptcy.

## CERTAIN RELEVANT ACCOUNTING PRINCIPLES

42. At all times relevant to this Indictment, KITD provided members of the investing public with information concerning KITD's anticipated and actual financial results. KITD provided such information through various methods, including public filings with the SEC, periodic news releases and other corporate announcements, statements made in conference calls with professional securities analysts and investors, and meetings and conferences held with investors. Investors considered the information provided by KITD in deciding whether to purchase, hold, or sell KITD securities.

43. KITD's public filings with the SEC included financial statements which contained, among other things, an Income Statement and a Balance Sheet. A company's Income Statement reports, among other things, revenue recognized, expenses incurred, and net income earned during a stated period of time, usually a fiscal quarter or a fiscal year. Within an Income Statement, expenses are subtracted from revenue to calculate net

income.  A company's Balance Sheet reports the company's assets, liabilities, and shareholder equity as of a specific date.

44.  At all times relevant to this Indictment, KALEIL ISAZA TUZMAN, the defendant, CC-1, and others, participated in the process of communicating KITD's financial condition to the investing public by (a) signing and certifying the accuracy of KITD's filings with the SEC, (b) speaking at meetings, conferences, and conference calls with securities analysts and investors, and (c) providing and reviewing information that was included in KITD's financial results, reports, and public disclosures.

## THE SCHEME TO DEFRAUD

45.  As set forth more fully below, from at least in or about 2010 through in or about 2012, KALEIL ISAZA TUZMAN, the defendant, and CC-1, with others, engaged in an illegal scheme to deceive KITD shareholders, members of the investing public, KITD's independent auditors and others concerning KITD's true operating performance and financial results.  In furtherance of the scheme, TUZMAN, CC-1, and their co-conspirators: (a) made and caused KITD to make statements to the public, its independent auditors and others which falsely described KITD's revenues, expenses and other financial results and omitted to disclose material facts necessary to make the statements made about KITD's financial results complete, accurate, and not

misleading; and (b) caused KITD to file financial statements with the SEC that presented a materially false and misleading description of KITD's operating performance and financial results.

46. At various times relevant to this Indictment, KALEIL ISAZA TUZMAN, the defendant, and CC-1, with others, devised and executed a scheme to inflate falsely KITD's revenue. This scheme involved two principal methods: (a) the improper recognition of revenue from so-called "perpetual license" contracts for KITD software (contracts that gave the purchasing customer the right to use the licensed software indefinitely), and (b) the execution of fraudulent "round-trip" transactions which had the effect of using KITD's own cash, rather than payments received from customers, to pay off bills, known as accounts receivable, that were due and owed to KITD from those customers, rather than disclose to KITD's auditors and the investing public the fact that the bills were uncollectible.

47. With regard to the first method, KALEIL ISAZA TUZMAN, the defendant, and CC-1 knew that KITD had sold perpetual licenses for software that, at the time of sale, was not complete and required substantial future development. But instead of booking revenue ratably as KITD reached interim development milestones or recognizing revenue in full once software development was complete, TUZMAN and CC-1 caused KITD

to recognize the entirety of the revenue from certain contracts at the time of sale despite the fact that KITD had not delivered a product to KITD's customers. This premature revenue recognition violated relevant software accounting principles and was contrary to KITD's statements to the investing public and its independent auditors, among others.

48. With regard to the second method, KALEIL ISAZA TUZMAN, the defendant, and CC-1, on at least one occasion, caused KITD to use company money, ostensibly escrowed in connection with a KITD corporate acquisition, to pay off suspicious or uncollectible receivables by year-end. Specifically, TUZMAN and CC-1 caused KITD to add an artificial "restructuring fee" to the purchase price of certain companies that KITD sought to acquire. Once the purchase price was raised, TUZMAN and CC-1 established an escrow account that was funded with KITD cash which purported to represent the so-called restructuring fee. The use of the escrowed KITD money was governed by a "side letter" between KITD and the acquired company that TUZMAN and CC-1 created but that both men intentionally hid from KITD's independent auditors and the investing public. The side letter dictated that escrowed funds could be used only to cover the costs KITD expected to incur from integrating the acquired company into KITD. However, as more fully described below, on at least one occasion, TUZMAN and CC-1 used the escrowed money in a round-trip transaction

25

that resulted in KITD using its own cash to pay down old receivables that, because of their age, might have attracted scrutiny from KITD's independent auditors and could have negatively impacted KITD's financial statements if they had remained unpaid.

