USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7\13\16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -  x

                        :

UNITED STATES OF AMERICA      :     **SEALED INFORMATION**

                        :

       - v. -            :     S4 15 Cr. 536 (PGG)

                        :

STEPHEN E. MAIDEN,          :

                        :

       Defendant.       :

                        :

- - - - - - - - - - - - - - - -  x

## COUNT ONE

### (Conspiracy To Commit Securities Fraud: Market Manipulation)

The United States Attorney charges:

### RELEVANT PERSONS AND ENTITIES

1.    From in or about October 2006 to in or about June 2012, STEPHEN E. MAIDEN, the defendant, operated the Maiden Capital Opportunity Fund (the "Maiden Fund") in North Carolina through his investment advisory firm, Maiden Capital LLC ("Maiden Capital").  At all times relevant to this Information, Maiden Capital maintained an account at a bank located in North Carolina (the "Maiden Capital Account").

2.    At all times relevant to this Information, KIT digital, Inc. ("KITD") was a provider of end-to-end video asset management software and related services, with a focus on Internet Protocol-based interactive media, headquartered in Prague, Czech Republic and New York, New York.

3. At all times relevant to this Information, Kaleil Isaza Tuzman ("Tuzman") was the Chairman of the Board of Directors and Chief Executive Officer ("CEO") of KITD and Robin Smyth ("Smyth") was the Chief Financial Officer ("CFO"). At various times relevant to this Information, KITD maintained a United States based bank account (the "KITD Bank Account").

4. From in or about May 2008 to on or about August 12, 2009, KITD's common stock was traded on the OTC Bulletin Board, which is an electronic quotation system for over-the-counter securities that are not listed on a national securities exchange. Beginning on or about August 13, 2009, KITD's common stock was traded on the NASDAQ. As a publicly traded company, KITD was required to file with the United States Securities and Exchange Commission (the "SEC") annual financial statements that had been audited by independent certified public accountants and quarterly financial reports.

5. On or about November 21, 2012, after an internal investigation led by KITD's audit committee, KITD announced to the investing public that KITD had discovered various errors and irregularities in its historical financial statements and that it would have to issue restated financial statements. In or about December 2012, KITD's stock was delisted from NASDAQ. KITD subsequently declared bankruptcy.

6.    At all times relevant to this Information, a co-conspirator not named herein ("CC-1") was a self-described entrepreneur, filmmaker and investor in media, finance and technology companies.    At various times relevant to this Information, CC-1 raised money for Enable Invest Ltd. ("Enable"), an investment company based in Dubai and managed by an individual not named as a defendant herein ("Individual-1"). Certain United States-based bank accounts and entities were affiliated with Enable Invest Ltd., including a trading account (the "U.S. Enable Trading Account") and two bank accounts ("U.S. Enable Bank Account-1" and "U.S. Enable Bank Account-2," collectively, "U.S. Enable Bank Accounts").

7.    At various times relevant to this Information, STEPHEN E. MAIDEN, the defendant, through the Maiden Fund, Tuzman, CC-1 and Individual-1 were each investors in a privately held special purpose investment vehicle (the "KIT SPIV"), which was controlled by Tuzman and invested in KITD.

**OVERVIEW OF THE MARKET MANIPULATION SCHEME**

8.    Between in or about December 2008 and in or about September 2011, STEPHEN E. MAIDEN, the defendant, Tuzman, CC-1, and others engaged in efforts to artificially inflate the share price and trading volume of KITD shares.    During this time period, during which KITD shares traded on the OTC Bulletin Board and on the NASDAQ, MAIDEN, at Tuzman and CC-1's behest,

3

purchased and sold shares of KITD through the Maiden Fund, at times for the purpose of manipulating the stock price and at times for the purpose of creating the illusion of greater volume in the trading for KITD shares.

9.    Tuzman personally invested his own money into the Maiden Fund, and also arranged for KITD to invest money in the Maiden Fund, thereby using the Maiden Fund as a vehicle by which KITD, at Tuzman's direction, invested in itself, without disclosing that fact or the scheme to manipulate KITD's stock to KITD's board of directors (the "KITD Board"), KITD's auditors, or the investing public.

