BEYS LISTON & MOBARGHA LLP
Michael P. Beys

December 8, 2016

**VIA ECF & FACSIMILE** (212-805-7986)

The Honorable Paul G. Gardephe
United States District Judge
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007-1312

    Re:    *United States v. Kaleil Isaza Tuzman*, No. S7 15 Cr. 536 (PGG)

Dear Judge Gardephe:

    We represent defendant Kaleil Isaza Tuzman and respectfully submit this letter in reply to the government's December 6, 2016 opposition ("Opposition," ECF No. 184) to Mr. Isaza Tuzman's motion for a modification of the terms of his bail conditions (the "Motion," ECF No. 175), namely, the removal of home detention and the lessening of travel restrictions, while maintaining electronic monitoring. The bail review hearing is scheduled for Friday, December 9, 2016 at 12:30 p.m.

    In its Opposition, the government maintains its misguided position that Mr. Isaza Tuzman is a flight risk and a danger to the community. But, as detailed below, the facts relied on by the government in support of risk of flight and dangerousness are either untrue, distorted, or inherently unreliable. For example, the government's Opposition relies largely on the self-serving hearsay statements of co-defendant Omar Amanat, an individual who has a proven history of claiming he is being physically threatened during business disputes. And the allegations relied on by the government are the very same ones it knew about when it agreed to recommend Mr. Isaza Tuzman's release solely on electronic monitoring. The government's about-face and continued insistence upon home detention, despite all the evidence proffered in our moving papers, is perplexing and punitive.

    Remarkably, the government's Opposition fails to rebut the following:

- **The government ignores the well-reasoned conclusions of Mr. Isaza Tuzman's court-appointed mental health experts that home detention is impairing the defendant's much-needed mental health treatment.** Both his therapist and psychiatrist agree that Mr. Isaza Tuzman should be removed from home detention in order to progress in his mental health treatment, which is much needed because he suffers from PTSD and depression. These court-appointed professionals are obligated to carry out

825 Third Avenue, 2nd Floor, New York, NY 10022
Main: 646.755.3600 • Fax: 646.755.3599
www.blmllp.com

their duties to the Court and Pretrial Services, with candor and forthrightness. They do not shade their views. The fact that they have spoken with such uniformity speaks volumes.

- **The government fails to credit the recommendation of Pretrial Services to eliminate home detention.** The government's only mention of that recommendation is reduced to a footnote that merely references Pretrial Services's preference for travel restrictions. After having supervised Mr. Isaza Tuzman for nearly 5 months, Pretrial Services recommends against home detention, and has concluded that stand-alone GPS monitoring would be sufficient to reasonably assure Mr. Isaza Tuzman's future appearance and the safety of the community. That conclusion deserves deference, particularly since the government has offered no explanation for why electronic monitoring – which would provide Pretrial Services a minute-by-minute account of Mr. Isaza Tuzman's whereabouts 24 hours a day and 7 days a week – is insufficient to achieve the goals of the Bail Reform Act.

- **The government fails to reference let alone satisfy its high standard of proof for dangerousness, which must be by clear and convincing evidence.** 18. U.S.C. § 3142(f); *see United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995). Literally, the words "clear and convincing" do not even appear in the government's Opposition. Just as Magistrate Judge Maas flatly rejected any claim of dangersousness at the bail hearing in July 2015, *see* Motion, Ex. 1 at 51:1-5, this Court should similarly find that the government's evidence fails to satisfy the lower probable cause standard, let alone clear and convincing evidence. This is not surprising given that the government has proffered not a single contemporaneous piece of objective evidence to corroborate the claims of threats made by Omar and Irfan Amanat, co-defendants in this case whom the government has accused of fraud.

- **The government concedes that it reneged on an agreed-upon bail package that involved no home detention, which the government reached with knowledge of the allegedly "threatening" emails it now relies on to support a finding of dangerousness.** Leaving aside the merits of the allegations – which we vigorously dispute below – the government's agreement for several months not to seek home detention for Mr. Isaza Tuzman  calls into question whether the government actually believes the content of the emails. It is noteworthy, of course, that the government has proffered not a single contemporaneous piece of objective evidence to corroborate the fanciful claims of threats made by Omar and Irfan Amanat, co-defendants in this case whom the government has accused of fraud.

