# EXHIBIT 6

Case 1:15-cr-00536-PGG   Document 238-6   Filed 02/14/17   Page 1 of 5

# COLOMBIA 2015 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Colombia is a constitutional, multiparty republic.  In June 2014 voters re-elected Juan Manuel Santos president in elections that observers considered free and fair.  Civilian authorities generally maintained effective control over security forces.

The government's negotiations with the Revolutionary Armed Forces of Colombia (FARC) marked significant progress with the announcement on September 23 of a six-month deadline to sign a final peace accord, an agreement on transitional justice, and a timeline for the FARC to begin disarmament within 60 days of the signing of a peace accord.

The most serious human rights problems were impunity, an inefficient judiciary, forced displacement, corruption, and societal discrimination.  An inefficient justice system subject to intimidation limited the government's ability to prosecute effectively individuals accused of human rights abuses, including former members of paramilitary groups.  The availability and influence of drug-trafficking revenue often exacerbated corruption.  Societal discrimination against indigenous persons and Afro-Colombians at times restricted the ability of these groups to exercise their rights.

Other problems included extrajudicial and unlawful killings; slow pace of investigations, trials, and indictments in cases related to extrajudicial killings; insubordinate military collaboration with members of illegal armed groups; forced disappearances; overcrowded and insecure prisons; harassment and attacks against human rights groups and activists, including death threats and killings; violence against women and girls; trafficking in persons; and illegal child labor.

The government continued efforts to prosecute and punish perpetrators of abuses, including members of the security services.  It increased resources for the Attorney General's Office, prioritized human rights cases, and employed a contextual analysis strategy to analyze human rights and other cases.  Nonetheless, the system generally failed to close out cases quickly and efficiently.

Illegal armed groups--including the FARC and the National Liberation Army (ELN), as well as organized crime groups (some of which contained former paramilitary members)--committed numerous abuses, including the following: political killings; killings of members of the public security forces and local

Although the law prohibits such practices, there were reports that police, military personnel, and prison guards sometimes mistreated and tortured detainees. Members of the military and police accused of torture generally were tried in civilian rather than military courts. The NGO Center for Research and Education of the Populace (CINEP) reported that during the year through June 30, government security forces were involved in 28 incidents of torture.

On August 17, the Attorney General's Office arrested four current and former army members (Luis Arturo Ardila Alza, Manuel Segundo Melendez Acosta, Eduardo Alberto Fuentes Marenez, and Jaider Jesus de Arco Martinez) for their alleged participation in a case of torture against a civilian carrying a large amount of money between the municipalities of Nechi and Montecristo. Allegedly the soldiers tortured the businessman to compel him to confess that the money was obtained illegally.

During the year through June, the Attorney General's Office charged three members of the security forces (one police and two military members) with torture; two of the cases occurred prior to 2015. The Attorney General's Office reported no convictions of members of the armed forces or members of illegal armed groups in cases of torture during the year through June.

CINEP reported criminal bands were responsible for at least 11 documented cases of torture during the year through June 30. In 10 other documented cases, CINEP was not able to identify the party responsible for the abuses.

**Prison and Detention Center Conditions**

With the exception of new facilities, prisons and detention centers were overcrowded, lacked adequate sanitation, and provided poor health care and nutrition to detainees. Poor training of officials remained a problem throughout the prison system.

Physical Conditions:  The national prisons had a design capacity of 78,044 individuals but were 54.8 percent over capacity. Overcrowding existed in men's as well as women's prisons. The National Prison Institute (INPEC) operated the national prisons and oversaw the jails.

The law prohibits holding pretrial detainees with convicted prisoners, although this sometimes occurred. Authorities did not hold juvenile detainees and prisoners with adults but permitted children younger than three years of age to stay in

prisons with their mothers.  As of September 21, INPEC registered 86 children living with their incarcerated mothers.

On July 21, the Superior Judiciary Council ordered INPEC to transfer persons already sentenced or issued imprisonment orders to prisons and to eliminate the overcrowding of judicial detention facilities in Bogota.  The Superior Judiciary Council stated that the maximum time that a person may remain in these judicial detention facilities is three days.  The same rules apply to jails located inside police stations.

The Inspector General's Office continued to investigate allegations that some prison guards routinely used excessive force and treated inmates brutally.  It reported that during the year through March 25, it conducted 21 investigations and issued four disciplinary verdicts.  According to NGOs working with the prison community, there were numerous allegations of sexual violence and physical violence committed by guards and other inmates.

Many prisoners continued to face difficulties receiving adequate medical care.  Nutrition and water quality were deficient and contributed to the overall poor health of many inmates.  Inmates claimed authorities routinely rationed water in many facilities.  INPEC's state of emergency in the country's prisons continued throughout the year.  It was first declared in 2013 due to overcrowding, problems with infrastructure, and poor sanitary conditions that threatened the health of the inmate population.

INPEC's physical structures were in generally poor repair.  The Inspector General's Office noted some facilities had poor ventilation and overtaxed sanitary systems.  Prisoners in some high-altitude facilities complained of inadequate blankets and clothing, while prisoners in tropical facilities complained that overcrowding and insufficient ventilation contributed to high temperatures in prison cells.  Some prisoners slept without mattresses on floors, while others shared cots in overcrowded cells.

Administration:  INPEC used a centrally managed electronic database with regular updates, and each prison also had its own local database.  Foreign diplomatic observers, however, found that the information in both systems often was not well coordinated, resulting in delays in locating foreign detainees, especially dual nationals who had both Colombian and foreign citizenships.

Some vegetarian and Muslim inmates reported difficulty receiving meals according to their needs.  Prisoners generally could submit complaints to judicial authorities, request investigations of inhuman conditions, and request that third parties from local NGOs or government entities, such as the Ombudsman's Office, represent them in legal matters and aid them in seeking an investigation of prison conditions.  Although authorities investigated complaints, including complaints of prison guards soliciting bribes from inmates, some prisoners asserted the investigations were slow and the results, not accessible to the public.

Independent Monitoring:  The government permitted independent monitoring of prison conditions by local and international human rights groups that exercised a high degree of independence.  INPEC required a three-day notice before granting consular access.  Some NGOs complained that authorities, without adequate explanation, denied them access to visit prisoners.

Improvements:  In May, INPEC launched a campaign to raise awareness and strengthen a culture of human rights within the institution.  The Office of the Director General of INPEC developed a strategy to identify and combat the most common violations of human rights in the prison system.  On August 10, the Ministry of Justice established by decree the Monitoring Committee on the Conditions of Detention of the Penitentiary System.  During the year the government worked to provide staff gynecologists at women's prisons.  As of September 21, there were gynecologists on the medical staffs of the women's prisons in Bucaramanga, Ibague, and Jamundi, and inmates at prisons elsewhere in the country had access to outside gynecologists.

### d. Arbitrary Arrest or Detention

Although the law prohibits arbitrary arrest and detention, there were allegations that authorities detained citizens arbitrarily.  CINEP reported 87 cases during the year through June 30.

### Role of the Police and Security Apparatus

The Colombian National Police (CNP) is responsible for internal law enforcement and is under the jurisdiction of the Ministry of Defense.  Formed in 2011, the Migration Directorate, part of the Ministry of Foreign Affairs, is Colombia's immigration authority.  The CNP shares law enforcement duties with the Attorney General Office's Corps of Technical Investigators (CTI).  In addition to its responsibility to defend the country against external threats, the army shares