UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
UNITED STATES OF AMERICA            :
                                    :
        v.                          :
                                    :   No. S8 15 Cr. 536 (PGG)
KALEIL ISAZA TUZMAN, OMAR           :
AMANAT, and IRFAN AMANAT,           :
                                    :
                Defendants.         :
                                    :
------------------------------------------------------------- x

## SECOND DECLARATION OF AMANDA L. BLAUROCK

AMANDA L. BLAUROCK, pursuant to 28 U.S.C. § 1746, declares the following under penalty of perjury:

1. I submit this declaration in support of Kaleil Isaza Tuzman's motion for discovery and a hearing regarding the Government's conduct in this case. I am counsel to Kaleil Isaza Tuzman ("Kaleil"). My work background is detailed in the two prior declarations that were submitted in this case in support of Kaleil's motion to seek dismissal of the arrest warrant. (*See* Dkt. #24-1 (Declaration of Amanda L. Blaurock, dated November 20, 2015), Dkt. #33 (Supplemental Declaration of Amanda L. Blaurock, dated December 2, 2015).) As a courtesy, copies of my previous declarations (without exhibits), which were filed under seal, are attached to the Court's courtesy copy of this declaration as Exhibit 1 ("Blaurock Decl.") and Exhibit 2 ("Blaurock Supp. Decl.").

2. Soon after Kaleil was arrested, and placed at the "Martires" jail in Bogotá, Colombia, I contacted the U.S. Embassy for assistance in moving him to a safer location. Throughout the time that Kaleil was incarcerated in Colombia, and especially while he was housed at La Picota, I repeatedly communicated with Robin Busse of American Citizen Services ("ACS"), who worked at the U.S. Embassy in Bogotá, about the conditions of Kaleil's confinement and asked for his help in ensuring his safety.

1

3. While Kaleil was imprisoned in Colombia, various family members and friends reached out to U.S. Government officials to voice their concerns about Kaleil's safety and to request assistance in making sure that he was safe and that he would be sent to the United States on an expedited basis. Attached as Exhibit 3 are copies of some of the emails from friends and family.

4. On October 9, 2015, I spoke with Mr. Busse by telephone. During that conversation, Mr. Busse stated that all inquiries regarding U.S. citizens in Colombia should be sent to him, and not directly to the U.S. Ambassador to Colombia, Kevin Whitaker. He also asked that I have Kaleil's family and friends stop sending him and Ambassador Whitaker correspondence because the communications were distracting him from his responsibilities, and did not help Kaleil's cause. Attached as Exhibit 4 is a copy of an email chain between me and Mr. Busse in which I confirmed in writing his request that I ask Kaleil's family to stop writing letters to his office in order to give him an opportunity to do his job without distraction.

5. Although I spoke more regularly with Mr. Busse, I also tried to communicate with Marlon Cobar, the judicial attaché at the U.S. Embassy in Bogotá. I called him the week Kaleil was first detained and asked to meet with him in person in order to better understand the extradition process in Colombia, and to seek assistance in getting Kaleil to the United States as quickly as possible. We spoke for about ten minutes, but he refused to meet with me, and did not return a number of my calls to him after that. We eventually spoke again in early November 2015, when I was having trouble gaining access into La Picota. This conversation sticks out in my mind because Mr. Cobar was very confrontational and rude during the telephone call. He told me that he could not help me to gain access to La Picota, but said that I should see if Mr. Busse could help me. He stated that he had returned my call only to "set the record straight" in that he claimed I had made many factual inaccuracies in my communications with the U.S. Embassy. When I challenged him to identify and refute the alleged inaccuracies, he said that he only had ten minutes to speak with me because he had to attend to other important matters. I told him that instead of being adversarial with me, he should

be working with me to ensure a U.S. citizen's safety in the Colombian prison system. As a courtesy, a copy of the email chain between me and Mr. Cobar, which includes the first email that he sent to me on October 23, 2015, as well as my reply to him on November 3, 2015 (filed previously with redactions, *see* Dkt. #13-11), is attached to the Court's courtesy copy of this declaration as Exhibit 5.

6.  After Kaleil was transferred to La Picota, I also frequently communicated with the Vice Warden there. In order to obtain entry into La Picota, I often had to receive final authorization from the Vice Warden, which meant that I spoke with her almost daily. She did not speak English so I communicated with the assistance of others who interpreted for me (there were several officers in the main office and visiting lawyers that could and did interpret our conversations). More than once during those discussions, the Vice Warden stated that as soon as the U.S. Embassy approved it, Kaleil would be transferred to Erre Sur (or "R Sur"), a safer unit at La Picota that houses individuals charged with white collar crimes. She also made it clear that she understood that Kaleil was not safe where he was currently being detained (the extradition ward) and her preference was to move him to R Sur. She left me with the clear impression that although INPEC controlled the prisons throughout Bogotá, in situations involving an extraditable prisoner, transfers within the prison system would not be made without the request or approval of government officials from the country seeking extradition – here, the United States.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 13, 2017.

_____
Amanda L. Blaurock

3