UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
UNITED STATES OF AMERICA   :
   :
      v.   :
   :   No. S8 15 Cr. 536 (PGG)
KALEIL ISAZA TUZMAN, OMAR   :
AMANAT, and IRFAN AMANAT,   :
   :
      Defendants.   :
   :
------------------------------------------------------------------ x

## DECLARATION OF KALEIL ISAZA TUZMAN

    KALEIL ISAZA TUZMAN, pursuant to 28 U.S.C. § 1746, declares the following under penalty of perjury:

    1.  I am a defendant in this action. I submit this declaration as part of my motion to obtain discovery and a hearing on the Government's conduct.

    2.  From September 7, 2015 to September 15, 2015, I was imprisoned at "Mártires", a maximum security jail in Bogotá, Colombia. From September 15, 2015 to November 21, 2015, I was imprisoned at "La Picota", a maximum security prison in Bogotá, Colombia. On November 21, 2015, I was transferred to the "Bunker", a maximum security jail at the Colombian Attorney General's Office in Bogotá, and remained there until I was extradited to the United States on July 14, 2016.

    3.  At La Picota, I was incarcerated in cellblock 16 of one of that prison's central towers. I am unaware of any individual who was incarcerated in either cellblocks 16 or 12 (the adjacent cellblock also designated for individuals awaiting extradition) for anything other than charges of violent and/or drug-related crimes. I had two cellmates while at La Picota: one was accused of multiple homicides and the other of distributing large amounts of cocaine.

    4.  In cellblock 16, there was less than one hour of cold, running water per day. La Picota is at

high altitude, with no heating; I would estimate average cellblock temperatures to be 50-55 degrees. Due to the lack of running water, the toilets were rarely functional, causing urine and fecal matter to build up within the cells and in the public bathroom area, which was within several yards of the commissary. Food rations, when delivered, were often contaminated. Stomach ailments and infections were rampant, and there was limited-to-non-existent medical care. On one occasion, one of my roommates vomited and defecated uncontrollably in our locked 5' x 7' cell for approximately many hours before being let out to receive medical attention. On another occasion, I had an infection that shut my right eye completely for over a week, without any medical attention. On cellblock 16, access to potable water, edible food, basic medical care, and the ability to meet with one's legal counsel all required the regular payment of bribes to prison guards. Occasionally, inmates were forced by the guards to stand naked in the cellblock common area while trained dogs urinated on our clothing and mattresses.

5. I would estimate that at least one-quarter of the inmate population on cellblock 16 functioned as "slaves" in prison-speak—meaning they were subjected to daily acts of subservience and humiliation (including but not limited to harassment and assault) in order to obtain basic needs like food, water and medication.

6. Since I had no criminal connections and arrived to cellblock 16 without the "protection" afforded to members of a drug gang or mafia group, I was immediately deemed a "fat cow"—a term used to refer to someone who can be "milked" for personal gain or gratification—and lived in constant fear of extortion (by both inmates and prison guards and officials), ▓▓▓▓▓▓▓▓ ▓▓▓▓ and the well-being of my loved ones. I was repeatedly threatened (including threats of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓), subjected to extortion demands, assaulted and emotionally tortured through a variety of means, including threats to my family, friends, attorneys and business interests. Photographs and other indicia were sometimes shown to me by extorting parties to make it clear to

me that they had "access" to my loved ones and business interests outside of the prison—even in the United States. In addition to two prior ███████████████, on October 14, 2015, ██ ████████████████████████████████████████████████████████████████████ ███████████████ I personally made the U.S. authorities aware on several occasions of both the conditions and the imminent danger to which I was subjected at La Picota. I also made these authorities aware of the threats, extortion and assaults that had occurred against me. In particular, I warned U.S. Embassy consular affairs officer Robin Busse of the imminent dangers to me well in advance of ████████, and begged to be moved to a safer location. I also met with Mr. Busse on several occasions after October 14, 2015, as well as Mr. Busse's replacement at the U.S. Embassy, Cassandra Payton, at both La Picota and the Bunker. At these meetings, I explained in detail to the U.S. government officials with whom I met the conditions and dangers to which I was subject, and begged for their intervention.

