# EXHIBIT 1

AMERICAS    NOVEMBER 24, 2015 3:00 AM

# Hard times: U.S. extradition system strands detainees abroad

**HIGHLIGHTS**

Locked up on U.S. warrants abroad, detainees say they're being denied basic rights

Detainees describe unsanitary conditions and legal intimidation

U.S. is seeking to expand extradition powers in South America




   1 of 7   



BY JIM WYSS
*jwyss@miamiherald.com*

BOGOTA, COLOMBIA — It was going to be a big week for Hugo Enrique Romero. On Thursday, he was heading home to Miami with his girlfriend and on Sunday, they were going to get married.

But at 4 a.m. on Jan. 29, on the dawn of their departure, police came banging on his door with weapons drawn. As his fiancee and family looked on, Romero was shoved to the ground and notified that he was wanted in the United States on drug trafficking and money-laundering charges.

Romero, a 53-year-old dual U.S.-Colombian citizen who once sold interior decorations and auto-parts near Pembroke Pines, was in shock.

ADVERTISING



Romero says he's innocent and wants to prove it in U.S. courts as quickly as possible. But almost a year later, he remained locked in Bogotá's notorious La Picota prison, in a 9th floor bunker designed for Colombia's highest profile and most dangerous criminals.

"I've never even had a parking ticket," Romero explained. "I feel like a victim of the judicial system."

From 2002-2014, the United States extradited 1,769 people from Colombia, and hundreds more are dragged into the system each year.

The Miami Herald interviewed more than 10 people who are either awaiting extradition or have passed through the system. All of them claim they were denied basic rights a U.S. prisoner might expect: running water, sunlight, minimal levels of hygiene, access to medical care and full disclosure of the charges against them. Some claim U.S. law enforcement questioned them without giving them access to a lawyer or informing them of their rights.

As the U.S. is mulling laws that could dramatically expand extradition from Andean nations like Colombia, it raises questions about what responsibility, if any, the United States might have for the inmates it locks up abroad.

## Hard Time

Colombia warehouses detainees awaiting transfer and trial — primarily to the United States — in Patio 12 and 16 of La Picota. It's a cold bunker atop a prison block that receives no direct sunlight, has less than three hours of running water per day and is isolated from other inmates and amenities.

There, in this prison within a prison, detainees say they spend up to 12 hours a day locked in a communal area with little supervision.

Kaleil Isaza Tuzman, a 44-year-old U.S. citizen who was detained in September on allegations of U.S. securities fraud and lying to regulators, says it's a chaotic and dangerous environment where the innocent — and those accused of lesser crimes — are housed together with hardened criminals.

"There is limited food and water and for most of the day there are no guards present, which creates a 'Lord of the Flies' type environment," said Isaza, who claims to have received physical threats and been the subject of extortion attempts. "I'm accused of a nonviolent financial crime that I'm innocent of and yet I'm in a medieval maximum security prison with no recourse to habeus corpus or due process."

———————————————————————— 66 ————————————————————————

Colombian court documents paint an ugly picture of the two pavilions where the "extraditables" are held. After an inspection in 2013, the court found the wards had poor ventilation and drainage, and only sporadic running water. They also acknowledged that the absolute lack of sunlight was a violation of Colombian human rights.

The harsh conditions might not be surprising for Latin American convicts, but the vast majority of the detainees in the unit, like Romero and Isaza, haven't been declared guilty of anything, they're simply awaiting their day in court.

Inmates described toilets clogged with feces due to the lack of water and having to go days without showers. One former prisoner said the cells smelled so bad he resorted to smearing deodorant on the walls. The little water that is available isn't potable, so inmates have to line up, sometimes for hours, to boil it just for a drink.

Andres Felipe Rios, 51, who has been in the extradition holding area for about six months on drug charges, says he spent years in notorious prisons in New York and Kentucky. Even by those standards, these conditions are grim, he claims.

"There, at least, you're treated like a human," he said. Here, "we're practically living like caged animals."

