UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

UNITED STATES OF AMERICA        :
        :
      -v.-        :        S8 15 Cr. 536 (PGG)
        :
KALEIL ISAZA TUZMAN,        :
OMAR AMANAT, and        :
IRFAN AMANAT,        :
        :
      Defendants.        :

------------------------------------------------------x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPPOSITION TO DEFENDANTS' OMNIBUS PRETRIAL MOTIONS

JOON H. KIM
Acting United States Attorney
Southern District of New York
One St. Andrews Plaza
New York, New York 10007

Damian Williams
Andrea M. Griswold
Joshua A. Naftalis
Assistant United States Attorneys
   - Of Counsel -

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ...................................................................................... 2

    A.    The Origins of the Isaza Tuzman-Omar Amanat Relationship and the Enable

          Losses ................................................................................................. 3

    B.    The Maiden Capital Scheme (Counts One, Two and Three).................................. 5

    C.    The Market Manipulation Scheme (Counts Four and Five) .................................. 5

    D.    The KITD Accounting Fraud (Count Six) ............................................................. 9

ARGUMENT ...................................................................................................... 12

    POINT I: Isaza Tuzman's Rule Of Specialty Claim Fails For Lack Of Standing And Fails

    On The Merits .............................................................................................. 12

        A.    Applicable Law ................................................................................. 12

        B.    Discussion ........................................................................................ 16

    POINT II: Isaza Tuzman Is Not Entitled To A Bill Of Particulars On The Market

    Manipulation Conspiracy .............................................................................. 18

        A.    Applicable Law ................................................................................. 18

        B.    Discussion ........................................................................................ 23

    POINT III: Omar Amanat's Motion To Dismiss Count Four Based On Duplicity Should

    Be Denied..................................................................................................... 27

        A.    Applicable Law ................................................................................. 28

        B.    Discussion ........................................................................................ 29

    POINT IV: The Defendants' Severance and Improper Joinder Motions Should

    Be Denied..................................................................................................... 32

        A.    Severance Under Rule 8(b) Is Not Warranted ................................... 32

            1.    Applicable Law ....................................................................... 32

            2.    Discussion............................................................................... 33

i

B.    Severance Under Rule 14 Is Not Warranted .................................................... 34

    1.   Applicable Law ................................................................................ 35

    2.   Discussion ....................................................................................... 37

        a.   Spillover Prejudice ................................................................ 37

        b.   Antagonistic Defenses ........................................................... 39

        c.   Considerations of Judicial Economy ..................................... 41

POINT V: The Court Should Deny The Defendants' Motions To Compel Various Other
Pretrial Disclosures .................................................................................... 42

    A.    Witness List ........................................................................................ 42

    B.    Exhibit List .......................................................................................... 45

    C.    *Brady, Giglio*, and Jencks Act Material ........... **Error! Bookmark not defined.**

    D.    Rule 404(b) ......................................................................................... 49

POINT VI: The Court Should Deny Omar Amanat's Motion To Strike Language In The
Indictment As Surplusage .......................................................................... 51

    A.    Applicable Law .................................................................................... 51

    B.    Discussion ............................................................................................ 53

CONCLUSION .................................................................................................... 56

## **TABLE OF AUTHORITIES**

**Cases**

*Brady* v. *Maryland*, 373 U.S. 83 (1963) ...................................................... 52

*Fiocconi* v. *Attorney General of U.S.*, 462 F.2d 475 (2d Cir. 1972) ...................................... 13, 18

*Giglio* v. *United States*, 405 U.S. 150 (1972) ................................................ 52

*Grunewald* v. *United States,* 353 U.S. 391 (1957) ........................................ 32

*Hemphill* v. *United States*, 392 F.2d 45 (8th Cir. 1968) ................................ 23

*In re United States*, 834 F.2d 283 (2d Cir. 1987) ......................................... 54

*Richardson* v. *Marsh*, 481 U.S. 200 (1987). ................................................ 40

*United States* v. *Abello-Silva*, 948 F.2d 1168 (1991) .................................... 18

*United States* v. *Allums*, 1997 WL 599562 (S.D.N.Y. Sept. 25, 1997) ......................................... 56

*United States* v. *Al-Marri*, 230 F. Supp. 2d 535 (S.D.N.Y. 2002) ................................ 57

*United States* v. *Aracri*, 968 F.2d 1512 (2d Cir. 1992) ........................................... 32, 33

*United States* v. *Baez*, 349 F.3d 90 (2d Cir. 2003) ........................................ 12

*United States* v. *Banks*, 464 F.3d 184 (2d Cir. 2006) ................................... 16

*United States* v. *Bari*, 750 F.2d 1169 (2d Cir. 1984) .................................... 43

*United States* v. *Bejasa*, 904 F.2d 137 (2d Cir. 1990) ................................... 47

*United States* v. *Bellomo*, 263 F. Supp. 2d 561 (E.D.N.Y. 2003) ................................ 23

*United States* v. *Bin Laden*, 91 F. Supp. 2d 600 (S.D.N.Y. 2000) ......................................... 58, 59

*United States* v. *Bonventre*, 2013 U.S. Dist. LEXIS 74829 (S.D.N.Y. May 28, 2013) ............... 51

*United States* v. *Bonventre*, 2013 WL 2303726 (S.D.N.Y. May 28, 2013) ................................ 27

*United States* v. *Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ..................................... 20, 21

*United States* v. *Bosch*, 385 F. Supp. 2d 387 (S.D.N.Y. 2005) ............................... 36, 42

*United States* v. *Brockenborrugh*, 575 F.3d 726 (D.C. Cir. 2009) ................................................ 34

*United States* v. *Bryan*, 868 F.2d 1032 (9th Cir. 1989) ........................................................ 32

*United States* v. *Butler*, 351 F. Supp. 2d 121 (S.D.N.Y. 2004) ........................................ 59, 61, 62

*United States* v. *Cannone*, 528 F.2d 296 (2d Cir. 1975).......................................................... 47, 50

*United States* v. *Canter*, 338 F. Supp. 2d 460 (S.D.N.Y. 2004) .......................................... 55

*United States* v. *Cardascia*, 951 F.2d 474 (2d Cir. 1991) .................................................. 40, 45

*United States* v. *Carroll*, 510 F.2d 507 (2d Cir. 1975) ........................................................ 30

*United States* v. *Carson*, 702 F.2d 351 (2d Cir. 1983) ........................................................ 40, 42

*United States* v. *Casamento*, 887 F.2d 1141 (2d Cir.1989) ................................................ 44

*United States* v. *Castellano*, 610 F. Supp. 1359 (S.D.N.Y. 1985)........................................ 32

*United States* v. *Castro*, 1995 WL 6235 (S.D.N.Y. Jan. 6, 1995) ....................................... 57

*United States* v. *Cervone*, 907 F.2d 332 (2d Cir. 1990)........................................................ 37

*United States* v. *Chalmers*, 474 F. Supp. 2d 555 (S.D.N.Y. 2007)........................................ 50

*United States* v. *Coppa,* 267 F.3d 132 (2d Cir. 2001) ........................................................ 53, 54

*United States* v. *Crozzoli*, 698 F. Supp. 430 (E.D.N.Y. 1988) ............................................ 48

*United States* v. *Cuevas*, 496 F.3d 256 (2d Cir. 2007) ........................................................ 16

*United States* v. *Cuti*, 2009 WL 3154310 (S.D.N.Y. 2009) ............................................ 20, 27

*United States* v. *D'Amico*, 734 F. Supp. 2d 321 (S.D.N.Y. 2010)........................................ 20, 23

*United States* v. *Davis*, 2006 WL 20493 (S.D.N.Y. Jan. 3, 2006)........................................ 56

*United States* v. *DePalma*, 461 F. Supp. 778 (S.D.N.Y. 1978) ............................................ 58

*United States* v. *Droms*, 566 F.2d 361 (2d Cir. 1977) ........................................................ 31

*United States* v. *Earls*, 2004 WL 350725 (S.D.N.Y. 2004)........................................ 21

*United States* v. *Eppolito*, 543 F.3d 25 (2d Cir. 2008) ........................................................ 34

*United States* v. *Feola*, 651 F. Supp. 1068 (S.D.N.Y. 1987)........................................................ 30

*United States* v. *Figueroa*, 618 F.2d 934 (2d Cir. 1980) ......................................................... 46

*United States* v. *Flores,* 538 F.2d 939 (2d Cir.1976)........................................................ 14, 18

*United States* v. *Frankel*, 443 Fed. Appx. 603 (2d Cir.2011) ........................................... 15

*United States* v. *Fusco*, 560 Fed. Appx. 43 (2d Cir. 2014)............................................... 15

*United States* v. *Gallo*, 1999 WL 9848 (S.D.N.Y. Jan. 11, 1999) ................................... 52

*United States* v. *Garavito-Garcia*, 827 F.3d 242 (2d Cir. 2016) .................................... 16

*United States* v. *Garcia*, 780 F. Supp. 166 (S.D.N.Y. 1991) .......................................... 44

*United States* v. *Gibson*, 175 F. Supp. 2d 532 (S.D.N.Y. 2001)...................................... 23

*United States* v. *Giffen*, 379 F. Supp. 2d 337 (S.D.N.Y. 2004) ....................... 50, 51, 52

*United States* v. *Gotti,* 42 F. Supp. 2d 252 (S.D.N.Y. 1999) .......................................... 59

*United States* v. *Greyling*, 2002 U.S. Dist. LEXIS 4502 (S.D.N.Y. Mar. 18, 2002)................... 55

*United States* v. *Gutierrez-Flores*, 1994 WL 558034 (S.D.N.Y. Oct. 11, 1994) ...................... 53

*United States* v. *Henry*, 861 F. Supp. 1190 (S.D.N.Y. 1994) ........................................ 21, 23, 24

*United States* v. *Heredia,* 2003 WL 21524008 (S.D.N.Y. 2003) ................................... 24

*United States* v. *Jackson*, 2015 WL 4601021 (D. Conn. July 29, 2015) ...................... 45

*United States* v. *Jacques Dessange, Inc.*, 2000 WL 280050 (S.D.N.Y. Mar. 14, 2000) .............. 60

*United States* v. *Kassir*, 2009 WL 995139 (S.D.N.Y. April 9, 2009) ........................... 58

*United States* v. *Kazarian*, 2012 WL 1810214 (S.D.N.Y. 2012) ................................. 21

*United States* v. *Leonelli*, 428 F. Supp. 880 (S.D.N.Y. 1977) ................................... 19, 22

*United States* v. *Levy*, 25 F.3d 146 (2d Cir. 1994)...................................... 1, 13, 22, 25

*United States* v. *Lino*, 2001 WL 8356 (S.D.N.Y. 2001) ........................................ 25

*United States* v. *Lumiere*, 16 Cr. 483 (JSR) (S.D.N.Y. Aug. 31, 2016) ................... 52, 57

*United States* v. *Mahabub*, 2014 WL 4243657 (S.D.N.Y. 2014) .................................... 19, 22, 24

*United States* v. *Mandell*, 710 F. Supp. 2d 368 (S.D.N.Y. 2010) ................................................. 22

*United States* v. *Martoma,* 2013 WL 2435082 (S.D.N.Y. June 5, 2013) .................................... 29

*United States* v. *Masefield*, 2005 WL 236443 (S.D.N.Y. Feb. 1, 2005) ............................... 14, 18

*United States* v. *Matos-Peralta*, 691 F. Supp. 780 (S.D.N.Y. 1988) ........................................... 56

*United States* v. *Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y. 2001) ............................................. 22, 23

*United States* v. *Moloney*, 287 F.3d 236 (2d Cir. 2002) ............................................................. 32

*United States* v. *Monserrate*, 2011 WL 3480957 (S.D.N.Y. 2011) ............................................ 20

*United States* v. *Morgan*, 690 F. Supp. 2d 274 (S.D.N.Y. 2010) ............................................... 53

*United States* v. *Mostafa*, 965 F. Supp. 2d 451 (S.D.N.Y. 2013) ............................................... 60

*United States* v. *Mulder,* 273 F.3d 91 (2d Cir. 2011) .................................................................. 58

*United States* v. *Munoz-Franco*, 986 F.Supp. 70 (D.P.R. 1997) ............................................... 34

*United States* v. *Murray*, 618 F.2d 892 (2d Cir. 1980) ............................................................... 31

*United States* v. *Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) .................................. 21, 30, 50

*United States* v. *Nadeem*, 2014 WL 3563407 (E.D.N.Y. July 18, 2014) .................................... 36

*United States* v. *Napolitano*, 552 F. Supp. 465 (S.D.N.Y. 1982) ............................................... 59

*United States* v. *Nixon*, 418 U.S. 683 (1974) ............................................................................. 53

*United States* v. *Noble*, 2008 WL 1990707 (S.D.N.Y. May 7, 2008) ......................................... 55

*United States* v. *Ohle*, 678 F. Supp. 2d 215 (S.D.N.Y. 2010) .................................................... 36

*United States* v. *Page*, 657 F.3d 126 (2d Cir. 2011) ................................................................... 40

*United States* v. *Paroutian,* 299 F.2d 486 (2d Cir. 1962) .......................................................... 13

*United States* v. *Percevault*, 490 F.2d 126 (2d Cir. 1974) ......................................................... 54

*United States* v. *Perez*, 940 F. Supp. 540 (S.D.N.Y. 1996) ....................................................... 53

*United States* v. *Rahman*, 854 F. Supp. 254 (S.D.N.Y 1994)............................................. 43, 48, 55

*United States* v. *Rajaratnam*, 2010 WL 2788168 (S.D.N.Y. 2010) ............................................ 29

*United States* v. *Rauscher*, 119 U.S. 407 (1886) ......................................................................... 12

*United States* v. *Reed*, 639 F.2d 896 (2d Cir. 1981) .............................................................. 16, 17

*United States* v. *Rittweger*, 259 F. Supp. 2d 275 (S.D.N.Y. 2003)................................... 22, 37, 58

*United States* v. *Rittweger*, 524 F.3d 171, 177 (2d Cir. 2008)………………………………...…..33

*United States* v. *Rodriguez-Perez*, 2012 WL 3578721 (S.D.N.Y. Aug. 16, 2012)...................... 55

*United States* v. *Rossi,* 545 F.2d 814 (2d Cir.1976) ............................................................... 14, 18

*United States* v. *Rueb*, 2001 U.S. Dist. LEXIS 943 (S.D.N.Y. Feb. 5, 2001) ............................. 50

*United States* v. *Salameh*, 152 F.3d 88 (2d Cir. 1998) ................................................................. 35

*United States* v. *Samsonov*, 2009 WL 176721 (S.D.N.Y. 2009) ............................................ 20, 24

*United States* v. *Sattar*, 314 F. Supp. 2d 279 (S.D.N.Y. 2004) ................................................... 59