## THE DEFENDANT ARTIFICIALLY INFLATES KITD REVENUE

49. From at least in or about 2010 up to in or about 2012, KITD improperly recognized revenue from certain perpetual licenses for software that had not been delivered to customers. This fraudulent practice of recognizing revenue caused KITD to materially overstate its reported revenue, which had the effect of materially overstating KITD's net income and earnings on its annual and quarterly financial reports issued from the fiscal quarter ending June 30, 2010 through the fiscal quarter ending March 31, 2012.

50. In each of its annual Form 10-K filings, KITD disclosed to members of the investing public that it followed a revenue recognition policy that required four basic criteria to be met in order for revenue to be recognized. Specifically, KITD disclosed that it counted revenue on its books and records when (a) there is persuasive evidence that an arrangement exists; (b) the price is fixed or determinable; (c) collectability is reasonably assured; and (d) product delivery has occurred or services have been rendered. Pursuant to KITD's

disclosures, therefore, revenue was not to be recognized when KITD had not in fact delivered a product to a client.

51.  As set forth below, on at least two occasions, KALEIL ISAZA TUZMAN, the defendant, and CC-1, with others, recognized revenue for products that KITD had failed to deliver to its clients.  TUZMAN and CC-1 also worked together to conceal their improper revenue recognition from KITD's independent auditors.

### The Country Network Contract

52.  In approximately August 2010, KITD entered into an agreement with TCN to provide TCN with a product that KITD referred to as "VX Manager" or "VX Enterprise" (hereinafter, "VX Manager").   The total contract value was approximately $1,488,000, which consisted of a $1,338,000 perpetual license fee for KITD software and $150,000 for setup fees.  A KITD sales representative ("Employee-1") pitched the VX Manager as a groundbreaking technological innovation that would allow TCN to stream video content on various platforms, including mobile devices.

53.  On or about June 25, 2010, Employee-1 sent the TCN CEO a KITD proposal dated June 20, 2010 (the "June 20, 2010 Proposal") for VX Manager.   Critically, the June 20, 2010 Proposal set forth a "deployment timeline" in which KITD promised to provide TCN with certain components of VX Manager starting in August 2010 and ending in April 2011.

54.   Despite this deployment timeline, CC-1 caused KITD to record approximately $1,338,000 of revenue -- the entirety of the perpetual license fee from the TCN contract -- during the fiscal quarter ending June 30, 2010.   To aid this fraudulent scheme, among other things, on or about August 9, 2010, CC-1 directed Employee-1 to ask the TCN CEO to confirm falsely and in writing that KITD had delivered VX Manager to TCN on June 22, 2010.   Employee-1 complied with CC-1's instruction, and the TCN CEO subsequently signed the false confirmation.   As CC-1 well knew at the time, this revenue recognition was improper for three principal reasons:   First, as of June 30, 2010, KITD and TCN had not finalized a contract to purchase VX Manager. Second, as of June 30, 2010, KITD had not delivered VX Manager to TCN.   Third, as the June 20, 2010 Proposal illustrated on its face, the VX Manager software did not exist as of June 30, 2010 and required significant development by KITD through 2011. Accordingly, pursuant to KITD's stated accounting policies, the TCN perpetual license fee should not have been recorded as revenue for the fiscal quarter ending June 30, 2010.   As a result of this improper revenue recognition, KITD's revenue for the fiscal quarter ending June 30, 2010 was overstated by more than 5% and its pre-tax losses were understated by approximately 78%.   Furthermore, the consensus estimate among analysts covering KITD's stock was that KITD would earn $22.2 million in