10.    To facilitate the manipulation of KITD shares, Tuzman and CC-1 agreed to compensate STEPHEN E. MAIDEN, the defendant, in several ways, as detailed below, including by making investments in, and loaning money to, Maiden Capital.  In total, between December 2008 and September 2011, at the direction of Tuzman and CC-1, and with their knowledge, MAIDEN bought and sold in excess of $2 million in KITD shares to artificially inflate the trading volume and/or price of KITD stock.

### THE MARKET MANIPULATION SCHEME

#### MAIDEN LOSES MONEY IN INVESTMENTS SOLICITED BY CC-1

11.    In or before July 2008, CC-1 solicited Tuzman, on behalf of KITD, to invest in Enable.  In or about August 2008, KITD invested approximately $6.5 million in Enable.  The

majority of these funds were deposited into the U.S. Enable
Trading Account.

12.  The  U.S.  Enable  Trading  Account  was  opened  in
approximately June 2008.  Between June 2008 and September 2008,
in excess of $7 million was deposited into the U.S. Enable
Trading Account, including more than $5.5 million from the $6.5
million KITD investment.  In July, August and September 2008,
the U.S. Enable Trading Account realized losses every month and,
in total, incurred trading losses in excess of $5.5 million.

13.  In or about the summer of 2008, at approximately the
same time as the U.S. Enable Trading Account was opened, CC-1
introduced STEPHEN E. MAIDEN, the defendant, to Tuzman as a
potential investor in the KIT SPIV.  As a result of CC-1's
introduction,  in  or  about  June  2008,  MAIDEN  invested
approximately $1 million from the Maiden Fund into the KIT SPIV.
MAIDEN subsequently learned that Tuzman had redirected the funds
from Maiden Capital's investment in the KIT SPIV into KITD's
$6.5 million investment in Enable, without MAIDEN's permission
or authorization.

14.  Despite the trading losses sustained in the U.S.
Enable Trading Account, Individual-1 misrepresented to STEPHEN
E. MAIDEN, the defendant, that Enable's returns were positive.
For example, on or about October 11, 2008, Individual-1 sent an
email to MAIDEN in which Individual-1 stated that Enable "has

been making good profits . . . trading has been smooth and profitable – no huge profits, but with the markets [] going psychotic these days, I am happy to be taking things safe."  In truth and in fact, by September 30, 2008, the U.S. Enable Trading Account contained less than $113,000.

15.  In or about November 2008, CC-1, who was, by that time, well aware that Enable had incurred losses and was unable to fund redemptions, sought $2 million from STEPHEN E. MAIDEN, the defendant, purportedly for the purpose of investing in Enable.  Specifically, on or about November 8, 2008, CC-1 asked MAIDEN to make a "$2 million short term (anticipated to be no more than one week) investment into [Enable]."  CC-1 indicated that Enable would hold the cash as "show money" to induce other investments and then would be returned.  In reality, CC-1 instead intended to misappropriate MAIDEN's investment to pay redemptions to Enable investors, thereby concealing the Enable losses.

16.  At the behest of CC-1, STEPHEN E. MAIDEN, the defendant, between November 10, 2008 and November 18, 2008, wired a total of $2 million from the Maiden Capital Account to U.S. Enable Account-1.  These funds were never deposited into the U.S. Enable Trading Account.  Instead, CC-1, contrary to his representations to MAIDEN, misappropriated a majority of the

funds for his own purposes, including to meet an Enable redemption demand made by Tuzman on behalf of KITD.