In short, the government's analysis is deeply flawed, relies on "evidence" that should nto be credited, and the position it takes is unnecessarily punitive to Mr. Isaza Tuzman. The government cannot meet its high burden to show that the proposed bail conditions, which include continued electronic monitoring by Pretrial Services, would be insufficient to ensure Mr. Isaza Tuzman's future appearance and the safety of the community. Accordingly, the Court should modify Mr. Isaza Tuzman's conditions of bail to remove home detention and expand his

permissible travel.

>   **A. The Government's Allegations Of Dangerousness, And Its Reliance on Co-Defendant Omar Amanat's Statements, Are Not Credible and Fall Short of Satisfying the Government's Heightened Burden of Proof**
>
>   *1. The Amanats' Claims Of Being Threatened Are Untrustworthy*

*First*, the emails on which the government relies only prove Mr. Isaza Tuzman's lack of violence. Opposition, Ex. C, D. As discussed in our moving brief, the 2009 email exchanges were selectively excerpted by the government for many months, and read in context, they do not support any claim of threatened or actual violence. As revealed in those exchanges, Mr. Isaza Tuzman believed that Mr. Amanat had defrauded KIT digital of millions of dollars, and was trying to get money back for his company as a fiduciary. Far from threatening physical violence, Mr. Isaza Tuzman simply said he "will do everything within my power and *within the limits of the law* to enforce KIT Digital's right and take action where appropriate." Motion, Ex. 12 at 3. Nowhere in any of these emails does Mr. Isaza Tuzman remotely threaten physical violence. For example:

- Opposition, Ex. E – In an April 29, 2009 email from Mr. Isaza Tuzman to Irfan Amanat, Mr. Isaza Tuzman writes that he will "hold [Irfan] responsible" for "steal[ing] my [Mr. Isaza Tuzman's] money and then . . . refus[ing] to make good? You make me stick to my stomach. SICK TO MY STOMACH. BE A MAN FOR ONCE IN YOUR LIFE AND LIVE UP TO YOUR OBLIGATIONS." Nowhere in this email does Mr. Isaza Tuzman remotely suggest or convey a threat to Irfan Amanat. Opposition, Ex. E at 1 (all capitals in original).

- Opposition, Ex. C – In a March 26, 2009 email, Mr. Isaza Tuzman responds to Omar Amanat's allegations that he "hired 'special collection agents' from Colombia and Spain to pursue the collection efforts;" and to Amanat's statement that "I believe in the sanctity of human life, even if you loose [sic] all your money or someone robs it from you, killing is unacceptable. Kaleil has told me he believes it is ethical and justifiable under those circumstances. I believe this is what Kaleil was referring to earlier about me and him coming from 'two very different ethical places.'" In his response, Mr. Isaza Tuzman sets the record straight, making clear both that he was *not* threatening violence and that he was aware of Amanat's ruse: "ACTUALLY, THIS IS NOT AT ALL WHAT I MEANT WHEN I REFERRED TO TWO VERY DIFFERENT ETHICAL PLACES, BUT YOU KNOW THAT. … <u>YOUR 'SPECIAL COLLECTION AGENTS' AND THREATS AND SANCTITY OF HUMAN LIFE COMMENTS ARE ALL A RUSE THAT HIDE THE SIMPLE FACT THAT MONEY WE SENT YOUR BROTHER DISAPPEARED INEXPLICABLY AND WITHOUT AN AUDIT TRAIL</u>…" *Id.*, Ex. C at 2 (all capitals in original; underlining added).