7. As a result of the conditions and assaults while incarcerated, I suffer from post-traumatic stress disorder and have, at times, suffered from depression. I experience insomnia, nightmares, inability to focus and, ██████████████████. (I did not suffer from any of these conditions prior to my incarceration and ███ at La Picota.) During the day, I struggle with focusing on and understanding my lawyers' questions. Because of the PTSD and lack of sleep, I am also irritable and suffer from mood swings. I have recently and reluctantly begun to take anti-anxiety medication and sleep aids prescribed by court-appointed mental health professionals, but I feel the medication dulls my senses and affects my ability to think clearly. ████████████████████████████ ████████████████████████████████, which were left untreated by the Colombian prison authorities (despite numerous requests for help to Colombian and U.S. authorities) for over two months, and I am advised by my doctors likely resulted in or exacerbated other health issues (including severe stomach issues, ████████████████████████████████). I spent a significant

3

period of my time incarcerated in various states of untreated physical malady, ███████████, eye infections and stomach viruses.

8. While incarcerated in Colombia, despite threats of reprisal by the Colombian prison authorities, I repeatedly made statements to the Colombian and international press, and filed legal complaints regarding the conditions of my confinement—including filings with the Colombian Attorney General, the Colombian Inspector General, the INPEC national directorate and the INPEC Judicial Police. My attorneys and family also spoke to officials at the U.S. Embassy in Colombia, the U.S. State Department, the U.S. Congress and the U.S. Attorney's Office in the Southern District of New York. By letter dated October 28, 2015, I initiated a formal complaint shortly thereafter with the Inter-American Commission on Human Rights (the "IACHR"), which was signed by over 150 other inmates on cellblocks 12 and 16 of La Picota, and detailed the conditions there. My understanding is that the IACHR complaint was "accepted" and is being investigated by the Inter-American Court on Human Rights.

9. I reached out to law enforcement in Colombia to address the crimes of which I was a victim, while being mindful of the enhanced risks to me resulting from being labeled a "snitch". I made sworn declarations to INPEC Judicial Police in October and November 2015 regarding intimidation, extortion and the various other dangers in cellblock 16. On November 26, 2015, while at the Bunker, I provided a detailed, sworn declaration regarding certain conditions and events at La Picota to two officials from the Colombian Inspector General's Office. On June 24, 2016, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. At all times, I cooperated and was proactive with Colombian law enforcement, despite substantial risk of reprisals.

10. Despite implied and explicit threats to me and my family, throughout my incarceration in

4

Colombia I found ways (directly and through family and friends) to make statements to the national and international press regarding the conditions of incarceration which I experienced, and my views on the precedents set by my case. For example, in late September or early October 2015, I was interviewed by a reporter on behalf of *Semana*, the most popular Colombian news magazine and that interview was published on October 3, 2015. (Dkt. #21-2.) In October/early November 2015, and again in the summer of 2016, I also gave interviews to the *Miami Herald* (*See* Ex. 1 and 2), to *Los Informantes* (Colombia's most watched weekly television investigative news program*)*, and to *La Radio W*, a popular, world-wide Spanish-language radio broadcast. As I explained in my interview with *Los Informantes*, there was constant extortion, violence, and sexual assaults at La Picota. (*See* Dkt 21-2 at 5.) I was interviewed by *The Huffington Post* for an article entitled "Is the U.S. Using Colombia's Prison System as a Black Site? The Story of Kaleil Isaza Tuzman", that was published on March 4, 2016 (*see* Ex. 3), in which I described the circumstances of my imprisonment, and my views on the violations of human rights and due process inherent in the extradition system between the U.S. and Colombia.

11. On various occasions, I was told by Mr. Busse (consular affairs officer), Miguel Rodríguez Rey (warden of the Bunker) and other officials that a Federal Bureau of Investigation ("FBI") agent would visit me to investigate the assaults and take a statement from me. Although I and my lawyers repeatedly asked for this investigative visit, no FBI agent ever came to see me in any location. Yet, I frequently observed U.S. law enforcement and other U.S. officials visiting other prisoners while I was incarcerated at La Picota.

12. Given the subhuman conditions and ▮▮▮▮ I was enduring in cellblock 16 at La Picota, I made frequent requests (both formal and informal, oral and written, directly and through counsel, friends and family members) to be brought to the U.S. under lock and key to face trial or, at least, to be transferred to a safer location within the Colombian prison system. The imminent threats to me

were explicitly described and these requests occurred both *before* and after ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮. A variety of Colombian officials, including but not limited to Warden César Augusto Ceballos (at La Picota), Colonel Efraín Oswaldo Aragón Sánchez of INPEC (at La Picota), Major Magnolia Angulo (at La Picota), Warden Miguel Rodríguez Rey (at the Bunker) and Vice-Warden Blanca Janeth Torres (at the Bunker) all made it clear to me that, because I was a prisoner awaiting extradition to the United States, I could not be transferred anywhere without the request or the approval of the U.S. government.