Rios, who is the elected human rights representative for the section, said many inmates have developed skin conditions due to the lack of sunlight. Infections and illnesses sweep through the ward regularly. When one detainee suffered a heart attack last year, he had to be escorted down nine flights of stairs across the prison yard and up more stairs to the infirmary, Rios said. The man died shortly after.

## High Security

Vicente Ostos, a regional director of Colombia's prison system who oversees the extradition ward, says many of the problems come down to architecture. There's not enough pressure to take the water up to the ninth floor, and the height of the tower keeps the block cold amid the Andean air.

Asked why — even after the court inspection — the prisoners don't get any direct sunlight, he said the risks are too high.

"It's an issue of security and movement," he said. "Moving inmates means we need extra security," which is not available.

Responding to allegations of poor medical care, Ostos said that, due in part to last year's death, a new infirmary has been placed closer to the extradition block, but inmates disputed that claim.

When Colombia resumed extradition in 1997, the system was designed for powerful drug dons, guerrilla commanders and paramilitary leaders wanted in the U.S. The detainees tended to be extremely dangerous and well connected, necessitating the isolation.

But lawyers and researchers say the extradition system seems built on the presumption of guilt. Amid the harsh conditions, FBI and Drug Enforcement Agency (DEA) officials often press detainees for information.

Narco-traffickers, for example, might be encouraged to give up routes and associates in exchange for reduced jail time, said José Guarnizo, who wrote a book about Colombians mistakenly sucked into the system called "Extradited by Error."

"If you're innocent, you have no routes to give up and no accomplices to name, you don't have anything," he said. "And you also probably don't have a lawyer with teeth that can get you out."

> **"**
>
> **IF YOU'RE INNOCENT YOU HAVE NO ROUTES TO GIVE UP AND NO ACCOMPLICES TO NAME, YOU DON'T HAVE ANYTHING.**
>
> José Guarnizo, author of 'Extradited by Error.'

Inmates said the psychological pressure — and the uncertainty surrounding their future — tempts some to make false confessions in hopes of speeding up the process. Even those who waive their rights and demand a quick trial can often spend months in prison. Ostos, with the prison authority, said it usually takes a year for a detainee to be extradited.

## Extradited by Error

Carlos Ortega, 65, spent 10 months in the extradition ward on U.S. allegations that he was a drug trafficker.

"It's like you're being kidnapped by the state," he said from his home in Bogotá. "You're stuck there; you have absolutely no rights."

> **"**
>
> **IT'S LIKE YOU'RE BEING KIDNAPPED BY THE STATE...YOU'RE STUCK THERE; YOU HAVE ABSOLUTELY NO RIGHTS.**
>
> Carlos Ortega, extradited to the U.S. by error.

It was only after he was transferred to Florida that he and his lawyers had access to the evidence against him: poorly transcribed wire-taps that confused Carlos Ortega with another Carlos who lived in Costa Rica. It was a simple case of mistaken identify that could have been resolved by relistening to the tapes or checking Ortega's passport. (He's never been to Costa Rica.)

Even as the government's case was falling apart, he said officials offered him a deal: plead guilty and he could go home in six months. Otherwise, they warned, he was looking at decades of litigation and hard time. He refused and two weeks later, they returned with a sweeter deal: accept charges and go home immediately.

"I asked them 'Guilty of what, if I haven't committed any crimes?'" Ortega recalls. "Their answer was, 'We'll think of something, don't worry about it.'"

Ortega stood his ground and the court found him innocent. But he said the experience ruined his life. He ran up more than $250,000 in legal fees and travel expenses, lost his aviation consultancy business, and was stripped of his U.S. visa, which he'd had for six decades.

Ortega said he was old and proud enough to resist the pressure, but "most people who are in the system are young or have families, and they're willing to say anything to get out," he said.

Ortega and others also claim they were questioned by DEA and FBI officials without being read their Miranda rights and without the presence of a lawyer. In Ortega's case, he said the information he gave agents was used against him in court.

"The first time I was ever read my [Miranda] rights was when I was getting on the plane to be flown to the United States," he said.