*United States* v. *Scarpa*, 913 F.2d 993 (2d Cir. 1990).......................................................... 58, 61

*United States* v. *Sebastian*, 497 F.2d 1267 (2d Cir. 1974).......................................................... 54

*United States* v. *Shkreli*, 15 Cr. 637 (KAM) (E.D.N.Y. April 19, 2017)...................................... 45

*United States* v. *Shuford*, 454 F.2d 777 (9th Cir. 1971) ............................................................. 46

*United States* v. *Sindone*, 2002 WL 48604 (S.D.N.Y. Jan. 14, 2002) .......................................... 49

*United States* v. *Smirlock*, 2001 WL 913911 (S.D.N.Y. Aug. 13, 2001) ..................................... 61

*United States* v. *Smith*, 464 F.2d 1129 (2d Cir. 1972).................................................................. 26

*United States* v. *Solano*, 2008 WL 536648, (S.D.N.Y. Feb. 25, 2008) ........................................ 15

*United States* v. *Spinelli*, 352 F.3d 48 (2d Cir. 2003).................................................................. 35

*United States* v. *Sturdivant*, 244 F.3d 71 (2d Cir. 2001) ............................................................ 31

*United States* v. *Sturtz*, 648 F. Supp. 817 (S.D.N.Y. 1986)......................................................... 14

*United States* v. *Suarez*, 791 F.3d 363 (2d Cir. 2015) ........................................................ 1, 16, 17

*United States* v. *Tomero*, 496 F. Supp. 2d 253 (S.D.N.Y. 2007).................................................. 61

*United States* v. *Torres*, 901 F.2d 205 (2d Cir. 1990) ........................................................... passim

*United States* v. *Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001) ............................................ 21, 55

*United States* v. *Turkish,* 458 F. Supp. 874 (S.D.N.Y. 1978)................................................. 48, 52

*United States* v. *Turoff*, 853 F.2d 1037 (2d Cir. 1988) ................................................................ 36

*United States* v. *Tutino*, 883 F.2d 1125 (2d Cir. 1989)................................................................ 32

*United States* v. *Ulbricht*, 2014 WL 5090039 (S.D.N.Y. Oct. 10, 2014)............................... 59, 60

*United States* v. *Valenti*, 60 F.3d 941 (2d Cir. 1995).................................................................... 57

*United States* v. *Van Hise*, 2013 WL 6877319 (S.D.N.Y. Dec. 31, 2013) ....................... 40, 44, 45

*United States* v. *Vilar*, 530 F.Supp. 2d 616 (S.D.N.Y. Jan. 17, 2008) ................................. 50, 51

*United States* v. *Villegas*, 899 F.2d 1324 (2d Cir. 1990)........................................................ 43, 44

*United States* v. *Walker*, 142 F.3d 103 (2d Cir. 1998)................................................................. 40

*United States* v. *Walsh*, 194 F.3d 37 (2d Cir. 1999) ................................................................... 19

*United States* v. *Washington*, 947 F. Supp 87 (S.D.N.Y. 1996) ................................................. 47

*United States* v. *Wey,* 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) ............................................ 25

*United States* v. *Zackson*, 6 F.3d 911 (2d Cir. 1993).................................................................. 40

*Van Cauwenberghe* v. *Biard*, 486 U.S. 517 (1998) ..................................................................... 12

*Zafiro v. United States,* 506 U.S. 534 (1993)................................................................... 39, 40, 41

## PRELIMINARY STATEMENT

The Government respectfully submits this response to the pretrial omnibus motions filed by defendants Kaleil Isaza Tuzman ("Isaza Tuzman") and Omar Amanat. Both motions request relief to which the defendants are not entitled.

Isaza Tuzman first moves to dismiss the S8 Indictment ("the Indictment") because, in his view, it violates the Rule of Specialty. This claim fails at the threshold because, in *United States* v. *Suarez*, 791 F.3d 363 (2d Cir. 2015), a case involving an extradition from Colombia, the Second Circuit held that defendants lack standing to raise Rule of Specialty challenges unless the extraditing country first lodges a protest. Because Colombia has made no such protest, Isaza Tuzman lacks standing. In any event, the claim is meritless.

Isaza Tuzman's also insists that the Government itemize every single trade made in furtherance of the market manipulation conspiracy charged in Count Four. This argument fares no better. At bottom, Isaza Tuzman seeks the "production of evidentiary minutiae that is not appropriate in a bill of particulars," *United States* v. *Levy*, 2013 WL 664712, at *13, (S.D.N.Y. 2013), and, under longstanding Circuit precedent, is not required. Indeed, Isaza Tuzman fails to identify a single case in which a court has required such particularization for a defendant charged with market manipulation conspiracy.

Omar Amanat alleges, incorrectly, that Count Four is duplicitous and should be dismissed. This argument ignores the Indictment — which on its face properly pleads a single, ongoing conspiracy — and relies on Amanat's arguments about what he believes the trial evidence will show. This is not a basis for relief, and his motion therefore should be denied.

Isaza Tuzman and Omar Amanat also both seek some form of severance. Each asks for separate trials because of supposedly mutually antagonistic defenses. Amanat further requests that

the Court sever the counts charging a fraud on Maiden Capital investors (for which he has been charged) from the counts charging a fraud on KIT digital ("KITD") investors (for which he has not been charged but is nonetheless an unindicted co-conspirator). These requests should be denied. The defendants' claimed dislike of each other did not prevent them from banding together with Stephen Maiden ("Maiden") in December 2008 to commit fraud, and their intent to point the finger at each other about conduct that led them to form a criminal pact is an irrelevant side show. Under the law, they are neither entitled to separate trials nor severance of the counts in the Indictment.

The other arguments raised by the defendants, including requests to strike surplusage and requests for unprecedented pretrial disclosure of 3500 material two months before trial, are premature, meritless or both.

Accordingly, and for the reasons set forth more fully below, the defendants' motions should be denied.

## STATEMENT OF FACTS

When Isaza Tuzman ran KITD between 2008 and 2012, he touted the company as fast growing and financially successful. This was a lie. Not only was KITD never profitable, the company consistently failed to achieve the financial success Isaza Tuzman projected. Isaza Tuzman hid the truth about KITD's financial health in multiple ways — by artificially inflating KITD's revenue, manipulating KITD's share price, and lying to KITD's auditors about the status of millions of dollars of KITD's cash, which had been invested in Enable, Ltd. ("Enable"), an investment firm affiliated with Omar Amanat and Irfan Amanat.

Isaza Tuzman did not carry out these schemes alone. To create fraudulent revenue, Isaza Tuzman worked with his lieutenants within KITD, including Robin Smyth ("Smyth"), KITD's

Chief Financial Officer, and Gavin Campion "Campion"), KITD's President.  To manipulate the market in KITD shares, Isaza Tuzman turned to his associate, Omar Amanat who, in turn, recruited Stephen Maiden, who managed a hedge fund called Maiden Capital, into the criminal fold.  And when Enable lost millions of dollars, including money invested by KITD and Maiden's hedge fund, Isaza Tuzman banded together with the Amanat Brothers and Maiden to hide this information from KITD's auditors and Maiden Capital investors.

The Indictment in this case charges Isaza Tuzman, Omar Amanat and Irfan Amanat with the various interconnected fraud schemes perpetrated on the investors of Maiden Capital and KITD.

### A.    The Origins of the Isaza Tuzman-Omar Amanat Relationship and the Enable Losses

In June 2008, Isaza Tuzman and Omar Amanat agreed to raise money for each other.  (Ind. ¶¶ 19-20).  Omar Amanat agreed to raise millions of dollars for a special purpose vehicle controlled by Isaza Tuzman and invested in KITD (the "KIT SPIV").  In turn, Isaza Tuzman agreed to raise money for Enable, the United Arab Emirates-based investment vehicle associated with the Amanat Brothers.  (*Id.*)  Specifically, Isaza Tuzman (through KITD) and Maiden (through Maiden Capital) invested millions of dollars in Enable.  In June 2008, Amanat induced Maiden to invest $1 million of Maiden Capital funds into the KIT SPIV (Ind. ¶ 24).  Shortly thereafter, in August 2008, Isaza Tuzman invested approximately $6.5 million on behalf of KITD.  (Ind. ¶ 23).  This represented the majority of KITD's available cash at the time. (*Id.*)  The $6.5 million also included Maiden Capital's $1 million investment, which Isaza Tuzman had redirected from the KIT SPIV into Enable without Maiden's knowledge or consent.  (Ind. ¶ 24). Within months, the Amanat Brothers had either lost or misappropriated the investment money in Enable.  (Ind. ¶¶ 25-26).  In November 2008, after Isaza Tuzman sought to redeem a portion of KITD's investment in Enable in November

2008, Isaza Tuzman learned that Enable was unable pay redemptions.  On November 5, 2008,

Isaza Tuzman sent an email to an associate in which he stated:

> Auditors are now inquiring regarding cash mgmt.  When the A/R
> line was cancelled, we had to inform them.  They asked how it
> happened.  We had to explain the Enable funds withdrawal delay.
> Now they're inquiring about my business involvement with Enable.
> This could get very ugly, man.  We need to unwind with Enable and
> Irfan COMPLETELY.  Please speak to Irfan tonight."

With the Amanat Brothers unable to meet KITD's redemption demand, Omar Amanat

asked Maiden to make a $2 million investment in Enable in the form of a "short-term" loan, which,

together with Maiden's prior $1 million investment, brought Maiden Capital's exposure in Enable

to $3 million.  (Ind. ¶¶ 19, 27).  The majority of Maiden Capital's $2 million was then

misappropriated and a portion used to repay KITD, which, combined with other monies repaid to

KITD, reduced KITD's exposure to Enable to approximately $2 million.

On December 18, 2008, Maiden asked Omar Amanat to return his $2 million investment.

Knowing that the money was gone, a panicked Omar Amanat wrote to Irfan Amanat:  "Maiden

has tried to reach me and is asking for his $2mln back.  In a post madoff world everyone is

suspicious.  This is a major problem and red flag for me.  As u know.  I don't have any ability to

repay it. . . . This is a major disaster – of madoff proportions – if maiden suspects fraud of some

sort and notifies the authorities I'm cooked.  All in all this is some pickle of a situation this time."

(Ind. ¶ 29).

Unable to repay Maiden Capital, the Amanat Brothers, along with Isaza Tuzman,

participated in a telephone call during with Maiden in March 2009 on which they told Maiden that

Enable was insolvent.  (Ind. ¶ 32).  Maiden understood from this call that Isaza Tuzman was

previously aware that Enable had no money.  (*Id.*).  This call was the genesis of the multi-faceted

criminal scheme alleged in the Indictment in which Isaza Tuzman, the Amanat Brothers and

Maiden, despite their Enable-related grievances against each other, banded together to reach a solution that would cover up the Enable losses before they brought down Maiden Capital and exposed Isaza Tuzman's lies concerning KITD's true financial condition.

### B.    The Maiden Capital Scheme (Counts One, Two and Three – Omar Amanat and Irfan Amanat)

Instead of disclosing the Enable losses to his investors when he learned of them in March 2009, Maiden, working with the Amanat Brothers and with Isaza Tuzman's knowledge, hid the truth.  (*E.g.*, Ind. ¶ 42).  Among other things, Maiden provided his investors fictitious account statements, at times created by Irfan Amanat, that falsely claimed that Maiden Capital maintained more than $2 million with Enable.  (Ind. ¶ 36).  These statements were designed to conceal the fact that the Enable losses largely had rendered Maiden Capital insolvent.  To prop up Maiden Capital, which was otherwise unable to pay investor redemptions, Omar Amanat wired hundreds of thousands of dollars to Maiden.  (Ind. ¶ 38).

As a result of this conduct, Counts One, Two and Three of the Indictment charge Omar Amanat and Irfan Amanat with conspiring to commit wire fraud on Maiden Capital investors, wire fraud and aiding and abetting Maiden's investment advisor fraud.  Although Isaza Tuzman is not charged with this conduct, he is a co-conspirator given his knowledge of the cover-up and participation in, among other things, in-person meetings and phone calls in which Maiden and the Amanat Brothers discussed the need to keep the Enable losses hidden from Maiden Capital investors.  (*See, e.g.*, Ind. ¶ 32-34, 42).

### C.    The Market Manipulation Scheme (Counts Four (Isaza Tuzman and Omar Amanat) and Five (Isaza Tuzman))

The Enable losses – as well as Isaza Tuzman's desire to misrepresent KITD's financial health so he could obtain a listing on NASDAQ – also prompted Isaza Tuzman, Omar Amanat

and Maiden to form and maintain an alliance to manipulate the market in KITD shares. The scheme started on December 31, 2008 when they signed an illegal agreement (the "Market Manipulation Agreement") in which Maiden agreed to purchase KITD shares in the open market in exchange for money and a promise to not redeem Maiden Capital's investment the KIT SPIV and Enable. (Ind. ¶ 58). At the time the Market Manipulation Agreement was signed, Isaza Tuzman and the Amanat Brothers knew of Enable's insolvency but Maiden did not.

The Market Manipulation Agreement stated, in relevant part:

> In consideration of Maiden Capital LLC ("Maiden Capital") acquiring at least $400,000 of common stock in KIT digital, Inc. . . . in the open market over the next 30 days ("Open Market Investment"), KIT Capital, Ltd., a UAE registered investment company . . . and Omar Amanat . . . (the "Owners") will grant Stephen E. Maiden, 6% of the aggregate net carry that the Owners will receive pursuant to the carry arrangements that the Owners have through investors' participation in KIT Media Ltd. (the "Carry Inducement").[1]

> The Carry Inducement shall only be due to you at the time of liquidation of KIT Media, Ltd. . . . or when the Owners receive proceeds as part of their carry arrangement in KIT Media (the "Liquidity Event"), pro rata of the actual proceeds received.

> As part of this Agreement, Maiden Capital agrees to retain its previous investment(s) in KIT Media in place, without any request for distribution of underlying KIT digital common shares or warrants, at least until the Liquidity Event. Furthermore, Maiden Capital agrees to retain its Open Market Investment shares in KIT digital for at least 90 days prior to any sale (in aggregate, the "Retention Commitment").

As these terms reflect, while the Market Manipulation Agreement contemplated an initial purchase by Maiden of "at least" $400,000 shares of KITD in the open market over 30 days, the agreement was structured to incentivize Maiden to continue to manipulate KITD's stock price.

---

[1] KIT Media Ltd. is otherwise referred to in the Indictment and herein as the KIT SPIV.