MAIDEN ENTERS AGREEMENT TO MANIPULATE THE MARKET IN KITD SHARES

17. In or about December 2008, STEPHEN E. MAIDEN, the defendant, Tuzman and CC-1 entered into a written agreement (the "Agreement") in which MAIDEN agreed to purchase at least $400,000 of common stock in KITD in the open market over the next 30 days and to hold it for at least 90 days. MAIDEN also agreed that he would not to seek to redeem his investment in the KIT SPIV or Enable. Because Tuzman and CC-1 knew, as of at least December 2008, that Enable had suffered significant losses, this agreement was valuable to both Tuzman and CC-1. In return, Tuzman agreed to, among other things, make efforts to induce KITD to retain Maiden Capital to provide various services, and to assign to Maiden Capital a portion of Tuzman's interest in the KIT SPIV. For his part, CC-1 agreed to assign a portion of his interest in the KIT SPIV to Maiden Capital. In a second agreement between CC-1 and Tuzman, signed the same day, CC-1 further agreed to facilitate open market purchases of KITD.

18. Shortly after entering into the Agreement, STEPHEN E. MAIDEN, the defendant, fulfilled his commitment by acquiring over $400,000 worth of KITD shares in open market trading.

<u>MAIDEN RECEIVES INVESTMENTS FROM KITD AND TUZMAN FOR THE PURPOSE</u>
<u>OF FUNDING ADDITIONAL MANIPULATIVE TRADING</u>

19.   In furtherance of the scheme to artificially inflate the share price of KITD, Tuzman induced KITD to make investments in the Maiden Fund of $200,000 in or about March 2009 and $700,000 in or about February 2010.   Tuzman portrayed these investments to the KITD Board as efforts to safely invest assets of KITD.   In reality, Tuzman caused KITD to make these investments in order to help fund purchases of KITD shares by STEPHEN E. MAIDEN, the defendant, as part of an effort to manipulate the market for KITD shares.

20.   In or about February 2009, on a telephone call in which STEPHEN E. MAIDEN, the defendant, CC-1, Tuzman and Individual-1 participated, MAIDEN learned that Enable was insolvent and that the Maiden Fund's investment in Enable had been lost.   Following this call, MAIDEN spoke directly with CC-1, including to express his concern that, as a result of the losses in Enable, Maiden Capital could collapse.   CC-1 reassured MAIDEN that a solution would be reached to cover up the Enable losses.   Shortly thereafter, with CC-1's knowledge, MAIDEN began generating fictitious account statements that failed to disclose the losses and were distributed to Maiden Capital investors. Moreover, on several occasions between 2009 and 2011, MAIDEN

8

spoke to CC-1 about the fact that MAIDEN had not disclosed the Enable losses to Maiden Capital investors.

21. Between 2009 and 2011, STEPHEN E. MAIDEN, the defendant, Tuzman, CC-1, and others discussed solutions to hide the Enable losses from both investors in Maiden Capital and KITD shareholders.

22. Notwithstanding the fact that STEPHEN E. MAIDEN, the defendant, had fulfilled his obligations under the Agreement, Tuzman and CC-1 induced MAIDEN to continue to manipulate KITD's stock price based on, among other things, the understanding that MAIDEN's continued support of KITD's stock price would facilitate CC-1's and/or Tuzman's repayment of losses incurred by MAIDEN's investors, and thereby also hide the Enable losses from Maiden Capital investors.

23. To this end, using in part KITD funds provided by Tuzman and Tuzman's own funds, between February 2009 and September 2011, with the knowledge and approval of Tuzman and CC-1, STEPHEN E. MAIDEN, the defendant, continued to manipulate KITD's stock price, purchasing in excess of $2 million of KITD shares.

24. MAIDEN never disclosed to his investors that he was purchasing KITD shares on their behalf as part of an agreement under which he would forebear seeking an Enable redemption.

9

## THE CONSPIRACY

25.  From in or about December 2008 through in or about September 2011, in the Southern District of New York and elsewhere, STEPHEN E. MAIDEN, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated and agreed together and with each other to commit an offense against the United States, namely, fraud in connection with the purchase and sale of securities issued by KITD, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## Object Of The Conspiracy

26.  It was a part and object of the conspiracy that STEPHEN E. MAIDEN, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of

10

the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon any person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

## Overt Acts

27. In furtherance of the conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about December 31, 2008, STEPHEN E. MAIDEN, the defendant, Tuzman, and CC-1 executed an agreement pursuant to which MAIDEN agreed that Maiden Capital would buy at least $400,000 of KITD common stock.

b. Between in or about January 2009 and in or about February 2009, MAIDEN purchased over $400,000 of KITD common stock through Maiden Capital.

c. In or about March 2011, MAIDEN bought and sold KITD shares in an effort to artificially inflate the price of KITD shares.

d. In or about July 2011, MAIDEN met with Tuzman, CC-1, and others in Manhattan in part to discuss the losses sustained in Enable.