- Opposition, Ex. C – In the next section of the same email exchange, Mr. Isaza Tuzman again responds to Omar Amanat's false claims that "collection agents 'made contact'" with his

associate; and that he "received a call" from a collection agent stating that as long 'as the funds are delivered to KIT by year end, no one in my family will get hurt.'" Having already disclaimed any violence, Mr. Isaza Tuzman states, "I AM NOT GOING TO ADDRESS THE PARAGRAPHS ABOVE, OMAR, BECAUSE YOU KNOW THAT THEY ARE RIDDLED WITH FALSEHOODS – EITHER DIRECT OR BY OMISSION.  AS I SAID BEFORE, FRAUD/THEFT HAS SERIOUS CONSEQUENCES, AND WE ARE NOT THE ONLY ONES INVOLVED HERE.  ENABLE HAS BILKED A LOT OF PEOPLE.  I WILL DO EVERYTHING WITHIN MY POWER, AND **WITHIN THE LIMITS OF THE LAW**, TO ENFORCE KIT DIGITAL'S RIGHTS AND TAKE ACTION WHERE APPROPRIATE. THE 'CLEAN-UP' DOCUMENT I THINK REPRESENTS A CONSTRUCTIVE STEP FORWARD."  Here, far from threatening violence, Mr. Isaza Tuzman tells Amanat he will employ strictly lawful means to collect his debt and offers a legal document as a "constructive step forward."  *Id*. at 2-3 (all capitals in original; underlining and bold added).

- Opposition, Ex. C – Additional statements Mr. Isaza Tuzman makes in the same email exchange similarly show that he intends to act not only lawfully, but also ethically, professionally and constructively.  These statements include: "THE SOLUTION NEEDS TO BE MUTUAL, AND WE ALL NEED TO WORK PRODUCTIVELY;" "WE HAVE THE OPPORTUNITY TO FIX THIS IN A POSITIVE WAY FOR ALL CONCERNED.  I AM FINE FOR THIS EMAIL TRAIL TO STOP AND FOR US TO FOCUS ON THE SOLUTION," and "LET'S AGREE TO DISAGREE AND MOVE FORWARD." *Id*. (all capitals in original).  These statements further disprove any actual or threatened violence by Mr. Isaza Tuzman and in fact speak to Mr. Isaza Tuzman's rationality and level-headedness..

- Opposition, Ex. D – In another April 29, 2009 email from Mr. Isaza Tuzman to Irfan Amanat, Omar Amanat and others, Mr. Isaza Tuzman forwards legal documents and again makes clear that he is lawfully trying to collect a debt owed to his company: "Given the sequence of events (money lost within days of deposit, numerous lies and mischaracterizations, Irfan's commitment to myself and other executives at KIT digital that he would personally guarantee Enable funds, etc.), these documents are very generous to Irfan." *Id*., Ex. D at 2.

- Opposition, Ex. F – In a May 2010 email exchange Mr. Isaza Tuzman responds to Omar Amanat's complaint that "Your arbitrary and capricious deadlines are what they are … All of the conditions in [the settlement agreement] have been unequivocally met … if you choose to dispute this we will seek to protect our rights to the fullest extent of the law." *Id*., Ex. F at 2 (emphasis added).  In response, Mr. Isaza Tuzman writes, "Whatever putz … You are the most incredible bullshit artist I have met in my life." *Id*. at 1.  The fact that the two businessmen are bickering about "arbitrary and capricious deadlines," standard fare in any business negotiation, underscores that there were never any collection agents or threats of violence a year earlier.

Far from showing dangerousness, or a propensity for violence, the above emails prove that Mr. Isaza Tuzman was merely trying to collect on a debt, from two brothers who owed his

company a debt and who, at the time, he believed had defrauded his company.  He makes no threats of violence, disclaims having made any threats of violence or having hired "special collection agents," even when baited on the subject, and quite to the contrary, expressly states that he is *not* making a threat of violence.

*Second*, that Omar and Irfan Amanat claim in these emails and elsewhere that Mr. Isaza Tuzman threatened them is part of a proven *modus operandi* to make accusations of threats of violence when being legally pressed to repay business obligations. Presumably, this is done to elicit sympathy, create a record trail of signing settlements "under duress", and to distract from their own wrongdoing.

The government relies on Irfan Amanat's assertion that Mr. Isaza Tuzman tried to intimidate him, on one occasion claiming Mr. Isaza Tuzman "screamed he would '**hunt me down**' because I stole his money' and I couldn't hide, if I didn't sign [a settlement agreement] he would come after me." Opposition at 8 (quoting Ex. E at 1). This is not the first time the Amanat brothers have accused a creditor of screaming  "hunt me down."  In a high profile dispute involving Aman Resorts and Russian billionaire Vladislav Doronin, Omar Amanat claimed in his March 2014 court documents that Mr. Doronin made the exact same threat to him – using the *exact same words* – when Mr. Doronin realized Amanat had defrauded him of millions of dollars:

> Mr. Amanat met with Mr. Doronin in order to attempt to resolve the difference between the two of them.  In the event, Mr. Amanat ended up having a heated discussion with Mr. Doronin ...  During this conversation, Mr. Doronin said to Mr. Amanat: "if I feel you tried to screw me *I will **hunt you down** and shoot you*."