13. For example, during my incarceration at La Picota, I had several in-person conversations with Warden Ceballos, in which he told me that he "wanted me out" of La Picota but that he could not move an extraditable prisoner – not even move me to Erre Sur (or R Sur), which is an area within his own facility reserved for white collar and non-violent prisoners – unless approved by the United States. He told me that the United States was withholding this approval because I was "making noise." On at least three occasions, I was called to speak with Warden Ceballos in his office on the first floor of one of La Picota's main towers. During at least one of those conversations, he said he wanted to "wash his hands of me" because I was a "trouble maker," and he told me to speak to the U.S. Embassy because the United States was not letting him transfer me to a safer location or facility. Warden Ceballos also warned me to be careful about what I said to the press, and on more than one occasion, he made it clear to me that I would not be moved to a safer area of La Picota without paying him or a proxy a very substantial bribe.

14. In or about October 2015, Colonel Efraín Oswaldo Aragón Sánchez, the national Director of Human Rights at INPEC, visited me at La Picota. During that visit, he told me in words to the effect that if I continued to "make noise," INPEC would move me to an even worse prison, such as La Cómbita. He also conveyed to me that the U.S. Embassy could ask INPEC to have me moved to R Sur at any time "if they wanted to" and that this request would be honored, but that the U.S. had

"no interest" in doing so. Colonel Aragón Sánchez explained, in words and substance, that I remained in the extradition patio at La Picota (Patio 16) because this is "what your country [the U.S.] wants."

15. I understand that there was an important meeting in late October or early November 2015 at the U.S. Embassy in Bogotá, Colombia between high-level officials in the United States and Colombian governments. I learned of certain details of this meeting from an individual who participated in the meeting (who for fear of retaliation asked not to be named), as well as Warden Ceballos. I understand that the meeting involved, among others, General Jorge Luis Ramírez Aragón (National Director General of INPEC), Colonel Aragón Sánchez and Marlon Cobar (Judicial Attache at the United States Embassy). I was told that the Colombian officials stated at the meeting that they preferred to transfer me to a different facility given the attention my case was drawing in the press, and would do so at the United States' request. I was further informed that, on behalf of the United States, Mr. Cobar said that he did not want me moved.

16. During one of Mr. Busse's visits at La Picota, when I was explaining the conditions and threats under which I was living, he advised me that, in his experience, the "easiest way through this" (and ultimately be transferred quickly to the United States) was to speak with my lawyers, agree to plead guilty and to cooperate with the United States prosecutors. He also warned me on a couple of occasions that I should be wary of speaking to the press, explaining that doing so could put me at more risk in La Picota and make "everyone less cooperative". He said to me on several occasions, words to the effect that the more attention around my case, the less likely the United States would be to help me.

17. One evening a day or two after I was transferred to the Bunker, Warden Rodríguez Rey brought me out to the concrete patio immediately outside the cellblocks, and told me that he knew about the assaults against me at La Picota. He told me that he understood the danger I had been in,

and that he had been concerned for my safety and life in the context of my transfer to the Bunker due to the unusual resistance within INPEC he and his superior at the Colombian Attorney General's Office confronted when the Attorney General's Office attempted to have me moved from La Picota to the Bunker. He also told me that the United States government communicated with the International Affairs Office of the Colombian Attorney General on the afternoon of Friday, November 20, 2015, and requested that I be moved from La Picota to the Bunker. He told me that INPEC would have moved me earlier, but had not received the instructions to this effect from the United States. Warden Rodríguez Rey made it clear to me that my movement to the Bunker was the direct result of a request made by the United States government. He said that he and his superior had knowledge of and communication with (and would continue to have communication with) Mr. Cobar, the FBI and other United States government agents and warned me to the effect of "don't cause any more trouble, and everything will work out".

18. The Bunker is known throughout Colombia as the country's most secure, super-max holding facility. While at the Bunker, Warden Rodríguez Rey made it clear to me on several occasions that the United States and Colombian governments saw me as a "headache" and that if I continued to "cause trouble" (e.g., speaking to the press, complaining about solitary confinement, requesting specialized medical care, etc.), I would be sent back to INPEC's custody—La Picota, or worse.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 14, 2017.

_____
Kaleil Isaza Tuzman