The U.S. Embassy said DEA and FBI officials would not comment for this story. They also declined to address the specific allegations made by the detainees.

"Jorge," who is awaiting extradition on drug charges and asked to remain anonymous for fear of retribution, said he'd been questioned by FBI agents. When he asked for legal counsel he claims they told him he didn't have a right to a lawyer until he got to the United States.

"They told me if I cooperated and if it led to the arrest of other people that it would benefit me," he said. "But I never got to see a lawyer."

Douglas McNabb, a lawyer who has dealt extensively with extradition, speculated that U.S. agents might simply be gathering intelligence, rather than testimony that would be used against the defendants in court.

He said while the agents have no power to influence sentencing, it would not be uncommon for them to insinuate as much in exchange for information.

"U.S. law does apply outside the U.S. and the Fifth Amendment applies particularly in this instance," McNabb said. "There is an abbreviated Miranda warning that is supposed to be given to U.S. and foreign nationals." Failure to do so would allow lawyers to suppress any statements made, he said.

Roxanna Altholz, a human rights lawyer with Berkeley Law at the University of California, said the strong-arm tactics aren't out of the ordinary.

"I haven't looked specifically at using the deplorable conditions at places like La Picota to get people to talk but that would not surprise me," she said. "That's part of the prosecutorial strategy from the street level on up — to use what they can in order to get people to inform."

## Legal Limbo

In many ways, these inmates are caught in judicial limbo — stuck in Colombia while the charges against them remain in the United States. Those who can't afford a U.S. attorney often don't know the extent of the allegations until they're standing before a U.S. judge.

Henry Zamora, 53, and his brother lived as undocumented immigrants in the United States for 14 years before returning to Colombia. The men were involved in relationships and admit they left their partners on bad terms. Three years after they were home, they were both arrested on near identical allegations that they had molested their partners' teenage step-sons.

The men deny the allegations and say they're being framed by their scorned ex-lovers, perhaps as retribution for not providing financial support. Because they can't afford a U.S. lawyer, they haven't been able to get details about the charges, Zamora said.

"Because somebody simply made an accusation, we're in this situation," he said. "We're in horrible conditions and we haven't seen the sun this entire time...dogs live better than this."

Isaza, who is concerned for his safety and has petitioned officials to return to the U.S. as quickly as possible, said the United States should take responsibility for conditions in the prison.

"It's fully within the U.S. power to change the reality here and insist on basic human rights," he said. "We are effectively under the U.S. legal framework. I'm not accused of anything in Colombia. I'm here on a U.S. case, yet I have no ability to defend myself in court or ask for bail — rights which are supposed to be inviolable to me as a U.S. citizen."

## Broader Powers

The United States extradited 156 people from Colombia last year, and those figures could mushroom if new U.S. legislation takes effect. Earlier this month, the Senate passed the Transnational Drug Trafficking Act. The bill's authors say it's needed to close loopholes to extradition. But legal rights groups say the measure will allow U.S. authorities to extradite even the lowliest of drug trafficking suspects, including the tens of thousands of families who make a living growing coca.

Romero, who was arrested early this year on drug charges, was eventually extradited two weeks ago — almost 11 months after being detained. Before he was transferred to Puerto Rico to face charges, he reiterated his innocence. But he said that if authorities offer him a dea,l he'll consider it.

"If I have to say I'm guilty of something just to go home," he said, "then I'll do it."

   

**MORE AMERICAS**

**SUGGESTED FOR YOU**

**COMMENTS**

**2 Comments**

Sort by  Oldest



Add a comment...

 **Jake Slesnick**

Free Kaleil!

Like · Reply ·   2 · Nov 29, 2015 2:24pm

 **Dore Rodine** · Las Vegas, Nevada

Free Kaleil! Such inhumane conditions are akin to torture. I'd rather be water boarded than go through what Kaleil Isaza Tuzman is going through. Pleas sign the petition: https://www.change.org/.../demand-safety-and-fair...

Like · Reply ·   1 · Mar 5, 2016 1:19pm

Facebook Comments Plugin