Specifically, the Market Manipulation Agreement provided that monies paid to Maiden Capital under the Carry Inducement provision were linked to the success of the KIT SPIV, referred to in the agreement as KIT Media, Ltd.  Accordingly, the value of Maiden's carried interest in the KIT SPIV depended on the value of KITD's share price, which Maiden was manipulating.  (*Id.*).[2]

Similarly, although the December 31, 2008 market manipulation agreement was meant to last only 90 days, Isaza Tuzman, Omar Amanat and Maiden continued the market manipulation scheme in as part of the larger plan to hide the Enable losses from investors in Maiden Capital and to help Isaza Tuzman misrepresent KITD's financial health to its auditors and shareholders.  As noted above, as part of the discussions between Isaza Tuzman, the Amanat Brothers and Maiden about how to solve the issue of Enable's insolvency, the parties discussed giving Maiden a portion of their respective shares in the KIT SPIV, which Maiden could then record in place of his Enable investment.   (Ind. ¶ 33).   For this plan to work, KIT SPIV shares needed to be valuable. Accordingly, Maiden continued the scheme to manipulate the market in KITD well after fulfilling his initial commitment to purchase $400,000 shares within 30 days under the Market Manipulation Agreement.  (Ind. ¶ 60).

Between 2008 and in or about March 2011, Maiden, with Isaza Tuzman's and Omar Amanat's knowledge and assistance, manipulated the price and volume of KITD shares.  Isaza Tuzman frequently directed Maiden to make timely purchases of KITD stock to inflate the share price at critical moments.  For instance, on March 12, 2009, as Isaza Tuzman was trying to close a KITD transaction with a financial firm, he sent Maiden an email which read: "Urgent: in which

---

[2]      On the same day that the Market Manipulation Agreement was signed, Isaza Tuzman and Omar Amanat also signed a side agreement, without Maiden's knowledge, in which Omar Amanat agreed to facilitate market manipulation efforts through purchases by Maiden.  (Ind. ¶ 58).

[financial firm], trying to close.  Where is the stock right now?"  Maiden replied, "[n]ow 8.99 last – that is the ask."  Isaza Tuzman repled in part, "[g]reat work." (Ind. ¶ 62(a)).

In the context of discussions concerning who would have to contribute what to a settlement to hide the Enable losses, Omar Amanat boasted about his role in Maiden's continued manipulative purchase of KITD shares.  For example, in a series of emails dated March 25, 2009 and March 26, 2009, the following exchange took place between Maiden, Isaza Tuzman and Omar Amanat:

> Maiden:  I have purchased $1,211,331.00 worth of KDGL in the mkt since the beginning of the year.  Far surpassing my commitment.  I have been honest and upfront and helpful to you both.  I like and value both of our long-term relationships and interests.
>
> Tuzman:  You have been a great partner, Steve.
>
> Amanat:  Here are the unemotional, fully disclosed facts we can all reasonably agree upon and are not subject to dispute. . . .  "a further $1million in open market purchases was done by Maiden in furtherance of the December 31st agreement between [Omar Amanat] and Kaleil.

Between 2009 and early 2011, Isaza Tuzman, Maiden and Omar Amanat continued to discuss the terms of a potential settlement to keep Maiden Capital afloat and hide the Enable losses. Isaza Tuzman told Maiden that a strong KITD share price was essential for the parties to reach such an agreement.  As a result, throughout 2010 and in March 2011, Maiden to continue manipulate the market in KITD by purchasing and selling KITD stock, including at prices that were not to Maiden's economic advantage.  (Ind. ¶ 63).

Isaza Tuzman did more than encourage and direct Maiden's trading.  He also financed it. Isaza Tuzman fraudulently induced KITD to invest approximately $1.15 million with Maiden Capital.  Isaza Tuzman falsely portrayed these investments to KITD's Board of Directors, among

others, as an effort to safely invest KITD's cash holdings.  In reality, and as Isaza Tuzman well

knew, these investments were made to support the market manipulation conspiracy.  (Ind. ¶64).

Despite Maiden's continuing manipulation of KITD shares, negotiations concerning a

settlement to hide the Enable losses reached an impasse.  In July 2011, Isaza Tuzman, Omar

Amant, Maiden and others met in Manhattan to discuss the Enable losses and Maiden Capital's

solvency.  Omar Amanat coached Maiden on how to navigate the meeting and push Isaza Tuzman

for concessions, including the assignment of KIT SPIV shares:

> Be aggressive today: say it doesn't matter who did what.  Paint a
> stark nightmare scenario if your fund goes under . . . Madoff like
> trustee is appointed – he will quickly realize all money was lost in
> KIT Digital and everyone here will be sued.  Securities laws
> violations have occurred.  Criminal behavior jail time.  Bottom line:
> funds needs to be made whole or ship will sink.

(Ind. ¶ 42).  After no agreement was reached at the meeting, Maiden, who by that time no longer

had liquidity to invest, did not continue to manipulate the market in KITD shares.

### D.      The KITD Accounting Fraud (Count Six)

As the CEO of a public-traded company, Isaza Tuzman had a duty to be truthful about the

various financial entanglements between KITD, Enable and Maiden Capital.  That included the

disclosure of the $2 million Enable losses to KITD's auditors and shareholders, and the disclosure

of the true reason behind KITD's $1.15 million investment with Maiden Capital.

Isaza Tuzman, however, repeatedly breached his duties.  Similar to Maiden, Isaza Tuzman

worked with the Amanat Brothers to hide the Enable losses from his investors and his auditors.

For instance, Isaza Tuzman repeatedly worked with the Amanat Brothers to submit fictitious audit

confirmations to KITD's auditors in which Irfan Amanat falsely claimed that Enable maintained

an account on KITD's behalf with a balance in excess of $2 million.  As Isaza Tuzman explained

to the Amanat Brothers, this misrepresentation was material to KITD's audited financial

statements.  For instance, on March 9, 2011, one week before Irfan Amanat submitted the audit confirmation for KITD's fiscal year 2010, Isaza Tuzman emailed: "[I]rfan, [o]ur auditors require a confirmation note today (which our CFO Robin Smyth sent to you and cc'd [the KITD Auditor]) regarding KIT digital balance with Enable.  Without this confirmation KIT digital cannot get a clean audit for 2010.  This is vital, as you know from the past."  (Irfan Amanat Compl. ¶ 35(b)(i)).

A year later, on March 11, 2012, three days before Irfan Amanat caused one of his employees to submit a false audit confirmation for KITD's fiscal year 2011, Isaza Tuzman told Irfan Amanat:  "We need the Enable audit confirmation on KIT digital invested funds, or we cannot complete our 2011 10-K and annual report, and will have a material deficiency in our numbers.  This must be done immediately (the 10-K is being completed tomorrow on Tuesday) . . . .  Naturally, if we do not get this confirmation, there can be never be any positive outcome of any kind."  (*Id.* ¶ 35(b)(ii)).

For repeatedly submitting false Enable audit confirmations in connection with KITD's annual audits, Isaza Tuzman and Irfan Amanat have been charged with conspiring to commit securities fraud, to make false statements in annual and quarterly SEC reports, and to make false statements to auditors.  Because Omar Amanat was aware of these false Enable audit confirmations and encouraged Irfan Amanat to submit them, the Government considers Omar Amanat to be an unindicted co-conspirator, as defense counsel is aware.

The false Enable audit confirmations were only part of Isaza Tuzman's widespread accounting fraud at KITD.  For instance, Isaza Tuzman, working with Robin Smyth, KITD's Chief Financial Officer, and Gavin Campion, KITD's President, also engaged in a multi-year scheme to falsely misrepresent KITD's financial health.  The scheme employed two principal methods:  (1) the improper recognition of revenue from so-called "perpetual license" contracts for KITD

software, including contracts that were fabricated for the sole purpose of falsely inflating KITD's revenue; and (2) the execution of fraudulent "round-trip" transactions in which Isaza Tuzman and others used KITD's own cash to pay off bills that were owed to KITD.  (Ind. ¶ 97).  To facilitate these crimes, Isaza Tuzman worked with his fugitive co-conspirator, Rima Jameel ("Jameel"), who not only served as KITD's outside counsel for nearly every corrupt transaction at the heart of the accounting fraud scheme, but who also helped Isaza Tuzman submit false audit confirmations and conduct round-trip transactions with KITD funds.   (Ind. ¶¶ 117-19).

The corporate corruption at KITD, at Maiden Capital and at Enable finally burst into public view in 2012.  By July 2012, Maiden, despite Omar Amanat's assistance, was unable to forestall investor redemptions and collapsed.  In total, Maiden Capital investors lost more than $8 million, including their $3 million total investment in Enable. On November 21, 2012, KITD's audit committee disclosed in a Form 8-K that it had discovered substantial accounting irregularities in its financial statements for 2009, 2010, 2011 and the first two quarters of 2012.  That period spanned the lion's share of Isaza Tuzman's leadership of KITD during which, in derogation of his fiduciary duties and with disregard for the law, he helmed an accounting fraud conspiracy.  The price of KITD's stock plummeted after the announcement.  In December 2012, the stock was delisted from NASDAQ.  The company subsequently declared bankruptcy.  (Ind. ¶ 90).

## ARGUMENT

## POINT I

### ISAZA TUZMAN'S RULE OF SPECIALTY CLAIM
### FAILS FOR LACK OF STANDING AND FAILS ON THE MERITS

Like the original indictment on which he was extradited, S1 15 Cr. 586 (PGG), the current

Indictment, S8 15 Cr. 586 (PGG), charges Isaza Tuzman with the three counts of conspiracy.  Isaza

Tuzman nonetheless asks this Court to dismiss the Indictment because, in Isaza Tuzman's telling,

it "substantially expands the nature and scope of the allegations" against him.  (Isaza Tuzman. at

5.)  This argument fails as a matter of law because, under controlling Second Circuit authority,

Isaza Tuzman lacks prudential standing to challenge a purported violation of the treaty between

the United States and Colombia.  And, even if Isaza Tuzman were to have standing, his argument

would fail on the merits.

### A.       Applicable Law

First recognized by the Supreme Court in *United States* v. *Rauscher*, 119 U.S. 407 (1886),

the Rule of Specialty is rooted in principles of international comity.  At its core, the doctrine

"fundamentally bears on treaty obligations between states; the principle operates to ensure that the

receiving state does not abuse the extradition processes of the extraditing state."  *Van

Cauwenberghe* v. *Biard*, 486 U.S. 517, 525 (1998); *United States* v. *Baez*, 349 F.3d 90, 92 (2d Cir.

2003) ("[T]he principle of specialty generally requires a country seeking extradition to adhere to

any limitations placed on prosecution by the surrendering country.").

Under the Rule of Specialty, a defendant can only be prosecuted for the *offenses* for which

he was extradited.  In *United States* v. *Paroutian*, the Second Circuit explained that "the test

whether trial is for a 'separate offense' should be not some technical refinement of local law, but

whether the extraditing country would consider the offense actually tried 'separate.'" 299 F.2d 486, 490-91 (2d Cir. 1962). The defendant in *Paroutian* was originally indicted in the Southern District for conspiracy to traffic narcotics. He was extradited by Lebanon to the United States to face trial on that indictment. Upon his arrival, the defendant was indicted in the Eastern District of New York on two substantive counts, receipt of heroin and concealment of heroin. The Second Circuit rejected Paroutian's Rule of Specialty challenge to the charges in the superseding indictment, explaining that Lebanon, "fully apprised of the facts as they were, would consider that Paroutian was tried for anything else but the offense for which he was extradited, namely, trafficking in narcotics." *Id*. at 491. In *United States* v. *Levy*, the Second Circuit relied on *Paroutian* to reject a specialty challenge in which the defendant alleged that he had been extradited on a single narcotics conspiracy charge but later tried on five drug counts. 25 F.3d 146, 159 (2d Cir. 1994). The Court explained that "even if we were to conclude that Levy was extradited on the basis of the one narcotics conspiracy charge in his initial arrest warrant, the Rule of Specialty would still not have been violated by his subsequent trial on the five drug counts in his indictment." *Id*.

Indeed, the Second Circuit has held that extradited defendants are allowed to be tried for conduct committed *after* the conduct upon which extradition rests so long as the "subsequent offenses [are] of the same character as the crime for which they were extradited." *Fiocconi* v. *Attorney General of U.S.*, 462 F.2d 475, 481 (2d Cir. 1972). In *Fiocconi*, the Circuit rejected a Rule of Specialty challenge raised by a defendant who was extradited to stand trial on 1968-69 narcotics conspiracy based in the District of Massachusetts and was instead tried on 1970-72 conspiracy and substantive charges based in the Southern District of New York. *Id.*; *see also United States* v. *Rossi,* 545 F.2d 814 (2d Cir.1976) (no violation of specialty where extradition

13

charge covered 1969-72 and indictment covered 1965-73); *United States* v. *Flores*, 538 F.2d 939 (2d Cir.1976) (no violation of specialty where extradition charge covered 1970-71 and indictment covered 1968-71).

Guided by this authority, trial courts in this District have routinely denied Rule of Specialty challenges. *See, e.g.*, *United States* v. *Sturtz*, 648 F. Supp. 817, 819 (S.D.N.Y. 1986) ("A superseding indictment which charges offenses of the same character as the crime for which the fugitive was extradited does not offend the doctrine."). For instance, in *United States* v. *Masefield*, 2005 WL 236443, No. 02 Cr. 441 (LAP) (S.D.N.Y. Feb. 1, 2005), Judge Preska rejected a Rule of Specialty challenge where a defendant, extradited from Australia on charges alleging a single-object tax fraud conspiracy and four false subscription counts covering conduct between 1996 and 1999, was subsequently charged with a multi-object conspiracy and a substantive false subscription count covering conduct between 1993 and 2000. Judge Preska noted that "the Court of Appeals has consistently found that the Government is not limited strictly to charges described in an extradition warrant but rather may include additional facts and additional charges as long as the statutory charge is the same." *Id.* at *2 (citing, among other cases, *Levy*, *Ficcioni*, *Rossi*, *Flores*, *Paroutian).* Judge Preska went on to observe that "the Government may present additional facts or amplified allegations, 'so long as [they are] ... *directed* to the charge contained in the request for extradition.'" *Id.* (quoting Restatement (Third) of Foreign Relations Law of the United States § 477, comment c (2005) (emphasis added in *Masefield*).). Later, in *United States* v. *Solano*, 2008 WL 536648, (S.D.N.Y. Feb. 25, 2008), Judge Swain relied on *Masefield* and the controlling Second Circuit authority cited above to reject a Rule of Specialty challenge where the defendant had been extradited from the Dominican Republic for conspiring to import one kilogram and more of heroin but was later charged in a superseding indictment with conspiring to import heroin *and*

14

cocaine.  *Id.* at *1.  Judge Swain held that the defendant's challenge failed because he was charged under the same statutes prohibiting conspiracy to import and distribute *narcotics.  Id.* at *2.