(Title 18, United States Code, Section 371.)

11

## COUNT TWO

### (Conspiracy To Commit Wire Fraud)

The United States Attorney further charges:

28.   The allegations contained in paragraphs 1 through 24, and paragraph 27, are repeated and realleged as though fully set forth herein.

### THE SCHEME TO DEFRAUD KITD'S SHAREHOLDERS

29.   From in or about March 2009 through in or about April 2012, Tuzman, in causing KITD to invest approximately $1.15 million with the Maiden Fund, misled KITD's shareholders, with the assistance of STEPHEN E. MAIDEN, the defendant, by failing to disclose that KITD's "investments" were not part of an arm's length relationship but were actually related party transactions for an improper purpose.

30.   For example, in or about February 2011, Tuzman sought to redeem a personal investment in Maiden Capital.  Because of the Enable losses, among other reasons, STEPHEN E. MAIDEN, the defendant, was unable to pay this redemption.   To obtain approximately $250,000 for his personal use, Tuzman caused $250,000 of KITD funds to be wired to MAIDEN with the understanding that MAIDEN would then wire those funds back to Tuzman, which MAIDEN did.   Tuzman falsely represented to KITD that the $250,000 was for a legitimate investment with Maiden Capital when, as Tuzman and MAIDEN had agreed, it was instead to

12

be paid to Tuzman for his personal use.

31. Moreover, in or about March 2012, during the month when Tuzman was asked to resign as CEO of KITD, the KITD Board and auditors asked questions about, among other things, KITD's investments in the Maiden Fund. STEPHEN E. MAIDEN, the defendant, and Tuzman took steps to conceal from the KITD Board and auditors that Maiden Capital did not have the funds invested by KITD. For example, on or about March 16, 2012, MAIDEN, with Tuzman's knowledge, sent a false account balance confirmation to KITD's auditors confirming that there was at least $1 million of KITD's funds at Maiden Capital available for redemption despite the fact that MAIDEN and Tuzman knew that Maiden Capital did not have these funds.

## THE CONSPIRACY

32. From at least in or about March 2009 up to in or about April 2012, in the Southern District of New York and elsewhere, STEPHEN E. MAIDEN, the defendant, and others known and unknown, willfully and knowingly, combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

### Object Of The Conspiracy

33. It was a part and an object of the conspiracy that STEPHEN E. MAIDEN, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise

a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## FORFEITURE ALLEGATION

34.  As a result of committing one or more of the foregoing offenses alleged in Counts One and Two of this Information, STEPHEN E. MAIDEN, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of the offenses.

## Substitute Asset Provision

35.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

14

with, a third party;

        c.    has been placed beyond the jurisdiction of the court;

        d.    has been substantially diminished in value; or

        e.    has been commingled with other property which cannot be divided without difficulty; or

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

        (Title 18, United States Code, Section 981;
        Title 28, United States Code, Section 2461.)

*Preet Bharara*

PREET BHARARA
United States Attorney

15

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

v.

### STEPHEN E. MAIDEN,

Defendant.

### SEALED INFORMATION

S4 15 Cr. 536 (PGG)

(18 U.S.C. §§ 371, 1349.)

PREET BHARARA
United States Attorney

7/1/16    DEFT STEPHEN MAIDEN PRES w/ATTY RICHARD GLEASON
AUSA ANDREA GRISWOLD
DEFT WAIVES INDICTMENT AND PLEAD GUILTY TO CTS 1 d 2
JUDGE COTT RECOMMENDS THAT JUDGE GARDEPHE
ACCEPT THIS PLEA.
DEFT DETAINED

COTT, USMJ

16