Excerpt of Claim filed by Aman Resorts in the High Court Of Justice, Chancery Div., at 2 p. 10, ¶ 37.1, attached hereto as Exhibit 2 (emphasis added).

The fact that Amanats' claim of threats is manufactured is evidenced on the face of the email chain relied upon by the government.  Indeed, in Exhibit E to the Opposition, Mr. Isaza Tuzman emails Irfan Amanat on April 29, 2009 imploring Irfan to "be a man for once in your life and live up to your obligations."  In response, Irfan agrees to sign a settlement agreement and asks Mr. Isaza Tuzman not to call Irfan's "house and threaten me again." Then nearly two years later on February 5, 2011, Irfan's brother, Omar, *forwards the email chain just to his brother* and asks, "What did he say when he called and threatened you?" Irfan replied purporting to quote Mr. Isaza Tuzman:  "[h]e screamed he would 'hunt me down' . . . " Opposition, Ex. E at 1.  Again, the "hunt me down" threat mirrors exactly the one allegedly made to Omar by his litigation adversary in the Aman resorts dispute, under similar circumstances. *See* Ex. 2.  The fact that Omar and Irfan Amanat are revisiting a purported threat two years after the fact, demonstrates that this was a contrived exchange in an effort to manufacture a threat where none existed.  It is highly plausible that Omar Amanat was resorting to a his *modus operandi* of papering a non-existent threat when he baited his brother Irfan to reply with the "hunt me down" language two years after the fact.

The government also relies on an FBI 302 that describes a statement Omar Amanat volunteered to law enforcement following his arrest. This statement only proves, once again, the *modus operandi* described above. "[W]ithout being asked about it," Omar Amanat volunteered to the agents while inside the Pretrial Services waiting room his story about Mr. Isaza Tuzman threatening Omar while Omar and his wife were in a hospital in the Czech Republic for the birth of their first child. Opp., Ex. H. There is no corroboration or credible evidence to support this accusation, and Mr. Isaza Tuzman flatly denies the allegation. Given the evidence of the belated manufacturing of supposed threats, coupled with the fact that the Amanat brothers have a history of claiming they are victims to threats from business adversaries, this Court should not credit this statement, especially in the context of a bail hearing when presumably the Government is not offering to have Mr. Amanat take the stand. Simply put, these out-of-court statements by presumptive co-conspirators, which are not subject to cross-examination, do not satisfy the Government's heightened burden.[1]

Finally, the government does not and cannot dispute that it knew about the Amanats' claims of threats by Mr. Isaza Tuzman long before it agreed, in writing, to a bail package with Mr. Isaza Tuzman that did not require home detention. Motion, Ex. 1 at 50:13-21. Clearly the government did not think enough of the alleged threats to credit them during the extended bail negotiation process while Mr. Isaza Tuzman was incarcerated in Colombia awaiting extradition. The fact that Mr. Amanat made self-serving post-arrest statements with the same type of self-serving allegations that he has made in previous legal disputes does not warrant the government reneging on its agreement with Mr. Isaza Tuzman. Magistrate Judge Maas rejected the government's dangerousness argument. *See id.* at 51:1-5 (stating he was "not worried about danger to the community"). Your Honor should do so as well.

### 2. *The Government's Reliance on Other Alleged Evidence of Dangerousness Further Weakens Its Claim of Dangerousness*

In addition to its misguided reliance on Omar and Irfan Amanats' statements, the government also relies on other alleged evidence on dangerousness which further weaken its claim.