Until recently, the Second Circuit had assumed, without deciding, that extradited defendants had standing to challenge to prosecution or subsequent sentence on specialty grounds. *See, e.g.*, *United States* v. *Fusco*, 560 Fed. Appx. 43, 45 n.1 (2d Cir. 2014) ("We need not resolve whether Fusco has prudential standing to challenge his prosecution and sentencing on the grounds that they violate the terms of the Extradition Treaty or the rule of specialty, because his argument plainly fails on the merits"); *United States* v. *Frankel*, 443 Fed. Appx. 603, 606 (2d Cir.2011) (avoiding the prudential standing question); *United States* v. *Cuevas*, 496 F.3d 256, 262 (2d Cir. 2007) (noting that the Second Circuit had not "conclusively decided whether a defendant has standing to challenge his sentence on the ground that it violates the terms of the treaty or decree authorizing his extradition"); *United States* v. *Banks*, 464 F.3d 184, 191 (2d Cir. 2006) (sidestepping question whether "the right to enforce [an extradition] agreement belongs to" the extraditing country or to the defendant).  .

However, in *United States* v. *Suarez*, 791 F.3d 363, a case involving an extradition from Colombia, the Second Circuit held, for the first time, that a defendant "would have prudential standing to raise the [Rule of Specialty] claim that his sentence violated the terms of his extradition if the Government of Colombia makes an official protest."  Id. at 367 (emphasis added).  The Circuit explained that, "[g]enerally speaking, 'absent protest or objection by the offended sovereign, [a defendant] has no standing to raise the violation of international law as an issue.'" *Id*. (quoting *United States* v. *Reed*, 639 F.2d 896, 902 (2d Cir. 1981)).  The *Suarez* Court suggested that the Government "ensure that the State Department is kept apprised when extradited defendants plead guilty, proceed to trial, or are sentenced."  *Id.* at 368.  The Second Circuit relied on *Suarez*

in *United States* v. *Garavito-Garcia*, 827 F.3d 242 (2d Cir. 2016), another case involving an extradition from Colombia, and held that "because 'the Government of Colombia [has not] first [made] an official protest,' Garavito-Garcia lacks standing to invoke the extradition treaty as a basis for the dismissal of the indictment." *Id.* at 247 (quoting *Suarez*, 791 F.3d at 367).

Accordingly, defendants seeking to invoke the Rule of Specialty must first present evidence that the extraditing country has objected to the alleged violation. Without such evidence, the claim fails for lack of standing. And, even if the defendant presents such evidence of sovereign protest, the claim is reviewed on the merits under the strict standards set forth in *Paroutian* and similar cases.

### B.    Discussion

Based on the foregoing authority, Isaza Tuzman lacks standing to challenge his prosecution under the Rule of Specialty because the government of Colombia has not protested his prosecution on the Indictment. Isaza Tuzman does not dispute this fact. Instead, he argues that it is no obstacle to his claim because, in his view, *Suarez*'s holding was strictly limited to challenges to sentences and that any broader discussion of prudential standing was *dicta*. (*See* Def. Br. at 13).

This argument is meritless. There is no principled basis to conclude that the Circuit's standing analysis hinges on whether the defendant challenges his prosecution or, subsequently, his sentence. Instead, the *Suarez* court was clear that an individual's rights under an extradition treaty are derivative of the sovereigns that are parties to the treaty. Without evidence of sovereign protest, Isaza Tuzman "has no standing to raise the violation of international law as an issue." *Suarez*, 791 F.3d at 367 (citing *Reed*, 639 F.2d at 902) (internal quotation marks omitted). Accordingly, *Suarez*'s holding applies to all defendants whether they "plead guilty, proceed to trial, or are

16

sentenced." *Suarez*, 791 F.3d at 368.  Isaza Tuzman offers no legal authority in support of his contrary reading of *Suarez*.

Even if Isaza Tuzman had standing, his Rule of Specialty claim would still fail.  The charges against Isaza Tuzman in the operative Indictment are the same charges contained in the original Indictment: conspiracy to commit securities fraud, conspiracy to commit wire fraud and conspiracy to commit accounting fraud offenses.  Although the current Indictment charges one month of additional accounting fraud (extending the conspiracy's end from March 2012 to April 2012), that minor change is not a basis for a Rule of Specialty violation.  *See*, *e.g.*, *Fiocconi*, 462 F.2d 481 (no violation when later criminal conduct added); *Rossi,* 545 F.2d 814 (no violation of specialty where extradition charge covered 1969-72 and indictment covered 1965-73); *Flores,* 538 F.2d 939 (no violation of specialty where extradition charge covered 1970-71 and indictment covered 1968-71).

Nor does the Government's decision to allege a broader set of facts, including facts related to KITD's Enable investment, violate the doctrine.  *See Masefield*, 2005 WL 236443, at *2 (Government "may include additional facts and additional charges as long as the statutory charge is the same").  Indeed, in *United States* v. *Abello-Silva*, 948 F.2d 1168 (1991), another case dealing with extradition from Colombia, the Tenth Circuit explained that a superseding indictment that charged the same offenses but added additional facts did not violate the Rule of Specialty.

In sum, even if Isaza Tuzman had standing, his Rule of Specialty challenge would fail on the merits.[3]

---

[3]     Consistent with the Second Circuit's guidance in *Suarez*, on the Government has informed the State Department, the U.S. Embassy in Colombia and the Department of Justice's Office of International Affairs that Isaza Tuzman intends to proceed to trial on October 2, 2017.

## POINT II

## ISAZA TUZMAN IS NOT ENTITLED TO A BILL OF PARTICULARS ON THE MARKET MANIPULATION CONSPIRACY

Isaza Tuzman requests a bill of particulars detailing all manipulative trades placed by Maiden in furtherance of the market manipulation conspiracy. He is not entitled to one. As detailed below, the Government has gone to extensive lengths to provide Isaza Tuzman with a wealth of evidentiary detail, including by charging him in a detailed speaking Indictment, giving him electronically-searchable discovery (which the defendant has had since July 2016), and engaging in ongoing discussions with his defense counsel in which the Government has presented its current view of the manipulative conduct for which he has been charged. Isaza Tuzman is not entitled to any additional particularity, and, accordingly, his motion should be denied.

### A.    Applicable Law

The proper purpose of a bill of particulars under Federal Rule of Criminal Procedure 7(f) is "to provide a defendant with information about the details of the charge against him if this is *necessary* to the preparation of his defense, and to avoid prejudicial surprise at trial." *United States* v. *Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (quotation marks and citation omitted; emphasis added). Accordingly, "[a] bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States* v. *Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (quotations marks and citation omitted); *see United States* v. *Mahabub*, 2014 WL 4243657, at *2 (S.D.N.Y. 2014); *United States* v. *Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977) ("The purpose of a bill of particulars is to apprise defendant of the essential facts of a crime.").

In exercising its broad discretion to determine whether the charges are "so general" that they require supplementing, the Court should consider not just the text of the Indictment, but also discovery and other information supplied to the defendant to date. *See United States* v. *Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *see also, e.g.*, *United States* v. *Torres*, 901 F.2d at 234 (affirming denial of request for bill of particulars where defendants had "'been provided with a wealth of evidentiary detail from the discovery to date, including electronic intercepts, search evidence and exhaustive supporting affidavits'") (quoting district court); *United States* v. *Monserrate*, 2011 WL 3480957, at *4 (S.D.N.Y. 2011) (denying request for bill of particulars where discovery materials and indictment were "sufficient to apprise the defendant of the charge against him" and to allow him to prepare for trial); *United States* v. *D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) (denying bill of particulars request where supplementary facts supplied to defense by way of letter); *United States* v. *Cuti*, 2009 WL 3154310, at *3-4 (S.D.N.Y. 2009) (in accounting fraud case, denying request for particulars identifying all fraudulent transactions, payments, and statements made in furtherance of charged scheme where Government had furnished more than a million pages of discovery and, by letter, identified a series of fraudulent transactions and payments); *United States* v. *Samsonov*, 2009 WL 176721, at *4 (S.D.N.Y. 2009) (denying bill of particulars request where indictment, discovery letters, and discovery materials gave defendant adequate information to prepare for trial); *United States* v. *Earls*, 2004 WL 350725, at *4-5 (S.D.N.Y. 2004) (denying motion for bill of particulars in fraud case where, among other things, Government had "furnished the defendant with voluminous discovery"); *United States* v. *Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (denying bill of particulars request in stock fraud case where indictment was 15 pages long and substantial discovery had been provided); *United States* v. *Henry*, 861 F. Supp. 1190, 1198 (S.D.N.Y. 1994) ("In determining whether to grant a motion

requesting a bill of particulars, the Court must ascertain whether the information sought has been provided elsewhere, such as through pre-trial discovery, voluntary disclosure by the government, or the indictment itself.").

Although the Government's provision of "mountains of documents to defense counsel who [a]re left unguided as to which documents" are relevant to the charges does not substitute for a bill of particulars where one would otherwise be required, *see United States* v. *Bortnovsky*, 820 F.2d at 575; *United States* v. *Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000), the provision of voluminous discovery in combination with some guidance about what is most relevant can vitiate a need for further particulars, *see, e.g.*, *United States* v. *Kazarian*, 2012 WL 1810214, at *25 (S.D.N.Y. 2012); *United States* v. *Mandell*, 710 F. Supp. 2d 368, 385 (S.D.N.Y. 2010) (denying request for particularization of alleged misrepresentations where the indictment was 34 pages long and Government had provided voluminous, organized discovery). In no event should volume of discovery alone warrant a bill of particulars; "[w]hile [a] [c]ourt may sympathize with counsel's task of reviewing a large quantity of materials that continue to be produced," that concern is addressed by granting the defense sufficient time in which to conduct the review in advance of trial. *See United States* v. *Levy*, 2013 WL 664712, at *13 (S.D.N.Y. 2013).

Bills of particulars would undoubtedly be helpful to the defense in any case. But "the law does not impose upon the Government an obligation to preview its case or expose its legal theories," *United States* v. *Leonelli*, 428 F. Supp. at 882, and therefore "[t]he ultimate test must be whether the information sought is necessary, not whether it is helpful," *United States* v. *Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001); *United States* v. *Mahabub*, 2014 WL 4243657, at *2 ("The purpose of a bill of particulars is to ensure that a defendant has the information necessary to prepare a defense, not to turn over all information that would aid the defendant."); *United States*

v. *Rittweger*, 259 F. Supp. 2d 275, 292-93 (S.D.N.Y. 2003) (denying bill of particulars request as "an impermissible attempt to compel the Government to provide the evidentiary details of its case") (citation and quotation marks omitted).

A bill of particulars should not be misused to compel the Government to disclose "the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crime charged, or a preview of the Government's evidence or legal theories." *United States* v. *Mitlof*, 165 F. Supp. 2d at 569; *see also Torres*, 901 F.2d at 234 ("'Acquisition of evidentiary detail is not the function of the bill of particulars.'") (quoting *Hemphill* v. *United States*, 392 F.2d 45, 49 (8th Cir. 1968)). The "'wheres, whens and with whoms'" are "beyond the scope of a bill of particulars." *Mitlof*, 165 F. Supp. 2d at 569 (citing *Torres*, 901 F.2d at 233-34); *see also, e.g.*, *United States* v. *D'Amico*, 734 F. Supp. 2d at 335 ("'A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial.'") (quoting *United States* v. *Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001)); *United States* v. *Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory."); *United States* v. *Henry*, 861 F. Supp. at 1197 (S.D.N.Y. 1994) ("This instrument should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense.").

There are good reasons why bills of particulars are warranted only where the allegations in the indictment, as supplemented by discovery and elsewise, are so general as to render it impossible to prepare a defense. Because "a bill of particulars confines the Government's proof

to particulars furnished," it can "restrict unduly the Government's ability to present its case." *Id.*;
*see also Mitlof*, 2014 WL 4243657, at *2 (recognizing that "care must be taken" in deciding
whether to order a bill of particulars because "[t]he government's presentation of evidence at trial
is limited to the particulars contained in the bill"); *United States* v. *Samsonov*, 2009 WL 176721,
at *3 ("The vehicle of a bill of particulars serves to inform a defendant of the nature of the charge,
when he is otherwise insufficiently informed, and must not be misused to compel disclosure of
how much the Government can prove, nor to foreclose the Government from using proof it may
develop as the trial approaches."). Moreover, the Government's provision of particulars
tantamount to an itemized preview of its proof creates the very real danger that a defendant will
"tailor [his] testimony to explain away the Government's case." *Henry*, 861 F. Supp. at 1197.
These concerns animate the rule that "if the defendant has been given adequate notice of the
charges against [him] and can prepare fully for trial with reasonably diligent efforts, the
Government cannot be required to disclose additional details about its case." *Id.*

Courts have had no difficulty applying the foregoing principles consistently in cases, like
this one, alleging conspiracy to commit market manipulation. In *United States* v. *Heredia*, a court
denied a motion for a bill of particulars in a market manipulation case. 2003 WL 21524008, at *9
(S.D.N.Y. 2003). The court in *Heredia* denied the defendants' motion for a bill of particulars,
emphasizing that "[t]he Government is not required to disclose the manner in which it will attempt
to prove the charges, nor the means by which the crimes charged were committed." *Id.* The court
noted that the indictment specified the "*nature* of the acts with which the defendants are charged,"
with accompanying "dates and approximate place of where and when the alleged events occurred,"
even if it did not detail every act in furtherance of the scheme and conspiracy. *See id.* (emphasis
added); *see also United States* v. *Levy* No. 11 Cr. 62, 2013 WL 664712, at *13 (S.D.N.Y. Feb. 25,

22

2013)   (denying a bill of particulars in a market manipulation case where indictment described "the types of material misrepresentations and omissions that [the defendant] allegedly made"; "the extent of [the defendant's] financial commitment to the target companies"; and "[the defendant's] participation in the manipulation of the target companies' stock"); *United States* v. *Lino*, 2001 WL 8356, at *7, 11 (S.D.N.Y. 2001) (refusing to order bill of particulars in market manipulation scheme).

More recently, in *United States* v. *Wey*, another market manipulation case, Judge Nathan denied the defendant's attempt (identical to Isaza Tuzman's) to obtain disclosure of "trade-level detail," including an exhaustive list of manipulative trades.   2017 WL 237651, at *19 (S.D.N.Y. Jan. 18, 2017).   Relying on other market manipulation precedents, including *Heredia* and *Levy*, in which requests for a bill of particulars were denied, the court explained that the request for every manipulative trade sought to "compel the production of the very type of evidentiary minutiae that is not appropriate in a bill of particulars."   *Id.* (quoting *United States* v. *Levy*, No. 11 Cr. 62, 2013 WL 664712, at *13 (S.D.N.Y. Feb. 25, 2013)).

**B.    Discussion**

The fact that Isaza Tuzman *wants* a bill of particulars does not mean that, under the law, he *needs* one.   In reality, Isaza Tuzman's request runs afoul of Rule 7(f) because he seeks the "[a]cquisition of evidentiary detail" which, the Second Circuit has made clear, "is not the function of the bill of particulars."   *United States* v. *Torres*, 901 F.2d 205, 234 (2d Cir. 1990).