*First*, the government's reliance on a 2010 article in *Forbes* magazine is misplaced. Opposition at 6. The government quotes from the article, which purports to depict

---

[1] Omar Amanat also claimed to have filed a police report with the Montville Township Police Department regarding Mr. Isaza Tuzman's threats. Opposition, Ex. C at 2. Omar claims to have reported Mr. Isaza Tuzman's alleged threats to the FBI, and alleges that the FBI interviewed him. *Id.* He even claims that he reported the alleged incident to his alleged first cousin Huma Abedin, Hillary Clinton's Chief of Staff. *Id.* Surely, the government has the ability to track down this alleged corroboration if it existed. The fact that the government presents none only shows that Omar's emails regarding alleged threats cannot and should not be trusted.

Page 7 of 10

events from 2002, that "[b]aseball bat in hand, Tuzman said he would destroy KPE's offices and any capital improvements KPE had made unless the landlord allowed him to buy out the leases." *Id*. This statement is not to be taken literally – it is the type of journalistic embellishment that makes a more gripping story. *See* Paladino Concedes, With Baseball Bat in Hand, Wall Street Journal, Nov. 3, 2010 (describing how Republican gubernatorial candidate Carl Paladino conceded the race for governor to Andrew Cuomo: "Then Paladino brought out a baseball bat, reminding the audience of the one he said he'd bring to Albany if elected governor. He offered it to Cuomo, saying the governor-elect could use it or leave it untouched — and "run the risk of having it wielded against you."). The symbolic import of a baseball bat in negotiations between politicians and businessmen is widely recognized, and has been used for more than a century. Although part of Mr. Isaza Tuzman's job in corporate restructuring was to "play hardball" in business negotiations, especially in the particular area of work depicted in the article (leasehold renegotiations), he never actually wielded a bat or threatened anyone with violence. This embellished, out-of-context statement in a *Forbes* article is far from the type of proof the government may rely on to support a dangerousness finding.

Equally ineffective is the government's attempt to corroborate the *Forbes* article with a statement from Gavin Campion, a cooperating witness: "According to Campion, Tuzman kept the baseball bat in his KIT digital office as a reminder of the incident." Opposition at 6. In fact, Mr. Isaza Tuzman had a plaque of signed baseball bats, enclosed in glass, on a wall in his office, which was a gift from a business partner in recognition of their many deals together—with each bat representing a successful business transaction. *See* Photo of baseball bat plaque, attached hereto as Exhibit 1. Mr. Isaza Tuzman is an avid baseball fan and played college baseball. The bats cannot be removed from the glass casing, the plaque is decorative in nature, and there was never any 'incident' to be reminded of.

*Second*, later in its Opposition, the government credits, wholesale, another series of sensational statements attributed to Gavin Campion. As set forth in the Opposition, "[Campion] reported that Tuzman once pulled him aside and told him – point blank – that 'Omar [Amanat] would be killed.' Campion also explained that Tuzman would frequently declare, when referring to individuals he disfavored, 'He will wake up at the bottom of the river.'" Opposition at 8. These statements are lies. The Court should not credit Mr. Campion's uncorroborated statements. Indeed, Mr. Campion seems to have a propensity for blaming Mr. Isaza Tuzman for events in his life that are entirely unrelated to Mr. Isaza Tuzman.

For example, at his guilty plea on June 30, 2016, Campion claimed that Mr. Isaza Tuzman "ordered people to break into [Campion's] car to steal a file that had his legal notes concerning the indictment," even though as the Court noted, Mr. Isaza Tuzman was "in custody in Colombia" at the time. Sealed Affirmation of Andrea M. Griswold, dated September 20, 2016 (the "Affirmation," ECF No. 169) ¶ 5. Similarly, after Campion's release on bail and return to Australia, he claims that he was "approached, harassed and, on one occasion, punched by individuals unknown to [him];" "that his house [had] been broken into;" and that he believed "that these instances are connected to Tuzman and, specifically, are attempts by Tuzman to intimidate him and discourage [him] and discourage him from cooperating." *Id*. ¶ 7. Notably, the government never attempted to investigate these serious accusations, *id*. ¶ 10, and Mr. Isaza

Page 8 of 10

Tuzman was either incarcerated in Colombia or on home detention, in New York, under close supervision, during all relevant times. To suggest that Mr. Isaza Tuzman had anything to do with these events, is a bold accusation with potentially severe consequences to Mr. Isaza Tuzman – the Court simply should not lightly credit this uncorroborated accusation.