As an initial matter, the Government notes that Isaza Tuzman has been sufficiently apprised of the market manipulation charge he faces.   The 69-page speaking Indictment includes considerable detail about the market manipulation scheme.   It explains the purpose of the scheme (to artificially boost the share price and trading volume of KITD shares) (*See* Ind. ¶ 56).   It details

the person executing the manipulative trading (Maiden) (*See id.*).  It notes the trading accounts used to further the scheme (two accounts used by Maiden Capital) (*See* Ind. ¶ 61.) It highlights the manipulative means and methods Isaza Tuzman and his co-conspirators used to execute the scheme (primarily wash trading in which Maiden would, for instance, sell a quantity of KITD stock and then purchase a similar amount the KITD stock in the same account) (*See id.*).  It also contains numerous examples of the defendant and Maiden's communications in which the defendant encourages Maiden to manipulate the KITD stock.  (*See* Ind. ¶ 62).

Critically, the Indictment also offers specific examples, with corresponding dates, of manipulative trading. (*See* Ind. ¶ 61). Indeed, Isaza Tuzman concedes that the Government details multiple instances of the manipulative trading in the Indictment, (*See* Isaza Tuzman Br. at 25), a considerable list of overt acts that far outstrips the Government's minimal pleading requirements. *See, e.g.*, *United States* v. *Smith*, 464 F.2d 1129, 1134 (2d Cir. 1972) ("[T]he function of the overt act in a conspiracy indictment and trial is simply to manifest that the conspiracy is at work.  The overt act pleaded need not even be criminal.").  He nonetheless complains that the Government failed to list *all* manipulative trades in the S8 Indictment. (*See* Isaza Tuzman Br. at 26 to the Government's examples as "bare bones identification of a handful of Maiden Capital purchases of KITD stock").  But it is axiomatic that, at least in cases where some specific examples are offered, the Government is not required to furnish an inventory of every act it plans to prove furthered the fraud.  *See, e.g.*, *United States* v. *Bonventre*, 2013 WL 2303726, at *5-7 (S.D.N.Y. May 28, 2013) (in case involving largest Ponzi scheme in U.S. history, which spanned decades, denying request for bill of particulars identifying, among other things, "the specific arbitrage trades in which [a defendant] was involved that the Government alleges are fraudulent," the "dates and stock names for all allege backdated transactions," "all unnamed clients and allegedly fake trades referred to

in" a particular count, and all allegedly false documents and records); *Cuti*, 2009 WL 3154310, at *3-4 (in accounting fraud case alleged to have spanned years, denying request for bill of particulars identifying every fraudulent transaction).

The Government has also had numerous telephone conversations with defense counsel in which it has provided additional detail regarding the market manipulation scheme. Specifically, in response to Isaza Tuzman's request for a date-certain after which all trading was manipulative, the Government explained that it considered all trading after December 31, 2008 to be in furtherance of the conspiracy. The Government, however, further explained that it was reluctant to be cabined to that view because, as the trial proof developed, it could not rule out the possibility that Maiden executed isolated trades for legitimate purposes.[4]  To aid defense counsel's review of the trading records, the Government encouraged defense counsel to focus on the examples of manipulative conduct identified in the Indictment in order to isolate other manipulative trades, and specifically called defense counsel's attention to wash trading, which will help defense counsel narrow the universe of trades that are clearly manipulative.

Finally, Isaza Tuzman has had the Government's discovery, which includes trading records for the relevant Maiden accounts, since July 2016.  By the October 2, 2017 trial date, Isaza Tuzman will have had nearly 15 months to review the trading records.  He will also be aided by the Government's pretrial production of exhibits and 3500 material, which will include Maiden's statements about the charged conspiracy.  Accordingly, the defendant's claim – that without a bill

---

[4]     Ironically, the Government's prudence is being used against it.  The defendant concedes that, if the Government simply claimed that every trade after December 31, 2008 was made in furtherance of the conspiracy, then the defendant would not be entitled to a bill of particulars.  (*See* Isaza Tuzman Br. at 29 (citing *United States* v. *Dupree*, No. 10 Cr. 627 (KAM), 2011 WL 5976006, at *7 (E.D.N.Y. Nov. 29, 2011) (denying bill of particulars when Government alleged fraud "permeated and sustained" the entire business) and *United States* v. *Drivas*, No. 10 Cr. 771 (NG), 2012 WL 3011023, at *4 (E.D.N.Y. July 19, 2012) (denying bill of particulars when Government alleged that all transactions bill to Medicare were fraudulent).)

of particulars he will be to left "comb through" trading records in a "blind attempt to discern which additional trades the government believes to have been improper" – rings hollow. (Isaza Tuzman Br. at 29).

Equally unpersuasive is the defendant's attempt to blur the distinction between market manipulation cases (where courts consistently deny requests for particularization) and insider trading cases (where some courts have been more receptive to particularization).  The mere fact that both types of crimes involve "improper trading activity" – as Isaza Tuzman puts it (*id.* at 27) – and fall under the securities fraud umbrella does not mean they are analytically similar.  Nor do the insider trading precedents support Isaza Tuzman's demand that the Government itemize every manipulative trade made in furtherance of the conspiracy count. First, as *United States* v. *Rajaratnam* and other insider trading cases like *United States* v. *Martoma* make clear, defendants "'are not entitled to an itemization of trades at issue in the conspiracy counts' of insider trading cases," *Martoma*, 2013 WL 2435082, at *6 (S.D.N.Y. June 5, 2013) (quoting *Rajaratnam*, 2010 WL 2788168, at *9 (S.D.N.Y. 2010) and noting that, in *Rajaratnam*, the conduct "spann[ed] six years and involve[d] dozens of stocks, dozens of co-conspirators, and a total of seven conspiracies")).   Second, because the crux of a tipper-tippee insider trading case is the tip, the nature of the charge necessarily centers on the substance and timing of the alleged tip.  By contrast, market manipulation charges like the ones brought here (and in *Heredia* and *Wey*) center not on any particular conveyance of information but instead on concerted action taken over time to move the price of a given stock or set of stocks.  And particularly given the fact that Isaza Tuzman has been charged only with *conspiracy* to commit market manipulation, the Government need not prove every single instance in which Maiden bought or sold KITD stock with the intent to boost the stock price or volume.  Indeed, as a matter of law, after signing the December 31, 2008 market

manipulation agreement, and taking one overt act in furtherance of the agreement (such as wiring money from KITD to Maiden Capital for manipulative trading), there need not have been any manipulative trading at all for the jury to find Isaza Tuzman guilty. *Rajaratnam* and similar insider trading cases, therefore, do not support Isaza Tuzman's motion for a bill of particulars on this single conspiracy count.

Furthermore, Isaza Tuzman has failed to present a single example in which a court has required the Government to itemize all manipulative trades in a market manipulation conspiracy case. His reliance on other types of cases in which a bill of particulars was granted, such as *United States* v. *Bortnovsky* and *United States* v. *Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000), does not compensate for his lack of precedential support. (*See* Isaza Tuzman Br. at 28 (citing cases).) In *Bortnovsky*, an insurance fraud case, the Government refused to identify at any point before trial which of 15 burglaries were alleged to have been fabricated and thus the subject of fraudulent insurance claims. 820 F.2d at 575. And, in *Nachamie*, a Medicare fraud case, the district court relied on *Bortnovsky* to require the Government to identify the Medicare claims (out of the 2,000 claims for which it had produced discovery) it alleged were fraudulent.

These cases do not help Isaza Tuzman. As an initial matter, in *Nachamie*, the district court denied multiple defense requests, identical to Isaza Tuzman's request here, that "the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge." 91 F. Supp. 2d at 575-76 (quoting *United States* v. *Carroll*, 510 F.2d 507, 509 (2d Cir. 1975), and citing *United States* v. *Feola*, 651 F. Supp. 1068 (S.D.N.Y. 1987) ("It is well settled that defendants need not know the means by which it is claimed they performed acts in furtherance of the conspiracy nor the evidence which the Government intends to adduce to prove their criminal acts.")). And, more importantly, as noted above, the Government already has provided Isaza

27

Tuzman with substantial guidance – through the detailed Indictment, pretrial discovery, and multiple conversations with defense counsel in which it has already identified December 31, 2008 as the key date after which most, if not all, trading was manipulative.  These facts distinguish this case from cases like *Bortnovsky* and *Nachamie*, where adequate notice was not provided and the defendants were charged with substantive counts.

For these reasons, the defendant's motion for a bill of particulars should be denied.

## POINT III

## OMAR AMANAT'S MOTION TO DISMISS COUNT FOUR BASED ON DUPLICITY SHOULD BE DENIED

Omar Amanat moves to dismiss Count Four on grounds of "facial duplicity," arguing that the count improperly combines two "disparate" conspiracies or schemes:  first, a December 2008 "written agreement executed by Tuzman, Maiden, and [Omar] Amanat for Maiden to purchase [$400,000] of KIT Digital shares on the open market for a limited period," and, second, "an agreement solely between Tuzman and Maiden for Maiden to continue purchasing a large volume of KIT Digital shares for a period of several years."  (Amanat Br. at 4, 26-27).  In the alternative, Omar Amanat asks the Court to "order the [G]overnment to elect which conspiracy it will attempt to prove and strike the other."  (*Id.*)  The Court should deny these motions.

### A.    Applicable Law

"An indictment is impermissibly duplicitous where:  (1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a separate count for each offense,' and (2) the defendant is prejudiced thereby."  *United States* v. *Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001) (quoting *United States* v. *Murray*, 618 F.2d 892, 896 (2d Cir. 1980)).  Determination of whether a count is duplicitous is based on allegations in the

indictment itself, not on the anticipated trial evidence.  *United States* v. *Droms*, 566 F.2d 361, 363 (2d Cir. 1977).

The Second Circuit has long held that even where certain acts could be charged as separate counts of an indictment, they "may instead be charged as a single count if those acts could be characterized as part of a single continuing scheme."  *United States* v. *Aracri*, 968 F.2d 1512 (2d Cir. 1992); *United States* v. *Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989); *see also United States* v. *Moloney*, 287 F.3d 236, 240 (2d Cir. 2002).  In other words, "[a]s long as the essence of the alleged crime is carrying out a single scheme to defraud, then aggregation is permissible."  *Tutino*, 883 F.2d at 1141; *see also United States* v. *Bryan*, 868 F.2d 1032, 1037-38 (9th Cir. 1989) ("[T]he defrauding of different people over an extended period of time, using different means and representations, may constitute but one scheme.  Where the set of fraudulent transactions alleged in a count is within the conceivable contemplation of a greedy mind, no duplicity has occurred.") (internal quotation marks omitted).

Finally, a conspiracy offense requiring an overt act, like the market manipulation conduct charged in Count Four, is properly charged, for statute of limitations purposes, if at least one overt act was committed within five years of the indictment.  *Grunewald* v. *United States,* 353 U.S. 391, 396–97, 77 (1957).  Therefore, a charge that properly alleges a single, continuous conspiracy with an overt act committed within five years of the indictment should not be dismissed on duplicity grounds.  *See United States* v. *Castellano*, 610 F. Supp. 1359, 1381 (S.D.N.Y. 1985).

### B.    Discussion

On its face, the Indictment properly pleads a single, continuous scheme supported by at least one overt act within the statute of limitations.  Specifically, Count Four charges that between in or about December 2008 and in or about September 2011, Omar Amanat, Isaza Tuzman and

Maiden participated in a securities fraud conspiracy, the object of which was to artificially inflate the share price and trading volume of KITD shares. (Ind. ¶56). The Indictment further provides four overt acts committed in furtherance of the conspiracy: (a) a written December 2008 agreement executed by Isaza Tuzman, Omar Amanat and Maiden; (b) manipulative purchases by Maiden between January and February 2009; (c) manipulative purchases by Maiden in March 2011; and (d) a July 2011 meeting involving Isaza Tuzman, Omar Amanat and Maiden.

While this information alone would be sufficient, the Indictment contains much more – nearly twenty additional paragraphs detailing the market manipulation scheme, and the roles and incentives of Isaza Tuzman, Omar Amanat and Maiden at various points during the multi-year conspiracy. The information in the Indictment clearly demonstrates that the acts charged within Count Four "are of the same or similar character . . . or are connected with or constitute parts of a common scheme or plan." Fed. Rule Proc. 8(a); *see Aracri*, 968 F.2d 1512.

The detail in the Indictment also demonstrates the falsity of Omar Amanat's claims that the market manipulation conspiracy ended after Maiden's initial $400,000 purchase of KITD shares, or that the Omar Amanat had no further stake or involvement in later manipulative purchases. For example, paragraph 62 of the Indictment alleges:

> Maiden continued to purchase KIT Digital stock based on the notion that continued support of KIT Digital's stock price would facilitate Maiden Capital being repaid, thereby permitting Maiden to hide the Enable losses from Maiden Capital investors.

(Ind. ¶62).[5]

---

[5] Omar Amanat argues that "the materials provided in discovery provide additional support for the proposition" that Count Four constitutes two conspiracies. While the relevant inquiry is whether the Indictment properly pleads a single offense, which it clearly does, the evidence in this case, including emails outlined above, will show that: (a) Omar Amanat took credit for Maiden's continued purchases of KIT after the initial $400,000; and (b) Omar Amanat had a substantial and continued interest in the success of the ongoing market manipulation efforts as a mechanism to hide the Enable losses.

Nor does the fact that Isaza Tuzman did, at times between 2009 and 2011, direct Maiden to engage in manipulative trades without Omar Amanat's direct knowledge or involvement demonstrate that the acts in Count Four were not part of a single, ongoing market manipulation scheme. The law does not require that co-conspirators agree at the outset of the conspiracy on each and every tactic they might undertake in support of the "essential nature of the[ir] plan." *United States* v. *Eppolito*, 543 F.3d 25, 47 (2d Cir. 2008); *see also id.* ("The coconspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan.") (internal quotation marks omitted); *United States* v. *Crosby*, 294 F.2d 928, 945 (2d Cir. 1961) ("It is certainly no problem that not all the details were formulated at the outset. A single scheme to defraud may involve a multiplicity of ways and means of action and procedure. It may be such that the complete execution of it would involve the commission of more than one criminal offense." (internal quotation marks omitted)); *United States* v. *Brockenborrugh*, 575 F.3d 726,737 (D.C. Cir. 2009) ("[A] single conspiracy can pursue multiple schemes . . . without dividing into multiple conspiracies.").

Finally, the Defendant's reliance on *United States* v. *Munoz-Franco*, 986 F.Supp. 70 (D.P.R. 1997), a non-binding decision from the District of Puerto Rico, is misplaced. In *Munoz-Franco*, two corrupt bank employees together engaged in two separate schemes in which "the commercial and real estate transactions and loans of [scheme one] were totally unconnected with the transactions and construction loans involving [scheme two]." 986 F.Supp. at 72. In fact, unlike the multiple connected facts and transactions underlying the fraud schemes here – such as the shared actions undertaken to hide the Enable losses – the two schemes in *Munoz-Franco* were so separate that they did not involve a single "instance of an overt act where there [was] a crossing of lines of a participant from one conspiracy to the other, except for the two bank officers." *Id.*

31

For these reasons, the defendant's motion to dismiss or strike any portion of Count Four should be denied.