Finally, even if the government could prove dangerousness, it has not proven by clear and convincing evidence, that "no condition or combination of conditions will reasonably assure" the safety of the community. 18 U.S.C. § 3142(f). To the contrary, there is strong evidence that there are conditions, namely, GPS monitoring and the other conditions in place, to reasonably assure the community's safety. As set forth in its Memorandum, Pretrial Services agrees that the other conditions, including GPS monitoring, are sufficient and that "the condition of home detention [should] be eliminated." Memorandum at 2.

### B. **Mr. Isaza Tuzman Is Not A Risk Of Flight And The Government Cannot Meet Its Dual Burden Here**

The government's persistent claim that Mr. Isaza Tuzman is a flight risk fails as a matter of fact and law. Factually, Mr. Isaza Tuzman is not a flight risk, and never was one. He is a U.S. citizen with the strongest of ties to the United States. He was born and raised in Massachusetts, went to college at Harvard, worked for many years as an investment banker here in New York and owns a home in the Southern District of New York. Almost all of his family – his parents, siblings, uncles, aunts, nephews, nieces and cousins – reside in Massachusetts, Pennsylvania and Louisiana. None of his close relatives live outside the United States. Though he was working abroad in the years prior to his arrest, Mr. Isaza Tuzman still traveled in and out of the United States periodically: in fact, he traveled to Miami for business meetings, and to Cambridge, Massachusetts for his Harvard reunion, in the months immediately prior to his arrest. Unlike someone seeking to avoid arrest, he even posted his travel on various social media platforms.

Indeed, over the last several months Mr. Isaza Tuzman has further demonstrated that he is not a flight risk. Since his release on July 18, 2016, he has complied with the conditions of his bail in every respect. He communicates on a regular and frequent basis with his Pretrial Services Officer. He has appeared in Court before Your Honor, as required, on July 20, 2016, September 22, 2016, and on November 21, 2016. He has built a successful track record of court-approved travel outside this District, first to attend a friend's funeral in Wayne, Pennsylvania on August 5, 2016, then to visit his family in Western Massachusetts on two occasions in August and September, and to spend the Jewish High Holidays with his relatives in the Philadelphia area on two occasions in October 2016.

Nevertheless, the government makes three arguments to support its claim of flight risk, each of which is unavailing. First, the government states that Mr. Isaza Tuzman's "strong" "business, criminal and personal ties" to the United Arab Emirates, in particular, his ties to fugitive co-defendant Rima Jameel, make him a flight risk. Opposition at 3. This is a gross overstatement. Mr. Isaza Tuzman has not seen or spoken to Ms. Jameel in years; his relationship with her, whom he used as local counsel on transactional matters, grew out of an earlier

relationship with a larger law firm used by Jump TV, Inc. (a publicly listed company where Mr. Isaza Tuzman was a senior executive in the mid-00s). KIT digital used Ms. Jameel's firm, JB Legal and her predecessor firm Motei & Associates, due to their local registration, good reputation in the UAE and experience with international transactions. Mr. Isaza Tuzman was referred to her as a qualified lawyer, not knowing that she was a fugitive. Tellingly, Mr. Isaza Tuzman and KIT igital often hired Ms. Jameel's firms to work collaboratively with Greenberg Traurig, the "well-known, multinational law firm" referenced by the government in its Opposition, *id*. at 3. If, as the government would have the Court believe, Mr. Isaza Tuzman was attempting to use Ms. Jameel to further criminal transactions, it is a curious choice indeed to instruct her to work in concert with well-regarded U.S. law firms.

As for his daughter who lives in the UAE, her mother is a U.S. citizen and does not hold UAE citizenship. Although Mr. Isaza Tuzman has no visitation or custody rights, he is eager for her to return to the United States so he can see her more often. He has taken a number of trips in the past with his daughter in the United States.

Finally, Mr. Isaza Tuzman proactuively cancelled his UAE visa (which he had obtained for business purposes originally while with JumpTV) and he sold his apartment in the UAE several years ago. He has on numerous occasions expressed his disdain for the UAE to family and friends, including his occasional experiences of anti-semitism there. These actions are not consistent with a defendant who planned to hide there. As to Dubai and the UAE generally, Mr. Isaza Tuzman is an observant Jew, and it is one of the last places on earth – after only prison in Colombia – where he would wish to spend significant time.