## POINT IV

## THE DEFENDANTS' SEVERANCE AND IMPROPER JOINDER MOTIONS SHOULD BE DENIED

Isaza Tuzman and Omar Amanat each seek severance of counts and separate trials. Omar Amanat argues, under Rule 8, that Counts One through Three are improperly joined with Counts Five and Six. Both defendants seek separate trials and/or to sever Counts One through Three from Count Six under Rule 14(a) based on concerns of spillover prejudice and the parties' history of antagonism. These arguments are meritless. The conduct underlying each of the charges in the Indictment involves an interrelated series of acts and transactions involving many of the same participants. The evidence would be almost entirely the same whether this case is tried jointly or separately. Courts have recognized a "particularly strong" preference for joint trials in multi-defendant conspiracy cases like this one, *United States* v. *Salameh*, 152 F.3d 88, 115 (2d Cir. 1998); *see also United States* v. *Spinelli*, 352 F.3d 48 (2d Cir. 2003); *United States* v. *Bosch*, 385 F. Supp. 2d 387, 389 (S.D.N.Y. 2005), and neither Isaza Tuzman nor Omar Amanat provides reason to disregard that preference here other than the "run-of-the-mill situation where codefendants accuse one another of being the guilty parties." *United States* v. *Nadeem*, 2014 WL 3563407, at *6 (E.D.N.Y. July 18, 2014).

### A.    The Defendants and Offenses are Properly Joined Under Rule 8

### 1.    Applicable Law

Rule 8 of the Federal Rule of Criminal Procedure provides:

> Rule 8(a) Joinder of Offenses. The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are

> of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.
>
> Rule 8(b) Joinder of Defendants. The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8.

"When a defendant in a multiple-defendant case challenges joinder of offenses, his motion is made under 8(b) rather than 8(a)." *United States* v. *Turoff*, 853 F.2d 1037, 1043 (2d Cir. 1988); *see United States* v. *Ohle*, 678 F. Supp. 2d 215, 224 (S.D.N.Y. 2010) ("[Al]though Rule 8(a) addresses joinder of offenses and Rule 8(b) concerns joinder of defendants, when a defendant in a multi-defendant action challenges joinder in the Southern District of New York, whether of offenses or defendants, the motion is typically construed as arising under Rule 8(b).") (internal quotations and citation omitted).  The Second Circuit has interpreted Rule 8(b) to mean that " 'joinder is proper where two or more persons' criminal acts are 'unified by some substantial identity of facts or participants,' or 'arise out of a common scheme or plan.' " *United States* v. *Rittweger*, 524 F.3d 171, 177 (2d Cir. 2008) at 177 (quoting *United States* v. *Cervone*, 907 F.2d 332, 341 (2d Cir. 1990)).  "Under the plain language of Rule 8(b), the decision to join parties turns on what is 'alleged' in the 'indictment' " ' not on the evidence adduced at trial. *Rittweger*, 524 F.3d at 178 (citing Fed. R. Crim. P. 8(b)).

### 2.     Discussion

Counts One through Three are properly joined with Count Six under Rule 8(b), which looks to the allegations in the Indictment.  *See Rittweger*, 524 F.3d at 178.  Both the scheme to defraud Maiden Capital investors (Counts One through Three) and the securities fraud related to KIT

digital (Count Six) were unified by a common scheme or plan, carried out and sustained by the Amanat brothers, Isaza Tuzman and Maiden, to conceal the Enable losses.

Omar Amanat's claim that joinder of these counts improper because the scheme alleged in Count Six was a "far more complex and multifaceted operation led by Tuzman to defraud KIT Digital shareholders" is unpersuasive.  At its core, the KIT digital accounting fraud scheme charged in Count Six involved efforts led by Isaza Tuzman to misrepresent the financial health of KITD to KITD shareholders, auditors and the public.  While the accounting fraud scheme involved additional participants and multiple forms, such as the creation of false and/or improperly recognized revenue, hiding the Enable losses was essential to its success.  Isaza Tuzman had misled KITD's Board and auditors into believing that KITD's investment with Enable, which constituted as much as 70% of KITD's available cash, was maintained in a liquid asset management account earning a steady interest rate.  (Ind. ¶¶ 23, 137).  If KITD's auditors and shareholders had known that the Enable money was not redeemable, Isaza Tuzman's other efforts to make KITD appear financially successful would have collapsed far earlier than they did.

Disclosure of the Enable losses would have been similarly disastrous to Maiden, as Omar Amanat concedes. (Amanat Br. at 17) ("Maiden Capital's $2 million investment in Enable represented one-fourth of Maiden Capital investors' total losses when Maiden Capital collapsed."). In fact, because the Enable investment was supposed to be liquid, the impact on Maiden Capital of not being able to redeem those funds was even more acute as is shown by the fact that Maiden Capital collapsed shortly after Omar Amanat stopped providing Maiden with money to meet investor redemption requests.

Finally, the market manipulation scheme charged in Count Four facilitated the fraud on Maiden Capital investors (Counts One through Three) and the Kit Digital accounting fraud (Count

Six), an additional reason why joinder of these counts is proper.  By inflating the value of KITD

shares, the market manipulation scheme made KITD look financially healthier than it was, thereby

assisting the fraud charged in Count Six.  In addition, because Maiden hoped to receive and use

shares of the KIT SPIV to hide the hole created by the Enable losses, the market manipulation

scheme's positive impact on KIT's share price facilitated the fraud on Maiden Capital investors

charged in Counts One through Three.

### B.    Severance Under Rule 14 Is Not Warranted

#### 1.    Applicable Law

Rule 14 provides that "[i]f the joinder of offenses or defendants in an indictment, an

information, or a consolidation for trial appears to prejudice a defendant or the government, the

court may order separate trials of counts, sever the defendants' trials, or provide any other relief

that justice requires."  A defendant seeking severance under Rule 14, however, has a very heavy

burden.  "There is a preference in the federal system for joint trials of defendants who are indicted

together."  *Zafiro* v. *United States*, 506 U.S. 534, 537 (1993)  "This preference is particularly

strong where, as here, the defendants are alleged to have participated in a common plan or

scheme."  *Salameh*, 152 F.3d at 115; *see also Spinelli*, 352 F.3d at 55 ("Joint trials are often

particularly appropriate in circumstances where the defendants are charged with participating in

the same criminal conspiracy.").  As the Supreme Court has explained:

> It would impair both the efficiency and the fairness of the criminal
> justice system to require . . . that prosecutors bring separate
> proceedings, presenting the same evidence again and again
> requiring victims and witnesses to repeat the inconvenience (and
> sometimes trauma) of testifying, and randomly favoring the last-
> tried defendants who have the advantage of knowing the
> prosecution's case beforehand. Joint trials generally serve the
> interests of justice by avoiding inconsistent verdicts and enabling
> more accurate assessment of relative culpability—advantages which
> sometimes operate to the defendant's benefit. Even apart from these

> tactical considerations, joint trials generally serve the interests of
> justice by avoiding the scandal and inequity of inconsistent verdicts.

*Richardson* v. *Marsh*, 481 U.S. 200, 210 (1987).  In light of this presumption, "defendants are not entitled to severance [under Rule 14] merely because they may have a better chance of acquittal in separate trials." *Zafiro*, 506 U.S at 540.  Relatedly, an argument for severance based on mutually antagonistic defenses will only succeed "if, in order to accept the defense of one defendant, the jury must necessarily convict a second defendant."  *United States* v. *Van Hise*, 12-CR-847 (PGG), 2013 WL 6877319, at *12 (S.D.N.Y. Dec. 31, 2013) (citing *United States* v. *Cardascia*, 951 F.2d 474, 484 (2d Cir. 1991)).

Finally, even assuming that a particular defendant is somehow prejudiced by joinder, the issue under Rule 14 is whether that prejudice "'is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials.'"  *United States* v. *Page*, 657 F.3d 126,129 (2d Cir. 2011) (quoting *United States* v. *Walker*, 142 F.3d 103,110 (2d Cir. 1998)).  Indeed, it is well settled that "differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *United States* v. *Carson*, 702 F.2d 351, 366 (2d Cir. 1983); *United States* v. *Torres*, 901 F.2d 205, 230 (2d Cir. 1990); *see also United States* v. *Zackson*, 6 F.3d 911, 922 (2d Cir. 1993).  Indeed, the Supreme Court has instructed that district courts should only grant a severance under Rule 14 when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.  Consequently, "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." *Id.*  Instead, a proper limiting instruction that the jury consider the evidence separately as to each charge against each defendant will typically provide appropriate protection against any potential for confusion or prejudice.

### 2.      Discussion

The defendants' requests for severance are meritless and should be denied.  Both Isaza Tuzman and Omar Amanat are charged with conspiring with each other and others in order to commit various fraud offenses related to Maiden Capital and/or KITD.  While Isaza Tuzman is not charged in the scheme to defraud Maiden Capital investors, he is an unindicted co-conspirator in that scheme, having helped devise plans to hide the Enable losses, including allocating shares of the KIT SPIV to Maiden and participating in the market manipulation conspiracy.  Analogously, Omar Amanat is an unindicted participant in the fraud on KITD investors and auditors.  Neither defendant identifies any particular reason that separates this case from numerous others in which multiple co-conspirators are charged and tried together for their crimes despite inevitable differences in their involvement, conduct, culpability, and lack of esteem for one another.  In the absence of this showing, this is hardly the exceptional case that warrants departing from the "particularly strong" preference for joint trials of defendants charged with interconnected schemes. *Salameh*, 152 F.3d at 115; *see also Spinelli*, 352 F.3d at 55 ("Joint trials are often particularly appropriate in circumstances where the defendants are charged with participating in the same criminal conspiracy."); *Bosch*, 385 F. Supp. 2d at 389 (S.D.N.Y. 2005) ("The arguments in favor of a joint trial are especially compelling where, as here, the crime charged involves a criminal conspiracy.").

### a.      Spillover Prejudice

Despite their claims to the contrary, neither defendant will be subject to any "spillover prejudice" from a joint trial.  Each defendant attempts to characterize the Government's charges and evidence to suggest that there is little overlap in the nature of the evidence that would be

introduced were separate trials conducted.  Isaza Tuzman, for example, argues that a joint trial would involve the admission of a "mountain of evidence implicating the Amanats in a scheme to defraud Maiden Capital investors."  (Isaza Tuzman Br. at 16).  Similarly, Omar Amanat argues that a joint trial would expose him to evidence concerning the "intricate multiple complex account fraud schemes employed in the KIT Digital Fraud."  (Amanat Br. atr. 15).  The defendants' characterization of the evidence attempts to create an artificial distance between them so as to generate an appearance of prejudice.  Indeed, Omar Amanat argues that a joint trial "would provide negligible, if any efficiency gains" in light of "the scant facts that both schemes have in common." (Amanat Br. at 16).  These arguments fall wide of the mark.  While it is always the case in a large fraud scheme that not *all* of the evidence presented at trial will directly implicate each co-conspirator, nor that each defendant is equally culpable, neither is the test for severance. *See Carson*, 702 F.2d at 366; *Torres*, 901 F.3d 911.

Here, the evidence to be introduced at separate trials would overlap considerably given the intertwined nature of the conduct underlying the charges in this case, beginning with the defendants' 2008 *quid pro quo* agreement to raise money for each other and extending to the defendants' joint efforts to hide the Enable losses to suit their respective needs.  As a result, contrary to the defendants' assertions, it is difficult to envision a case involving multiple fraudulent schemes in which the evidence relating to those schemes is more intertwined.

The upshot of the factual overlap is also that neither defendant would benefit from severance:  the evidence will be same whether they are trial jointly or separately.  Indeed, since Isaza Tuzman and Omar Amanat are co-conspirators, each defendant's statements during the conspiracy would be admissible against the other. *See, e.g.*, *United States* v. *Villegas*, 899 F.2d 1324, 1347 (2d Cir. 1990) (finding no prejudicial spillover where evidence regarding a charged

conspiracy would have been admitted at a severed trial); *United States* v. *Bari*, 750 F.2d 1169, 1178 (2d Cir. 1984) (denying motion to sever "the least active, but nevertheless fully implicated conspirator" because the evidence would have been admissible at a separate trial); *United States* v. *Rahman*, 854 F. Supp. 254, 262 (S.D.N.Y 1994) ("Once such proof is shown to be admissible, there is no potential prejudice to be avoided by severing the charges [or defendants] to which that proof relates.").

### b.   Antagonistic Defenses

Isaza Tuzman and Omar Amanat also claim that their trials should be severed because they expect to introduce mutually antagonistic defenses. For example, Isaza Tuzman speculates that "Amanats' defenses will consist of pointing the finger" at Isaza Tuzman. (Isaza Tuzman Br. at 22). Omar Amanat similarly expects that Tuzman "will vigorously seek to bolster the government's case against Amanat on the Maiden Capital Fraud" through "Tuzman's own accusations made at the time," presumably in the form of contemporaneous emails and text messages, and by casting himself as a victim of the Amanat's Enable-related misconduct. (Amanat Br. at 22). Omar Amanat further argues that Isaza Tuzman will blame Amanat for causing the Enable losses, which, according to Amanat, is antagonistic to his defense that the Enable monies were not misappropriated or lost but frozen by a foreign brokerage firm. (Ind. ¶ 21). All of these claims are meritless.

First, the Second Circuit has expressly stated that "[m]ere fingerpointing does not require severance." *United States* v. *Casamento*, 887 F.2d 1141, 1154 (2d Cir.1989); *Villegas*, 899 F.2d at 1346 ("The mere fact that codefendants seek to place the blame on each other, is not the sort of antagonism that requires a severance."). The standard for severance requires far more. *See, e.g.*, *United States* v. *Garcia*, 780 F. Supp. 166, 175 (S.D.N.Y. 1991) (noting the "extremely heavy

burden" of a defendant seeking severance).[6]   Co-conspirators commonly unite for a particular purpose but nonetheless have different personal objectives motivating their participation in a conspiracy.   As a result, they will have different levels of culpability and knowledge, different conduct, and conflicting defenses at trial that generate adversarial stances at trial.   But "an adversarial stance by a codefendant clearly does not, alone, require trials to be severed. Were this true, a virtual ban on multi-defendant conspiracy trials would ensue since co-conspirators raise many different and conflicting defenses." *Cardascia*, 951 F.2d at 485; *United States* v. *Jackson*, 2015 WL 4601021 (D. Conn. July 29, 2015) (rejecting severance motion despite claim that defendant "was himself a victim of [a co-defendant's] conduct").