<u>Second</u>, the government makes much of Mr. Isaza Tuzman's "conspicuous year-long absence from the United States." Opposition at 4. The government's suspicions are unfounded. First, there was nothing inherently "conspicuous" about Mr. Isaza Tuzman's year-long absence from the United States. Mr. Isaza Tuzman has worked on international business projects since his days on the Latin America desk at Goldman Sachs in the mid-90s and, as a result, has occasionally spent significant stretches of time outside of the country. During the time period in question, May 2014 to May 2015, Mr. Isaza Tuzman was working on his Obra Pia hotel project in Colombia, and this was in fact the most intense period of licensing and construction. Significantly, during this period, he was working with a real estate broker to find him a permanent home in Park City, Utah. *See* Declaration of Jillene Cahill, attached hereto as Exhibit 3. More importantly, he returned to America for business meetings and for his college reunion in June 2015, which the government has finally, after much resistance, been forced to concede. That ought to have put an end, once and for all, to any "suggestion" that "he was avoiding the country." Opposition at 4.

<u>Third</u>, the government claims that the defendant "possesses the means to flee." This is simply untrue. Mr. Isaza Tuzman's counsel disclosed his assets and properties, and the Court and Pretrial Services are aware of them. The government highlights that "in November 2016, Tuzman attempted to purchase" a BMW car. Id. at 5. It is true that, with the knowledge and pre-approval of Pre-Trial Services, he has been attempting to lease or purchase a four-wheel drive car since late last month, because he needs to be able to travel to and from his home in Loch

Sheldrake, New York, where the Court has allowed him to stay several nights each week. To date, he has been borrowing his friend's car, but his friend needs it back for winter.  Because of the indictment against him, Mr. Isaza Tuzman was rejected from all lease programs and was rejected for purchase financing by nearly all the dealers he contacted. For whatever reason, BMW Financial Services is the only company so far to approve financing of an SUV purchase at anything approaching a reasonable rate, and Mr. Isaza Tuzman does not possess the means to purchase a car at this time without very reasonable financing terms. Separately, as to the Patek Philippe watch and other luxury goods that were part of a specific business line, the government is still "conflating Tuzman's personal assets with KIT Capital's assets," Opposition at 5.  *See* Motion at 5-10, 18.  Mr. Isaza Tuzman is using his available means to pay for legal fees not covered by insurance, and modest living expenses. He has neither the means nor the rational motive to be a fugitive.

Thus, the "evidence" on which the government relies simply does not satisfy the government's burden here.  It is the government's "dual burden" to establish that the defendant poses a flight risk *and* that a particular condition will not "reasonably assure" the defendant's future appearance. *See United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (assuming it establishes risk of flight, "the government must then demonstrate by a preponderance of the evidence that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court." (internal citations omitted)).  In fact, our proposal to remove home detention, while still maintaining electronic monitoring under Pretrial Services' supervision, will not increase the risk of flight.  Pretrial Services will still know where Mr. Isaza Tuzman is at all times, as it does now.  Continued electronic monitoring – which Mr. Isaza Tuzman agrees to be subject to – will more than "reasonably assure" his future appearances, as Pretrial Services agrees.  The government cannot meet its heavy burden to show otherwise.

In sum, given his strong and enduring connections to the United States, along with his demonstrated record of compliance to date, Mr. Isaza Tuzman is not a flight risk and never was one.  The government cannot meet its dual burden to show either that Mr. Isaza Tuzman is a flight risk, or that the proposed condition – continued electronic monitoring, without home detention – would not "reasonably assure his presence in court."  18 U.S.C. § 3142(c)(1)(B).

We thank the Court in advance for its consideration.

Respectfully Submitted,

/s/ Michael P. Beys

_____
Michael P. Beys, Esq.
Joshua D. Liston, Esq.
*Counsel for Kaleil Isaza Tuzman*

cc.   All Counsel of Record (via ECF)
      John Moscato, Pretrial Services Officer (via email)