Instead, severance based on mutually antagonistic defenses is warranted in the rare case where "in order to accept the defense of one defendant, the jury must necessarily convict a second defendant."   *Van Hise*, 2013 WL 6877319, at *12 (citing *Cardascia*, 951 F.2d at 484).   That standard is not met here.   Omar Amanat argues that he and Isaza Tuzman have mutually antagonistic defenses because he and Tuzman are likely to advance different theories of how the Enable losses came about.   But this argument is a red herring.   Regardless of how Enable became unable to repay investors, Isaza Tuzman, the Amanat brothers and Maiden united in a common scheme to hide Enable's insolvency from investors at both Maiden Capital and KITD over a period of years.   Put differently, a jury could credit Omar Amanat's argument that Enable's insolvency

---

[6]      Isaza Tuzman cites *Van Hise*, 2013 WL 6877319, at *12 (S.D.N.Y. Dec. 31, 2013), for the proposition that "severance should be also be granted when antagonism at the essence of the defenses prevails to such a degree – even without being mutually exclusive – that the jury unjustifiably infers that the conflict alone indicated that both defendants were guilty." This language in *Van Hise* is dicta, and represents the court's summary of the holding of *Untied States* v. *Serpoosh*, 919 F.2d 835, 838 (2d Cir. 1990).   *Serpoosh*, which predated both *Cardascia* and *Van Hise* was a case requiring the jury, were it to credit one co-defendant's defense, to return a verdict of guilty against the other.   That is not the scenario presented here.

was caused by a foreign brokerage firm, as opposed to misappropriation or trading losses, and still find that the Amanat brothers defrauded the Maiden Capital investors by representing the Enable investment as safe, liquid and profitable.

Finally, a recent decision from the Eastern District granting severance in *United States* v. *Shkreli*, 15 Cr. 637 (KAM) (April 19, 2017, E.D.N.Y), does not support the severance arguments made here.  As the Court in *Shkreli* noted, that case involves "unique circumstances," most notably that the two defendants are a corporate lawyer and his former client who intends to raise an advice of counsel defense.  Significantly, the Court there found that "the defendants ha[d] not shown that their defenses [were] mutually antagonistic, or that the risk of spillover prejudice [was] so great that severance [was] warranted."

### c.    Considerations of Judicial Economy

The factual overlap in this case also means that considerations of judicial economy favor a joint trial.  The same evidence would be admitted against Isaza Tuzman and Omar Amanat whether tried jointly or separately, meaning that severance would require the same complex, month-long case to be tried twice.  For example, both Maiden and Robin Smyth, KITD's CFO, would testify at both trials about substantially the same topics and with reference to many of the same documents, including the Market Manipulation Agreement and numerous emails between the defendants discussing the Enable losses.  Such a result would be inefficient and a waste of the time and resources of the Court and witnesses.  *See United States* v. *Figueroa*, 618 F.2d 934, 946 (2d Cir. 1980) (declaring that "a co-defendant is obliged to accept some risk of prejudice because of the public advantages of a joint trial"); *Van Hise*, 2013 WL 6877319, at *12 (citing *United States* v. *Shuford*, 454 F.2d 777 n.5 (9th Cir. 1971) (noting that courts considering severance have examined the complexity and length of trials)).

## POINT V

## THE COURT SHOULD DENY THE DEFENDANTS' MOTIONS TO COMPEL VARIOUS OTHER PRETRIAL DISCLOSURES

Isaza Tuzman and Omar Amanat also argues that they are entitled to (a) early disclosure of the Government's witness list; (b) early disclosure of the Government's exhibit list; (c) early disclosure of *Brady*, *Giglio*, and Jencks Act material for potential Government witnesses; and (d) early disclosure of Rule 404(b) evidence that the Government intends to admit at trial. (Isaza Tuzman Br. at 30-38; Amanat Br. at 38-42). These requests should denied.

### A.    Witness List

Isaza Tuzman and Omar Amanat ask the Court to order the Government produce a list of the witnesses it intends to call 60 days before trial. (Isaza Tuzman Br. at 34-35). The Government normally provides a *de facto* witness list by producing Jencks Act material in advance of trial. The defendants have not shown a particularized or specific need for a witness list two months before trial, and their request is accordingly an improper attempt to preview the Government's case.

As the Second Circuit has held, Rule 16 of the Federal Rules of Criminal Procedure "does not require the Government to furnish the names and addresses of its witnesses in general." *United States* v. *Bejasa*, 904 F.2d 137, 139 (2d Cir. 1990); *see also United States* v. *Washington*, 947 F. Supp 87, 88 (S.D.N.Y. 1996) ("A defendant is not automatically entitled as a matter of right or under the Federal Rules of Criminal Procedure to a list of the names and addresses of the Government's witnesses prior to trial."). A defendant is entitled to disclosure of the Government's witnesses only if he or she makes a "specific showing that the disclosure [is] both material to the preparation of his defense and reasonable in light of the circumstances surrounding his case." *United States* v. *Cannone*, 528 F.2d 296, 301 (2d Cir. 1975); *accord United States* v. *Rahman*, 1994 WL 533609, at *3 (S.D.N.Y. Sept. 30, 1994). An "abstract, conclusory claim that such

disclosure [is] necessary to [the] proper preparation for trial" is insufficient to meet this burden. *Cannone*, 528 F.2d at 302; *id.* (finding that the district court "clearly abused its discretion" in requiring disclosure of witness names based only on a generalized statement of need); *see also United States* v. *Crozzoli*, 698 F. Supp. 430 (E.D.N.Y. 1988) (noting that "[v]ague assertions that the disclosure of witnesses will assist in preparation for trial is not a particularized showing of need").

In assessing a defendant's requests for a witness list, courts in this District often look to the factors set forth in *United States* v. *Turkish*:

> (1) Did the offense alleged in the indictment involve a crime of violence?

> (2) Have the defendants been arrested or convicted for crimes involving violence?

> (3) Will the evidence in the case largely consist of testimony relating to documents (which by their nature are not easily altered)?

> (4) Is there a realistic possibility that supplying the witnesses' names prior to trial will increase the likelihood that the prosecution's witnesses will not appear at trial, or will be unwilling to testify at trial?

> (5) Does the indictment allege offenses occurring over an extended period of time, making preparation of the defendants' defense complex and difficult?

> (6) Do the defendants have limited funds with which to investigate and prepare their defense?

458 F. Supp. 874, 881 (S.D.N.Y. 1978).

Here, the defendants have not demonstrated any particularized need for a witness list. Although the indictment involves nonviolent crimes, there are specific reasons to believe that early disclosure of witnesses in this case could result in misconduct in ways other than through violence, such as collusion with friendly witnesses or the fabrication of evidence. As one court explained,

"[t]he stakes in a criminal case are high, and temptations of perjury, subornation and intimidation are ever present.  Accordingly, the government is not required to turn over information that will permit a defendant to preview the government's case . . . or see to it that the government's proof is not presented."  *United States* v. *Sindone*, 2002 WL 48604 at *1 (S.D.N.Y. Jan. 14, 2002); *see also id.* ("Discovery in criminal proceedings is not comparable to discovery in civil because of the nature of the issues, the danger of intimidation of witnesses, and the greater danger of perjury and subornation of perjury.").  Those concerns are particularly acute here.  As discussed above, the Indictment alleges that the defendants created false documents and destroyed evidence (*see, e.g.*, Ind. ¶¶ 16, 21, 34-37, 99-115).  Indeed, in staying the parallel SEC action in this matter, Judge Nathan took into account two emails and the Government's proffer concerning "numerous interviews where potential witnesses in the criminal case ha[d] reported fears of violence and intimidation by Isaza Tuzman."  *SEC* v. *Kaleil Isaza Tuzman & Robin Smyth*, 15 Civ. 7057 (AJN), Docket Entry No. 43 (opinion dated March 1, 2016).  With more on the line now, the defendants' incentives to engage in misconduct vis-à-vis witnesses or to fabricate evidence to gain an advantage in their defense will be correspondingly greater.

The defendants also claim that they need a witness list in light of the length of the charged conspiracies and "the millions of pages of discovery."  (Isaza Tuzman Br. at 35).  While the charged conspiracy covers a number of years and the Government has produced significant amounts of discovery, the defendants ignore that they have had this discovery since July 2016 (and even earlier in the parallel SEC case).  What is more, much of the discovery was produced in an abundance of caution, such as all of the e-mails provided by KITD's successor company, Piksel, to the Government.  Moreover, the defendants have vast resources, evidenced, for example, by the fact that Isaza Tuzman has multiple law firms working on his behalf.

Finally, to the extent that the Court were to require disclosure of a witness list separate and apart from its production of Jencks Act material, the defendants' request that such disclosure occur 60 days before trial is unwarranted.  Indeed, the cases that the defendants cite from this District either denied disclosure of a witness list, ordered disclosure of witness lists on shorter timelines, or involved substantially longer and more complicated trials.  *See, e.g.*, *United States* v. *Cannone*, 528 F.2d at 301 (reversing district court's order requiring Government to provide witness list); *United States* v. *Nachamie*, 91 F. Supp. 2d 565, 579 (S.D.N.Y. 2000) (ordering Government to provide witness list 14 days before trial); *United States* v. *Chalmers*, 474 F. Supp. 2d 555, 573 (S.D.N.Y. 2007) (30 days before trial involving, where "a significant portion" of document discovery was in Arabic); *United States* v. *Rueb*, 2001 U.S. Dist. LEXIS 943, at *19-26 (S.D.N.Y. Feb. 5, 2001); (30 days before trial); *United States* v. *Vilar*, 530 F. Supp. 2d 616, 638-39 (S.D.N.Y. 2008) (60 days before trial in 3-month securities fraud trial).

The Government also requests that the Court order the defendants to disclose their witnesses on the same schedule as the Government.  *Cf. United States* v. *Giffen*, 379 F. Supp. 2d 337, 344 (S.D.N.Y. 2004) (noting that the "Government is entitled to reciprocity from the Defendant" with respect to trial materials like exhibit lists).

### B.    Exhibit List

The defendants also requests an exhibit list at least 60 days before trial.  (Isaza Tuzman Br. at 33-34; Amanat Br. at 40-41).  This request too should be denied.

There is "no statute or rule specifically mandates disclosure of an exhibit list," and "there is some divergent authority among courts in this Circuit as to whether a district court may compel the Government to specify the sub-set of items produced pursuant to Rule 16 that it intends to offer at trial."  *United States* v. *Vilar*, 530 F. Supp. 2d at 639.  The cases cited by the defendants highlight

the incongruity of the request in this case.  For example, in *Vilar*, 530 F. Supp. 2d at 638-41, the Court ordered production of an exhibit list 60 days before trial in light of an extended conspiracy that was alleged to have encompassed an almost 20-year period, from 1986 to 2005, and in light of possible taint issues that needed to be uncovered through review of exhibits and resolved prior to trial.  *United States* v. *Bonventre*, 2013 U.S. Dist. LEXIS 74829, at *25 (S.D.N.Y. May 28, 2013), was the six-month long Madoff-related trial; there, the Court order production of a witness list 60 days before trial.  In *United States* v. *Giffen*, 379 F. Supp. 2d 337. 344, (S.D.N.Y. 2004), a Foreign Corrupt Practices Act case, the Court directed the Government provide a preliminary exhibit list 30 days before trial.   As set forth earlier, this case is clearly distinguishable because it will be substantially shorter and less complicated.

    In light of these considerations, the Government submits that production of a preliminary exhibit list two weeks before trial is appropriate, and that the Government should be permitted to supplement its exhibit list in good faith.  *See* Tr. 8, *United States* v. *Lumiere*, 16 Cr. 483 (JSR) (S.D.N.Y. Aug. 31, 2016) (securities mismarking case in which Judge Rakoff ordered a preliminary exhibit list 14 days before trial); *United States* v. *Turkish*, 458 F. Supp. at 881-82 (preliminary exhibit list 14 days before trial),   Further, to the extent the Court schedules a timeframe for disclosure of an exhibit list, the Court should require the defendants to produce their exhibit lists to the Government at the same time.  *See Giffen*, 379 F. Supp 2d at 344 (ordering the defendant to produce exhibit list at the same time as the Government).  A reciprocal production of the defendants' Rule 16 material should also be made well in advance of the defense's provision of an exhibit list.  *See* Fed. R. Crim. P. 16 (requiring the defendant to disclose items that the defendant intends to use in his case-in-chief at trial).  To date, the Government has received no discovery from the defendants.

The defendants next request that the Court order the Government to produce all *Brady* and *Giglio* material immediately, and Jencks Act material no later than 60 days before trial. (Isaza Tuzman Br. at 31-32, 35-38; Amanat Br. at 41-42). The Government understands and will comply with its obligations under *Brady* v. *Maryland*, 373 U.S. 83 (1963), *Giglio* v. *United States*, 405 U.S. 150, 154 (1972), and the Jencks Act, 18 U.S.C. § 3500.

As the Government has already informed the defendants, it is not aware of any undisclosed *Brady* material. As a result, the defendants' request for an order compelling the production *Brady* material should be denied. *See, e.g.*, *United States* v. *Gallo*, 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) (denying defendant's motion to compel production of *Brady* material based on Government's representations that "it is aware of its obligations under *Brady* . . . and will produce any *Brady* material to the defense well before trial"); *United States* v. *Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) (same).

Under *Brady* and its progeny, the Government's duty to disclose is not limited to "exculpatory" information but also includes information that could be used to impeach government witnesses, so-called *Giglio* material. *See Giglio* v. *United States*, 405 U.S. 150, 154 (1972). However, "as a general rule, *Brady* and its progeny do not require immediate disclosure of all exculpatory and impeachment material upon request by a defendant." *United States* v. *Coppa*, 267 F.3d 132, 146 (2d Cir. 2001). To the contrary, the Second Circuit has repeatedly held that the Government only need produce impeachment material regarding its witnesses "in time for its effective use at trial," *United States* v. *Morgan*, 690 F. Supp. 2d 274, 286 & n.61 (S.D.N.Y. 2010) (collecting authorities), which the Circuit has construed as shortly before the witness is expected to actually testify, *see*, *e.g.*, *Coppa*, 267 F.3d at 146. Such a timeframe is appropriate because "[g]enerally, the need for evidence to impeach witnesses is insufficient to require its production in

advance of trial." *United States* v. *Nixon*, 418 U.S. 683, 701 (1974); *see also United States* v. *Gutierrez-Flores*, 1994 WL 558034, at *3 (S.D.N.Y. Oct. 11, 1994) ("The defendants' request for material which would assist in impeaching confidential informants or government witnesses is premature.  The government is not required to disclose such material until the witness is called to testify."); *United States* v. *Davis*, 2009 WL 637164, at *14 (S.D.N.Y. Mar. 11, 2009) (same); *United States* v. *Tranquillo*, 606 F. Supp. 2d 370, 382-83 (S.D.N.Y. 2009) (same).  Indeed, the defendant cites no authority for the proposition that he is entitled to impeachment material immediately, some six months before trial, nor is the Government aware of any.  *Cf. Coppa*, 267 F.3d at 146 (granting mandamus and remanding after district court ordered "immediate disclosure of all exculpatory and impeachment evidence").

Courts in this Circuit, moreover, have held that the District Court lacks the power to mandate early production of Jencks Act material.  *See, e.g., United States* v. *Coppa,* 267 F.3d at 145 ("We have previously held that Jencks Act prohibits a District Court from ordering the pretrial disclosure of witness statements."); *In re United States*, 834 F.2d 283, 287 (2d Cir. 1987) (granting mandamus and remanding because District Court has no authority to order pretrial production of Jencks Act material); *United States* v. *Sebastian*, 497 F.2d 1267, 1268-69 (2d Cir. 1974) (finding that trial court erred in suppressing certain materials after government refused to produce such materials on ground that Jencks Act compelled such disclosure only after witness had testified on direct examination at trial); *United States* v. *Percevault*, 490 F.2d 126, 129 (2d Cir. 1974) (overturning an order calling for pretrial disclosure of Jencks Act material and holding that "the district court did not have the statutory authority to compel disclosure [of Jencks Act material], over the government's objection, prior to trial").

Courts in this District adhere to these principles — disclosure of *Giglio* and § 3500 material the Friday before trial, or several days prior to that, is the common and well-established practice in this District.   *See*, *e.g.*, *United States* v. *Rodriguez-Perez*, 2012 WL 3578721, at *10-11 (S.D.N.Y. Aug. 16, 2012) (declining to order early disclosures under the Jencks Act and *Giglio* where the Government intended to make such material available to defense counsel one week before trial); *United States* v. *Noble*, 2008 WL 1990707, at *9 (S.D.N.Y. May 7, 2008) (denying request for early disclosure of *Giglio* and 3500 material where the Government agreed to turn over such materials the Friday before trial); *United States* v. *Canter*, 338 F. Supp. 2d 460, 461-62 (S.D.N.Y. 2004) ("It has been the practice of this Court and of other courts in this district to require that the Government produce these materials a few days before the start of trial"); *United States* v. *Greyling*, 2002 U.S. Dist. LEXIS 4502, at *15-16 (S.D.N.Y. Mar. 18, 2002) (production of *Giglio* material by the Wednesday before the week in which a witness will testify is appropriate); *United States* v. *Trippe*, 171 F. Supp. 2d 230, 237 (S.D.N.Y. 2001) ("The usual practice in this district is that the Government agrees to make impeachment information available to the defense at the same time as Jencks Act material, that is, at least one day before the Government witness is called to testify").   As one court held, "[t]here is nothing unique about impeachment information to require that it be disclosed before other 3500 material."   *United States* v. *Rahman*, 1994 WL 533609, at *3.

Thus, the Government is prepared to produce *Giglio* and Jencks Act material (including from the Government's now-completed review of the SEC investigative file) regarding each witness it intends to call at trial one week before trial.  The Government respectfully submits that such a schedule is both adequate to permit the defendants time to prepare for trial and wholly consistent with governing law in this District.

49

#### D.      Rule 404(b)

Finally, the defendants asks for an order directing the Government to provide notice of evidence that it intends to admit under Rule 404(b) at least 60 days before trial.  (Isaza Tuzman Br. at 30-31; Amanat Br. at 38-40).  This request should be denied, as the Government proposes to make such disclosures 30 days before trial.

Rule 404(b) requires that the Government provide the defense "*reasonable* notice in advance of trial" that it plans to introduce evidence of a defendant's prior bad acts or crimes.  Fed. R. Evid. 404(b) (emphasis added).  Rule 404(b), however, sets no minimum time for action by the government in this request, nor would any time limit be appropriate, since the evidence the government wishes to offer may well change as the proof and possible defenses crystallize." *United States* v. *Matos-Peralta*, 691 F. Supp. 780, 790 (S.D.N.Y. 1988); *see also United States* v. *Allums*, 1997 WL 599562, at *1 (S.D.N.Y. Sept. 25, 1997) ("The Government has agreed to produce this material in time so that the defense may have an opportunity to challenge their admission; this is all that is required"); *United States* v. *Davis*, 2006 WL 20493, at *1 (S.D.N.Y. Jan. 3, 2006) ("The Government has asserted that it intends to make a motion *in limine* for the admission of Rule 404(b) evidence approximately two weeks before trial.  In the absence of any showing that the evidence is required earlier, the Court denies [the defendant's] request for immediate disclosure."); *United States* v. *Al-Marri*, 230 F. Supp. 2d 535, 541-42 (S.D.N.Y. 2002) (noting that "[o]bviously, every criminal defendant would find early production of Rule 404(b) materials to be of great assistance in preparing for trial," and denying request for production more than two weeks before trial).  Indeed, the Second Circuit has approved disclosure of Rule 404(b) evidence as late as several days before, and even during trial, depending on the circumstances of the particular case.  *See United States* v. *Valenti*, 60 F.3d 941, 945 (2d Cir. 1995) (notice four days

prior to trial sufficient where Government provided documents to defense on same day they were obtained).

The Government proposes, 30 days before trial, to provide notice of other crimes or bad acts, if any, that the Government will seek to prove at trial, pursuant to Rule 404(b).  *See* Tr. 15, *United States* v. *Lumiere*, 16 Cr. 483 (JSR) (S.D.N.Y. Aug. 31, 2016) (404(b) notice 30 days before trial); If other crimes evidence is discovered or becomes relevant after that point, or during the trial, the Government will bring such evidence to the immediate attention of the defense and the Court.  *See United States* v. *Castro*, 1995 WL 6235, at *3 (S.D.N.Y. Jan. 6, 1995).

## POINT VI

## THE COURT SHOULD DENY OMAR AMANAT'S MOTION TO STRIKE LANGUAGE IN THE INDICTMENT AS SURPLUSAGE

Omar Amanat asks the Court to strike purported "prejudicial and irrelevant language" from the Indictment as surplusage.  (Amanat Br. at 33-35).  This claim is meritless.

### A.    Applicable Law

"Although the Federal Rules of Criminal Procedure grant the Court authority to strike surplusage from an indictment, *see* Fed. R. Crim. P. 7(d), it has long been the policy of courts within the Southern District to refrain from tampering with indictments."  *United States* v. *Bin Laden*, 91 F. Supp. 2d 600, 621 (S.D.N.Y. 2000) (internal quotation marks and alterations omitted); *see also United States* v. *Kassir*, 2009 WL 995139, at *2 (S.D.N.Y. April 9, 2009).

The hurdle a movant must overcome in order to have allegations stricken from an indictment is a particularly high one. "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial."  *United States* v. *Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (internal quotation marks omitted); *see also United States* v. *Mulder,* 273 F.3d 91, 100 (2d Cir.

2011).   The court need not reach the question of whether the challenged allegations are inflammatory and prejudicial if evidence of the allegation is deemed admissible and relevant.  *See id.* ("'[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken.'" (quoting *United States* v. *DePalma*, 461 F. Supp. 778, 797 (S.D.N.Y. 1978) (alteration in the original)); *see also United States* v. *Rittweger*, 259 F. Supp. 2d 275, 293 (S.D.N.Y. 2003) (collecting cases).

A motion to strike must meet a standard that is "exacting" and, consequently, "only rarely is alleged surplusage stricken from a grand jury indictment."  *United States* v. *Napolitano*, 552 F. Supp. 465, 480 (S.D.N.Y. 1982); *see also United States* v. *Gotti,* 42 F. Supp. 2d 252, 292 (S.D.N.Y. 1999).  This is in keeping with the long-recognized principle that, in indictments, "the government may broadly allege that which it intends to prove and that which under applicable principles of law it may prove."  *DePalma*, 461 F. Supp. at 797.  The same standard applies to allegations that supply relevant background for the charged criminal conduct.  "Courts have held that statements providing background [on the crimes charged] are relevant and need not be struck." *United States* v. *Ulbricht*, 2014 WL 5090039, at *17 (S.D.N.Y. Oct. 10, 2014).

Indeed, courts in this District have noted that pretrial motions to strike surplusage are, in general, either premature or of no practical consequence, and, in any event, are almost never granted.  *See, e.g.*, *United States* v. *Bin Laden*, 91 F. Supp. 2d at 621 (denying motion to strike as surplusage references to "terrorist groups" from the indictment); *United States* v. *Sattar*, 314 F. Supp. 2d 279, 320 (S.D.N.Y. 2004) (denying motion to strike "background" or "introductory" paragraphs in the indictment, and words like "fatwah" or "jihad"; impossible to tell if such words are irrelevant or prejudicial until the government has presented its case); *United States* v. *Butler*, 351 F. Supp. 2d 121, 123-24 (S.D.N.Y. 2004) (noting that pretrial "motions to strike purported

surplusage are largely meaningless"). "Courts in this district routinely await presentation of the Government's evidence at trial before ruling on a motion to strike." *United States* v. *Mostafa*, 965 F. Supp. 2d 451, 467 (S.D.N.Y. 2013) (collecting cases); *see also Ulbricht*, 2014 WL 5090039, at *17 (denying motion to strike references to murders-for-hire included as overt acts in narcotics conspiracy charge, given potential relevance to defendant's criminal intent, which was best evaluated based on "the Government's presentation at trial"); *United States* v. *Jacques Dessange, Inc.*, 2000 WL 280050, at *3 (S.D.N.Y. Mar. 14, 2000) ("The Court will be in a better position after having heard the positions taken by the parties during the trial to evaluate whether there is any prejudice to the defendants from including this paragraph in the indictment as it is sent into the jury during their deliberations.").

### B.     Discussion

Omar Amanat moves to strike four parts of the Indictment as surplusage.  Each claim fails.

*First*, Amanat asks the Court to strike the phrase "self-described" from the first paragraph of the Indictment.  The first paragraph alleges, in relevant part:  "OMAR AMANAT, the defendant was a self-described entrepreneur, filmmaker and investor in media, finance and technology companies."  Amanat contends that this phrase "borders on the offensive and has no purpose other than to prejudice Amanat with this statement before the jury."  (Amanat Br. at 33).

 "Whether the charges in the indictment are accurate or truthful is a matter for the jury to decide."  *United States* v. *Tomero*, 496 F. Supp. 2d 253, 256 (S.D.N.Y. 2007) (internal citations and original alterations omitted) (denying motion to strike).  Moreover, Amanat cannot show that this harmless phrase was so "inflammatory and prejudicial" to require it be stricken.  *United States* v. *Scarpa*, 913 F.2d at 1013.

*Second*, Amanat requests that the Court strike reference to Irfan Amanat's SEC bar from paragraph two of the Indictment.  The second paragraph alleges, in relevant part:  "In or about 2006, IRFAN AMANAT was banned by the SEC from associating form any broker or dealers for a period of five years and ordered to cease and desist from committing or causing any future violations of Section 10(b) or Rule 10b-5 of the Securities Exchange Act."  Omar Amanat's primary complaint is that this phrase about his brother is somehow impermissible Rule 404(b) propensity evidence.  Omar Amanat also claims that this reference "prejudices" him because he is "collectively" referred to throughout the Indictment with his brother as "the Amanat Brothers." (Amant Br. at 34).  Omar Amanat's main propensity challenge is odd because the claimed prejudice is to Irfan Amanat, not Omar Amanat.  In any event, the Government's intends to offer evidence of Irfan's SEC bar as background to the conspiracy.  *See United States* v. *Butler*, 351 F. Supp. 2d 121, 124 (S.D.N.Y. 2004) denying motion to strike reference to murder because it was "relevant background to the charges in the Indictment").  Alternatively, the Government intends to offer this evidence under Rule 404(b) for permissible purposes, such as to show a lack of mistake.  Accordingly, any challenge to this reference is more appropriately addressed during motions *in limine*.  *United States* v. *Smirlock*, 2001 WL 913911, at *1, *3 (S.D.N.Y. Aug. 13, 2001) ("defer[ing] until trial" defendant's motion to "strike from the indictment language describing SEC sanctions entered against him by consent in a prior unrelated case").

*Third*, Amanat requests that the words "including investments Omar Amanat had solicited with false and misleading representations" be stricken from paragraph 15 of the Indictment. Paragraph 15 — the first paragraph in the "Overview of the Scheme to Defraud Maiden Capital Investors" section — alleges, in relevant part, that between March 2009 and June 2012, Omar Amanat and Irfan Amanat "devised and carried out a scheme to hide the fact investments by

54

Maiden Capital clients in Engage, including investments OMAR AMANAT had solicited with false and misleading representations, had been lost as a result of poor trading decisions and fraudulent misappropriation." This claim makes no sense. Omar Amanat does not contend that evidence of his solicitation of $2 million in November 2008 with false and misleading statements — to which the challenged statements refer, in part — is inadmissible at trial or not properly included in the Indictment. (*See* Amanat Br. at 35 ("As an evidentiary matter, such evidence might well be admissible at trial as 'other act' evidence under Rule 404(b) or 'intrinsic' or 'background' evidence. And, we do not seek to strike the allegations.")). Nor can he. He thus cannot show that the inclusion of this language in the introductory paragraph should be stricken.

*Fourth*, Amanat asks the Court to strike paragraphs 20 and 21 of the Indictment, which allege conduct by the Amanat brothers in June 2008, including an email from Omar to Irfan asking for his help deleting his Yahoo emails. This evidence is properly admitted as direct evidence, including as background to the conspiracy and consciousness of the defendant's guilt. *See United States* v. *Butler*, 351 F. Supp. 2d at 124 (S.D.N.Y. 2004). There is no basis for striking it from the Indictment.

*Finally*, as to the ripeness of Omar Amant's motion to strike, the Court has not yet indicated whether, at the close of trial, it intends to provide the jury with copies of the Indictment and/or read the Indictment to the jury. Should the Court decide only to summarize the Indictment for the jury, any arguments about "surplusage" would be of even less import. If the Court does intend to provide or read the Indictment to the jury, the issue can be raised with the Court at that point and resolved. After having heard the evidence and having considered the positions taken by the parties during the trial, the Court will be in a better position to address the relevance and prejudicial effect, if any, of the allegations Omar Amanat now seeks prematurely to strike from the Indictment.

**CONCLUSION**

For the above reasons, the Court should deny the defendants' pretrial motions.

Dated: New York, New York
       April 21, 2017

                                             Respectfully submitted,

                                             JOON H. KIM
                                             Acting United States Attorney

                                   By:    _____/s/_____
                                             Damian Williams
                                             Andrea M. Griswold
                                             Joshua A. Naftalis
                                             Assistant United States Attorneys
                                             (212) 637-2298 / 1205 / 2310