

Randall W. Jackson
Tel.:  (212) 303-3650
E-mail:  rjackson@bsfllp.com

November 9, 2017

**BY ECF AND EMAIL**
Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re:     *United States v. Kaleil Isaza Tuzman, et al.*, 15 Cr. 536(PGG)

Dear Judge Gardephe:

This letter is respectfully submitted in response to the Government's November 8, 2017 letter sent to the Court seeking to preclude Amanat Exhibit 907. The essence of the Government's argument is that the statements contained in AX 907 are hearsay, not subject to any exception to the hearsay rule. The Government is wrong. None of the statements contained in AX 907 are hearsay – they are not offered for the truth of the matter asserted. Even if the statements in question were hearsay, they are admissible under Federal Rule of Evidence 803(3), as they go to Mr. Amanat's state of mind during the alleged conspiracy. More specifically, they go to Mr. Amanat's state of mind almost contemporaneously with a document that the Government has introduced as probative of the defendant's state of mind. There are also admissible under Rule 106 and under the residual exception. Even if the Court concludes that some portions of AX 907 contain hearsay, the Government has not demonstrated that those portions cannot be redacted and that the remained of AX 907 should not be admitted. For the same reasons that AX 907 is admissible, the other documents in this series that we have offered are admissible.

We respectfully submit that any exclusion of these communications is inconsistent with fundamental notions of justice. In various ways, the courts have repeatedly expressed the principal that "[i]t is always open in a criminal case for the defendant to explain away the force of specific items of the government's proof by showing the existing of other hypotheses." *See Unites States v. Foster*, 986 F.2d 541, 545 (D.C. Cir. 1993). Where, as here, the Government has argued that specific communications within a family are relevant and probative of the defendant's state of mind, fundamental fairness indicates that the jury should be allowed to see contemporaneous communications within the family that will help the jury to understand the true nature of the family dynamic at issue as it pertains to the precise financial transactions at issue. The Government will regardless be permitted to argue that their exhibit reflects the true nature of the defendant's state of mind. Mr. Amanat, however, should not be prohibited from introducing evidence that is critical to put the purportedly inculpatory statements in context. For all of these



reasons, as explained in more detail below, the Court should deny the Government's motion to preclude.

## BACKGROUND

During the direct examination of Mr. Maiden the Government introduced a redacted version of a December 19, 2008 email from Omar Amanat to Irfan Amanat. In that email, Omar Amanat wrote:

> He spoke w Maiden where they apparently discussed 'difficulties get money out of Enable.' Maiden has tries to reach me and is asking for his $2mln back. In a            world where everyone is suspicious. This is a major problem and red flag for me. As u know. I don't have any ability to repay it. I only made the loan bc mahmood was promising to repay in a few weeks. Any monies out from mahmood need to first come to pay this down. This is a major disaster            if maiden suspects fraud of some sort and notifies the authorities I'm cooked. All in all this is some pickle of a situation this time.

(GX 2965, admitted in evidence and separately transmitted to the Court).[1]

During the cross-examination of Maiden, the defense attempted to introduce an email sent only a few hours later, marked as Amanat Exhibit 907, which was submitted to the Court at trial.[2] Essentially, AX 907 can be separated into four parts. Starting from the earliest time, **Part One** of the document is Irfan Amanat's underlying communication, complaining about his interactions with Omar Amanat and forwarding to his father, Sharif Amanat, the message of Omar Amanat contained in GX 2965:

> > *From:* Irfan Amanat [mailto:irfan@enableinvest.com]
> *Sent:* Friday, Dec 19, 2008 6:25 AM EST
> *To:* sharif amanat
> *Subject:* Fwd: Re: Let's chat >
> Abu,
> Salam. I respectfully need your advice on how to deal w Omi's questions on trading below. First, he is asking some details on the hedged trading strategy. Someone told Omi that there was no profit at GTL, which is of course patently wrong. I've gone over the statements again and its clear that the trades were fully hedged between the accounts at GTL and Oanda. Ther person telling Omi

---

[1] In the Government's letter motion ("Let."), the Government quotes an unredacted version of GX 2965. As the Court is aware, the version of GX 2965 that was admitted redacted certain references to Bernard Madoff.

[2] AX 907 redacts three references to Bernard Madoff, pursuant to the Court's Order of Amanat Motion in Limine #1. The version that appears in the Court's binder may retain one of the references to Madoff but it has been removed in the final version as excerpted here.



this used to work at Goldman Sachs and is arrogant and said he knows how to read trading statements, but he clearly doesn't, or he has a hidden agenda, or I don't know why but in any event I'd need your help to show ane explain to Omi how the multiple accounts (inc riverbank etc) all converge into Enables trading gains and show to Omi the overall profit.

Second, the delay with Mahmood's wire out has made Omi very upset with me, which I understand, so we need to press on Mahmood how much damage his delay caused. I had to tell all of the investors of the liquidity lockup and it damaged my reputation, especially because I was the one warning about counterparty risk with US banks! Mahmood has to know and work hard on either start sending wires to selling some of his assets to repay investors. But lastly, I really need your help and advice on how to talk to Omi,because I am also upset with him. He is trying to make me feel bad again. Just like after Tradescape he pretends he 'doesn't have money' (i.e. its all in investments or the family trust, ow whatever he says its always some blah blah excuse) whenever it suits him and then makes  me pay from my trading profits all expenses.

But I know he OWNS at somewhere between 20-50% of SUMMIT/TWILIGHT. I saw some of the documents. He can't keep this from me and its unfair. Twilight has become a major hit, everyone talks about it, and has already made over $150 million domestic in one month and is on its way to $150m foreign. That is over $300 million. I've seen the documents and the financial projections from Rizvi and it shows the DVD revenues will be 4x that.. So Omi is sitting on incredible wealth once again, and still pretends he "doesn't have any ability" and wants me to repay it from Mahmood- which means Omi will probably keep all of the Summit money for himself once again like Tradescape. It is really upsetting and I can't stand by quietly again like before at Tradescape and CCS. To justify keeping the money he is trying to make me feel bad and puts pressure on me by saying I'll get him in trouble. But again his exaggerations re beyond absurd,

There is absolutely no comparision. And no risk of him getting into any trouble. He knows this. Maybe he spent too much time in Hollywood and has lost touch with reality.  But I am not jealous of his successs, I am glad for him, and if he helps me out during this crisis I would appreciate it. If not I will work hard like before and recover on my own. Either way ia I have faith. But Omi making me feel bad just to not give money is simply unfair you know I don't care about the money- it is not and never has been my first



priority, so please tell me how to have him stop exaggerating just to making me feel horrible. He doesn't need to express his anger sidewayslet or doesn't need to hide the money from me please have tell me his issues directly instead of beating around the bush by pretending my actions will get him into trouble.

Your advice and intervention is appreciated.

Dutifully and respectfully,
Iffi

> --------------------------------------------------------------------
> *From:* irfan.amanat@gmail.com
> *Sent:* Friday, Dec 19, 2008 3:25 AM EST
> *To:* Omar Amanat
> *Subject:* Let's chat? >
> Ok. When can we talk? >
> 1) he doesn't know how to read the statements, which is creating the problem when I show it to him.
> 2) regarding maiden we have to discuss, Mahmood can't deliver 2 mil >
> ------Original Message------
> From: Omar Amanat
> To: Irfan Amanat
> ReplyTo: Omar Amanat
> Sent: Dec 19, 2008 6:48 AM
> Subject: Let's chat >
_____
> I had a call w kaleil.
> We need to discuss this. >
> A Few points:
> -He is trying to get me to loan him the funds. He is trying to figureout how to incentivize me to do so.
> However, he Is perplexed by a number of things: >
> -he said what you told him (describing how the loss occurred) do not jive w the statements/docs he saw from you/mahmood. Sees no evidence of big gains at gtl in the enable acct -As I suspected he is perplexed how Enable only had a few hundred$$ with GTL that do not show a major gain. Doesn't know anything about riverbank or other accounts. Seems he doesn't understand your attempts to explain this.-says he believes Enable violated the Escrow agreement and never kept money in the account it was deposited into. -he said he found a company in the US listing me and mahmood as co-owners.



> -He spoke w Maiden where they apparently discussed 'difficulties getting money out of Enable.' Maiden has tried to reach me and is asking for his $2mln back. In a world where everyone is
> suspicious. This is a major problem and red flag for me. As u know. I don't have any ability to repay it. I only made the loan bc mahmood was promising to repay in a few weeks. Any monies out from mahmood need to first come to pay this down. This is a major disaster-- if maiden suspects fraud of some sort and notifies the authorities I'm cooked.
>
> All in all this is some pickle of a situation this time.

AX 907 at 2-4.[3] **Part 2** of AX 907 is Sharif Amanat, the father of both Omar and Irfan Amanat, forwarding the message of Irfan Amanat to Omar Amanat. Importantly, besides being the father of both Omar and Irfan, Sharif is the head of the Amanat family trust (the "trustee"), and as the evidence in this case makes clear, an individual who is indirectly invested in various of the transactions at issue between 2008 and 2012. The term "Abu," which is used throughout AX 907, is an Arabic word meaning "father," and is a common term of respect and affection. Part 2 of AX 907 contains the following language:

> *From:* Sharif Amanat [mailto:sharifamanat@yahoo.com]
> *Sent:* Friday, Dec 19, 2008 7:17 AM EST
> *To:* Omar Amanat
> *Subject:* Fwd: Fwd: Re: Let's chat
> > PLZ EXPLAIN
> > LOVINGLY ABU

AX 907 at 2. **Parts 3 and 4** of AX 907 are the two halves of the message that Omar Amanat sends in response to his father. This message is sent at 9:43:20AM EST, approximately two hours after Sharif Amanat emails Omar, and approximately six hours after the initial exchange between Omar and Irfan Amanat that is the subject of GX 2965.[4] **Part 3** is the first four paragraphs of Omar Amanat's message to his father, in which he expresses his frustrations with his dealing with his brother regarding the transactions that are related to GX 2965:

> Abu
> I am so sorry he dragged you into this dispute. He should not have. But in truth, Yes I absolutely WANT him to feel bad bc I repeatedly warned him about trusting Mahmood (and Kaleil) and he didn't listen to me then-- he is always too trusting; AND I do not want him to think I will always bail him out whenever he asks.

---

[3] AX 907 contains the same redactions of the underlying Omar Amanat message that the Court ordered for GX 2965.

[4] The precise times of these messages is difficult to articulate with precision, because the recipients are believed to have been in three different time zones during the course of the email discussion, but the rough approximation described herein is the undersigned attorneys' best understanding. The messages unquestionably all occurred on the same day, within a period of several hours.



> Even the US govt is careful about giving bailouts to banks bc of
> "moral hazard" notwithstanding he is my brother and of course i
> love him and will help him.
>
> And yes he is right re: Twilight-- I am beyond grateful, humbled
> and thankful to G-d--- --but he forgets how he constantly made fun
> of ME and made ME feel bad and stupid by exaggerating how
> "crazy and reckless" i was for making film investments the last
> year or two and how "safe" his strategy was. Now look what
> happened. SO PLEASE downplay to him and anyone else how
> much we made already and will make (g-d willing), because you
> know it creates unnecessary and unrealistic expectations from
> everyone in the family, just like what happened after
> Tradescape/E*Trade; I never want to have the evil eye pointed in
> my direction again. As you know after that experience I would
> give someone half my wealth just to tell the world its theirs and not
> mine.
>
> Also you awlays tell me and the lawyers have explicitly warned
> me repeatedly that the family trust needs to be respected and
> protected from a legal and estate planning standpoint. So IT IS a
> true statement when i say "I dont have any ability to repay" right
> now because it needs your approval as well and it would pierce the
> corporate veil if I claimed otherwise. ANy creditor against me
> could claim against the trust. And also he doesn't appreciate even if
> I could control everything that we can't just cash in our twilight
> earnings so quickly or borrow against them prematurely without
> taking a big discount so I really don't want to do that. But you are
> the trustee so I defer to your better judgement.
>
> But it creates a bad precedent and rewards his mismanagement. Its
> not prudent.

AX 907 at 1.  Part Four of AX 907 is Omar Amanat's expression to his father of his state of
mind regarding language he was using with his brother and alleged coconspirator, Irfan Amanat:

> And of course I am embarrassed to admin I exaggerated about
> being concerned about this      or worried about being in any
> trouble with authorities. I'm boiling in anger but definitely
> not cooked!
>
> You know since a kid my language is always colorful but I was
> only bluffing him about that to exert pressure on him/make him
> feel bad but also for another legitimate reason: I am concerned that
> he wont repay ME the first $2mln he receives from
> Mahmood/GTL but instead give it to others. that is money owed to



me,(not maiden)....but I thought If iffi believes it has to go to maiden "otherwise" bad things will happen to me (like he didnt protect me when we were young) then he actually might pay me first--. The $2mln is actually MY collateral because maiden owes me and Russ as much as $9 million bc of his BESN losses we incurred (which maiden has been hesitant to admin that jim cohen may have committed pump and dump fraud but it was maidens decision on it so I am under ZERO obligation to repay it to maiden unless BESN stock miraculously above $6.25 (it is currently $2.80 but seemingly going to a penny stock) FYI as trustee please note that I am giving maiden the option to convert the collateral into Kit media shares since I used the money he owed me on buying Kit Media shares (as long as we get a signficant profit share back) which he will likely do if BESN stock doesnt recover. I remeber you taught me "Money is like hair, it grows back" so I have always strived for win-win situations instead of win-lose.

While Maiden knows that unless BESN stock recovers he wont any get that money back for a long time if ever, he is more than ok with this because he could get kit media shares instead so I sincerely believe there is no possibility I can get financially or legally harmed by any of this, so please don't worry. And you have plenty more concerns to worry about. Such as your health and your grandfatherly duties! Darien is excited to see his grandad.

Love you Abu!
Omi

AX 907 at 1-2. The Government describes additional information in its factual recitation that is incorrect and disputed but of no moment to the instant application.

## DISCUSSION

### A.       Applicable Law

The Federal Rules of Evidence provide that, regardless of the declarant, no statement constitutes hearsay if it not offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c)(2). The Notes of the Advisory Committee related to Subsection (c) observe that:

> Subdivision (c). The definition follows along familiar lines in including only statements offered to prove the truth of the matter asserted. McCormick §225; 5 Wigmore §1361, 6 id. §1766. If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay. *Emich Motors Corp. v. General Motors Corp.*, 181 F.2d 70 (7th Cir. 1950), rev'd on other grounds



> 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed 534, letters of complaint from
> customers offered as a reason for cancellation of dealer's franchise,
> to rebut contention that franchise was revoked for refusal to
> finance sales through affiliated finance company. The effect is to
> exclude from hearsay the entire category of "verbal acts" and
> "verbal parts of an act," in which the statement itself affects the
> legal rights of the parties or is a circumstance bearing on conduct
> affecting their rights.

*See id.* Rule 803(3) provides that, even if a statement is hearsay, it is admissible under an exception to the Rule Against Hearsay if it constitutes "A statement of the declarant's then-existing state of mind (**such as motive, intent, or plan**) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will." (emphasis added).

**B.      AX 907 is Nonhearsay As it is Not Offered For the Truth of the Matter Asserted**

The Government argues that "the defendant seeks to admit Omar Amanat's statement to his father at 9:43 a.m. on December 19, 2008 as evidence of his state of mind several hours earlier when the defendant sent the original email to his brother. The only state of mind for which the later email can be properly introduced under Fed. R. Evid. 803(3) is the defendant's state of mind at the time he sent the latter, explanatory email to his father, which is of no relevance." Let. At 4. Thus, right from the outset of its argument the Government is both legally and factually incorrect. The document is nonhearsay under Rule 801(c)(2), and it is admissible for multiple purposes within the scope of that rule. The first purpose of AX 907 is to demonstrate the true, non-conspiratorial nature of the relationship between Omar and Irfan Amanat with regard to the transactions at issue. Putting aside the truth of the assertions in the document, which do not matter, the document powerfully demonstrates that in December of 2008 Irfan and Omar Amanat were engaged in an intense dispute over the nature of the trading at Enable and manner in which the funds of the Amanat family and Omar Amanat would be deployed to address the liquidity issues that arose during that time period. Nothing in the document has to be true in order for the jury to be able draw a fair inference from this document that Omar and Irfan were operating during the months leading into 2009 in a manner very different from what the Government has suggested. Specifically, the Government has argued that in these months the conspiratorial motive, plan and relationship evolved after Omar and Irfan jointly realized that Enable was illiquid or insolvent. The Government has relatedly argued that the events that took place during this time period provided the motive for the conspiracy/substantive scheme charged in Counts One through Three of the Indictment.

The document, however, demonstrates that there was an intense dispute between the brothers about the operation of Enable that was being mediated by their father, a trusted advisor to both of them and an investor in their business dealings. The truth of what each of them is saying is irrelevant – the jury could conclude that they were both lying to their father in order to convince him to their side of the story and still conclude that the document demonstrates that they were not evolving into a meeting of the minds regarding an illegal objective.



We respectfully submit that an example of this principle from a less complex case is instructive. Consider a case where a defendant was charged with murdering his wife, where the Government's theory was that the defendant murdered his wife in order to allow himself to run away with his mistress. If, two months before the murder, the defendant had sent an email to his best friend explaining in detail the grievances he had with the mistress and expressing his intention to break it off with her, this would be admissible nonhearsay relevant to the question of whether the defendant in fact had the motive suggested by the Government. Now, in that example the Government would obviously be within its rights to argue that such a statement should not be credited, but the mere fact that the defendant was expressing his desire to end the relationship, whether true or not, would be probative of the motive questions in such a case.

Here of course, the Rule even more clearly indicates that this evidence should be admitted for this nonhearsay purpose since it is conceivable that one could engineer a conversation about dissatisfaction with a girlfriend in anticipation of committing a murder. We submit this still would not be an appropriate basis for the exclusion of such evidence. Regardless, it is highly implausible that Omar and Irfan Amanat were engineering, in 2008, a conversation with their father about their disputes with the express purpose of rebutting the inferences that might be drawn from an email about their disputes, several years before anyone was charged. The mere fact of the dispute about these issues as manifested in the document is probative of the questions in this case and is a permissible nonhearsay purpose for the admission of the document.

The second nonhearsay purpose is the impeachment of the testimony of Steven Maiden. The entire thrust of the first part of Mr. Maiden's direct testimony was that Irfan and Omar Amanat were engaged in a joint effort to deceive Maiden about the nature and status of funds that were sent from Maiden Capital to Enable. *Cf. United States v. Pelullo*, 14 F.3d 881, 887 (3d Cir. 1994) (affirming where excluded impeachment evidence did not go to the "thrust" of relevant witness's testimony). Indeed, it was for this reason that the Government introduced GX 2965 during the direct examination of Maiden, even though Maiden had no awareness of the email exchange reflected in that document. Regardless of the truth of the underlying assertions, the mere fact that Omar and Irfan Amanat were clearly *not* on the same page with regard to the status of the Enable investments and the implications of Maiden's demands tends to rebut the inference that the Government attempted to develop through this part of the testimony. This is permissible impeachment evidence.

## C.      AX 907 is Necessary and Permissible Proof of the State of Mind of Both Omar Amanat and Irfan Amanat

Even if AX 907 might be considered presumptive hearsay, it is admissible under Rule 803(3) in order to show the state of mind of both Omar and Irfan Amanat. Rule 803(3) makes explicit that statements which might otherwise be considered hearsay are admissible to the extent that they go to a defendant's "then-existing" "motive" or "intent." The Rule also makes clear that by "then-existing," the Rule means during the time period of the alleged criminal activity. The prosecution has attempted to contort Rule 803(3)'s language "but not including a statement of memory or belief to prove the fact remembered or believed" into a broad prohibition on any statement that includes a reference to something that has already happened. That is not the law.



This section of 803(3) is designed to prevent a litigant from introducing hearsay such as the classic hearsay statement in a post-arrest interview where a defendant denies that he committed a crime or states to interviewing law enforcement that he believes he is innocent. That is not the situation at hand.

The specific issues at play here were addressed in *United States v. Harris*, 733 F.2d 994, (2d Cir. 1984).[5] In *Harris*, the defendant was charged with conspiracy to distribute narcotics after a lengthy sting operation involving numerous conversations, many of which were recorded, between the defendant and a confidential informant named Stewart, discussing an impending heroin transaction. *See id.* at 997-98. The defense rested on a theory that the defendant had known all along that Stewart was an informant, and had told others during the course of the conspiracy about this suspicion. *See id.* at 1000 ("The defense thus attempted to establish that Harris knew Steward was an informant and only played along with him out of fear of what would happen to him if he refused"). The Court of Appeals explained:

> To advance this defense one step further, counsel for Harris proposed at the completion of the government's case to call Rafael Hernandez, Harris's parole officer from Detroit, as his first defense witness. According to Harris's written offer of proof, submitted at the request of the district judge:
>
>> Rafael Hernandez will testify, it is believed, to the following:
>> 1. He is a United States Government Employee—Federal Parole Officer.
>> 2. He is the Parole Officer who supervises the parole of George Harris.
>> 3. George Harris told Rafael Hernandez, at the time it occurred, of an encounter with some people who could cause him trouble. The statement of Harris was made around the time of the Superbowl and he made a note of it in his records, especially referring to the state of mind of George Harris.
>> 4. That during the period of time of the time charged in the Indictment, George Harris expressed to Rafael Hernandez that the Government and people were after him and trying to set him up. Rafael Hernandez indicated that in his notes of his records and that Harris exhibited worries or paranoia over this, and further that Harris was upset.
>> 5. That Harris indicated the Government was trying to set him up and eventually furnished the name of the person he thought was Rudy Steward.
>> 6. That as an employee of the United States Government and as their representative, Rafael Hernandez Kept records and a file with regular notes and recordations, including the information above. That he kept these records at times as

---

[5] The panel in *Harris* was comprised of Judge Friendly, Judge Feinberg, and Judge Pratt, who authored the opinion.



> memorandum of events and/or others reasons in a regular
> practice. That the above incidents are reflected in these
> records.
>
> After hearing brief argument, the district judge excluded this
> proffer, reasoning that "[i]t is plainly blatantly hearsay, unreliable
> and self-serving." When counsel for Harris then made an oral offer
> of proof with respect to similar proposed testimony by Ira
> Auslander, Harris's Detroit counsel, the district judge ruled "I
> would exclude that on the same ground. * * * If I am wrong, I am
> sure the Second Circuit knows their cases."

*Id.* at 1000-01. The Second Circuit summarized Harris's arguments with regard to this excluded evidence explaining: "Harris claims that this testimony was not hearsay under Fed.R.Evid. 801(c) since it was offered not to prove the truth of its assertions to the effect that Steward was a government agent, but instead only to show that Harris thought he was. Harris further argues that even if the proffered statements were hearsay, they were nevertheless admissible under Fed.R.Evid. 803(3), the hearsay exception covering statements of a declarant's then existing state of mind. We agree with these contentions." *Id.*

The Court of Appeals held: "Taking these offers of proof at face value, as unfortunately we must on this record, we believe the district judge erred in excluding the proffered testimony as hearsay. Depending on the precise phraseology used by each witness, their testimony would have been admissible either as nonhearsay, or under the then existing state of mind hearsay exception." *See id.* at 1004. The court stated that:

> [t]o the extent that Harris told either witness that he had 'an
> encounter with some people who could cause him trouble'; that
> 'the Government and people were after him and trying to set him
> up'; that 'the Government was trying to set him up' (written offer
> of proof of Rafael Hernandez); and/or that 'Mr. Steward had
> brought an agent to him' (oral offer of proof of attorney
> Auslander), the district judge erred in characterizing these
> statements as hearsay under Fed.R.Evid. 801(c). These statements
> were admissible, not for their truth, but instead as circumstantial
> evidence of Harris's state of mind—his knowledge of Steward's
> cooperation . . . . On the other hand, to the extent that Harris told
> either his parole officer or attorney 'that he believed [Steward]
> brought an agent to him" (emphasis added) (oral offer of proof of
> attorney Auslander), this statement would indeed have been
> hearsay under Fed.R.Evid. 801(c), since its evidentiary
> significance depended on the truth of the matter asserted—Harris's
> belief. However, such a 'statement of the declarant's then existing
> state of mind' should have been admitted as a hearsay exception
> under Fed.R.Evid. 803(3). *See United States v. DiMaria*, 727 F.2d
> 265 at 271 (2d Cir.1984) (citing cases).



*Id.*

The Court further explained that [t]he government's attempt to avoid these conclusions is unpersuasive" explaining that the Government's incorrect reading of the Advisory Committee notes and Weinstein's evidence contorted the exception in 803(3) to exclude clearly admissible evidence. *See id.* at 1004. The Court referenced Judge Friendly's opinion in *United States v. DiMaria*, 725 F.2d 265, 272 (2d Cir. 1984), writing:

> We recently recognized this point in *United States v. DiMaria*, supra, 725 F.2d at 272. As Judge Friendly observed there:
>
>> It is doubtless true that all the hearsay exceptions in Rules 803 and 804 rest on a belief that declarations of the sort there described have "some particular assurance of credibility." * * * But the scheme of the Rules is to determine that issue by categories; if a declaration comes within a category defined as an exception, the declaration is admissible without any preliminary finding of probable credibility by the judge, save for the "catch-all" exceptions of Rules 803(24) and 804(b)(5) and the business records exception of Rule 803(6) ("unless the source of information or the method or circumstance of preparation indicate lack of trustworthiness"). As Judge Weinstein has stated, "the scheme adopted for the hearsay article in the federal rules is that of a system of class exceptions coupled with an open-ended provision in Rules 803(24) and 804(b)(5), and with the exemption of certain prior statements from the definition of hearsay." * * *, even though this excludes certain hearsay statements with a high degree of trustworthiness and admits certain statements with a low one. This evil was doubtless thought preferable to requiring preliminary determinations of the judge with respect to trustworthiness, with attendant possibilities of delay, prejudgment and encroachment on the province of the jury.
>> (Citations omitted).
>
> We realize that under certain circumstances a *defendant* may object on the ground of probable unreliability to admission of a declaration of a nonwitness which is within an exception to the hearsay rule or is not hearsay. See *Ohio v. Roberts*, 448 U.S. 56, 62–66, 100 S.Ct. 2531, 2537–39, 65 L.Ed.2d 597 (1980); *United States v. Puco*, 476 F.2d 1099, 1102–05, 1106–07 (2d Cir.), cert. denied, 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973). This, however, is because of a defendant's special rights under the confrontation clause of the sixth amendment—a protection not



> extended to the government. *United States v. DiMaria*, supra at
> 272 n. 6.

*Id.* at 1005-06 (emphasis on *defendant* in original).  On the basis of this analysis, the Second Circuit found that the evidentiary error could in no way be deemed harmless and reversed the defendant's conviction. *See id.*

     *Harris* makes clear that Exhibit 907 should be admitted in its entirety – the evidence at issue here is even more clearly admissible than in Harris. As in *Harris*, we have statements during the course of the conspiracy made to others that go to the question of whether the defendant actually had the state of mind that the Government alleges he had during the time period of the conspiracy. The Government has attempted to improperly narrow the question to whether the statements in question reflect on the defendant's state of mind at the time he made the statement contained in GX 2965. That is not the question, though certainly this evidence bears on that question and further demonstrates the admissibility of AX 907. All of the evidence that has been proffered of Mr. Amanat's state of mind on the issue at play *during the course* of the conspiracy is relevant, admissible nonhearsay, and to the extent that it is presumptive hearsay it is admissible under the state of mind exception contained in Rule 803(3).[6] *Harris* makes clear that the path the Government is urging the Court to follow, excluding critical statement made by the defendant during the time period of the conspiracy reflective on his state of mind, is a path towards certain reversible error. *See also United States v. Hayes*, 369 F.3d 564, 568 (D.C. Cir. 2004) (finding error where district court allowed Government to admit tape recorded conversation and then refused to allow defendant to admit subsequent tape recorded conversation that tended to show the defendant's innocence).[7]

     The court in *Hayes* observed that:

> The government argues that "tell the truth" was an implied assertion.   Investigators had visited Hayes earlier that morning and so, according to the government, he must have suspected that Sweeney was cooperating.   By saying "tell the truth," therefore, he was actually asserting "I am innocent."   But that is beside the point. Statements inadmissible for one purpose may be admissible for another.   Even if Hayes did intend implicitly to assert his innocence, his statements were still admissible to show his state of mind.

*Id.*

     Here, the Government has attempted to lead the Court into the misimpression that there is some sort of presumptive bar on the admission of defendant statements that are not offered by the Government. No such presumptive bar exists. It is a fact that the Rule deeming admissions

---

[6] For this reason, the Court should also admit Amanat Exhibits 908, 9002 (which has already been admitted in part but should be admitted in its entirety), 9005, 9010 (which has already been admitted in part but should be admitted in its entirety); 9011, 9013, and 9016, which were all supplied to Your Honor in a binder on November 8, 2017.
[7] The panel in *Hayes* included then-Circuit Judge and now Chief Justice Roberts.



and coconspirator statements nonhearsay typically creates a much broader category of defendant statements that the Government is able to introduce than a defendant. That does not mean that the defendant is required to jump through special hurdles to admit defendant statements where they are offered for a nonhearsay purpose or are admissible under one of the exceptions to the hearsay rule.

The cases upon which the Government relies do not support the notion that the Court should exclude the evidence in question. Quite to the contrary – the cases even further demonstrate that the evidence should be admitted. First, the cases upon which the Government relies are largely cases in which defendants sought to admit statements they made during the post-arrest interviews. This is textbook inadmissible hearsay – because a post arrest statement necessarily is made *after* the time period of the alleged illegal activity, it is necessarily outside of the scope of Rule 803(3)'s requirement that a statement demonstrate "then-existing state of mind." States that occur during the time period of the purported illegal activity fall in an entirely different category. Where, as here, the Government charges a broad conspiracy stretching over a period of years, the range of statements made by the defendant that will be appropriately reflective of his state of mind will necessarily be relatively broad. Nevertheless, the defendants have sought to introduce a very narrow set of statements bearing on their state of mind, when considered in contrast to the literally thousands of statements the Government has marked as exhibits. Indeed, even *today* the Government has identified *additional* conversations in new exhibits between Omar and Irfan Amanat that it apparently will seek to introduce in this case.

The Second Circuit's decision in *United States v. Cardascia*, 951 F.2d 474, 488 (2d Cir. 1991), is reflective of the misimpression that the Government is attempting to press in this case. (Let. At 3). *Cardascia* did not involve statements made by the defendant during the time period of the alleged conspiracy. *See id.* at 486. The case involved a letter that was written by the defendant six months after he had withdrawn from the conspiracy, which the district judge concluded had been created specifically to influence the jury. *See id.* ("Judge Weinstein ruled that the letter was inadmissible. He determined that the letter had been written by Martorelli in his own self-interest—**after he had withdrawn from the conspiracy**—and not in furtherance of the conspiracy or of his codefendants' interests. He further found that the statement contained in the letter was not the product of a contemporaneous state of mind, but was intended rather for use by the jury to infer a state of mind that had occurred six months earlier.") (emphasis added). Here, of course, there is not even an allegation that the evidence in question was created after the conspiracy ended or was created after the conclusion of the crime in order to influence the jury. These are emails that were sent **almost ten years before the trial**.

Regardless, as Your Honor has already noted, the Court of Appeals in *Cardascia* made clear that "[a]s we noted in *Harris*, the likelihood that the declarant is misrepresenting his state of mind is not an additional qualification to the admissibility of state of mind hearsay statements. 'If a declaration comes within a category defined as an exception, the declaration is admissible without any preliminary credibility finding by the judge, save for the 'catch-all' exceptions of Rules 803(24) and 804(5).' Instead, the self-serving nature of a statement is considered **when the jury** weighs the evidence at the conclusion of the trial." *Id.* at 487. This language underscores that Mr. Amanat would be authorized to admit the emails in question even if the Government had never sought to introduce GX 2965 – they are reflective of his statement *during the time*



*period of the alleged criminal conduct* – whether the statements are credible is a matter for the jury. The distinction in the cases is essentially between statements made before a defendant is apprehended (or the conspiracy otherwise ends) and after. The "contemporaneity determination" the *Cardascia* court referenced was the determination the trial court has to make of whether the statement is contemporaneous with the time period of the alleged criminal activity. *See id.* at 488 ("To admit statements of one's state of mind with regard to **conduct** that occurred eight months earlier as in this case would significantly erode the intended breadth of this hearsay exception") (emphasis added). Here, it is not a close call – the statements in question unquestionably come in under the *Cardascia* test. [8]

The bulk of the other cases cited by the Government at pages 2 to 3 of their letter suffer from this problem. *See, e.g., United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("When the government offers in **evidence the post-arrest statement** of a defendant it commonly does so for either of two reasons . . . . In the present case, Romero's [post arrest] statement that Marin put the bag into Romero's car was hearsay if offered to prove that fact, and was irrelevant if offered simply to prove that Romero had made such an allegation"); *United States v. Yousef*, 327 F.3d 56, 153 (2d Cir. 2003) (dealing with admissibility of portions of *Brutonized* post-arrest statement); *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1987) (three paragraph *per curium* opinion involving "defense counsel sought to elicit a post-arrest statement Fernandez made to Bateman in which Fernandez denied committing the robbery"). Indeed the only potentially relevant case cited by the Government that appears to focus on something other than a post-arrest statement is the Second Circuit's decision in *United States v. Taubman*, 297 F.3d 161 (2d Cir. 2002), however *Taubman* also does not support the exclusion of AX 907.

First, its important to note that *Taubman* is not a developed opinion that purports to undermine *Harris* or the Circuit's other precedents – it is a very limited *per curium* opinion that offers little explanation of its relevant holding. *See id.* For this reason alone, it is a bizarre precedent for the Government to hang its entire theory of admissibility upon, when dealing with a category of evidence that has been discussed extensively in the Circuit's precedent. Regardless, in *Taubman*, the issue was a statement made by the defendant to his administrative assistant after a meeting that was apparently central to the charged conspiracy. *See id.* at 164. The Court of Appeals affirmed, without explanation, the exclusion of this statement under Rule 803(3) observing that the District Court had concluded that the statements:

> did not establish that the testimony was admissible pursuant to Fed.R.Evid. 803(3) to show Taubman's state of mind when he went to the relevant meeting, because it was not made contemporaneously with that meeting. *See* Trial Tr. at 290–92 (the District Court states that it "does not make sense" that Taubman's statement to the administrative assistant upon returning from a meeting with Tennant that he was unsure  why Tennant had

---

[8] Notably, even if the question was, as the Government incorrectly suggests, whether AX 907 is substantially contemporaneous with GX 2965, it would pass the test as it occurred within hours of the original message. But this clearly is not the question, though it is relevant to a separate ground for the admissibility of the document in question, as discussed below.



wanted to meet reflects Taubman's state of mind because at the meeting "they obviously discussed something"). Rather, it was a statement about a meeting that had already happened.

*Id.* at 165-66. What is unclear in *Taubman* is the scope of the defendant's alleged participation in the conspiracy – the scope of the period at which the defendant's state of mind was at issue. It appears that the district court made a determination that essentially the defendant's statement to his administrative assistant was an after the fact ruse designed to mask the significance of the meeting. This analysis would appear to run in conflict with *Cardascia's* admonition that a district court is not to weigh credibility in determining the admissibility of such evidence. Regardless, the *Taubman* opinion is insufficiently developed to provide meaningful guidance on this point. The substantive evidentiary determination of the Court of Appeals on this issue essentially came down to the fact that, given the overwhelming evidenced introduced at trial, "any error in the District Court's evidentiary rulings was, in the particular circumstances presented, harmless." *Id.* Without some explanation from the prosecutors as to what the significance of the meeting was in *Taubman*, the purported scope of the defendant at issue's participation in the charged conspiracy, or what the proffered testimony was to the administrative assistant, it is difficult to understand how the Government can contend that *Taubman* counsels against the admission of the evidence at issue here. At bottom, *Taubman* is not a developed circuit precedent, and to the extent that the Government is urging the Court to read its recitation of the District Court's opinion as informative of the question at hand, that urging should be rejected. The reading urged by the Government is in conflict with the explicit language of Rule 803(3)*, Cardascia, Harris*, and other precedent. It is also in conflict with logic and common sense.

That is to say: the Government cannot be contending that there is *no* situation in which a defendant's statement referencing an earlier statement would be admissible under the state of mind exception. Taken to its logical implications, the Government's position means that in a murder case the Government could introduce an email from a defendant to a friend that states "soon you will die," but the defendant would be precluded from introducing an email sent an hour later that says "don't be too alarmed about that message earlier – I was making a bad joke but what I really meant was soon you will 'dye,' I meant soon you're going have to help me paint my car." That result would be absurd, and more importantly, that is not the law. As *Harris* makes clear, AX 907 is entirely admissible.

**D.      AX 907 Should Be Admitted Pursuant to Rule 106, As It is a "Related Writing" that Ought in Fairness Be Considered in Connection With GX 2965**

Even if the Government could somehow demonstrate that AX 907 is inadmissible under the rules discussed above, the document would still be admissible under Rule 106. Rule 106 provides that "Remainder of or Related Writings or Recorded Statements -- If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part — or any other writing or recorded statement — that in fairness ought to be considered at the same time." Fed. R. Evid. 106. The Second Circuit has repeatedly explained that "[w]e have interpreted Rule 106 to require that a document be admitted when it is essential to explain an already admitted document, to place the admitted document in context, or



to avoid misleading the trier of fact." *See Phoenix Associates III v. Stone*, 60 F.3d 95, 102 (2d Cir. 1995) (internal quotation marks omitted). In *Phoenix Associates*, the Second Circuit reversed and remanded for a new trial where the district court permitted the defendant to introduce a set of financial statements for 1989, but prevented the plaintiffs from introducing a separate of work paper that helped to put the financial statements in context. *See id.* ("without the work paper the jury could not have reached an 'impartial understanding' of appellants' financial statements."); *see also Frymire–Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 187 (7th Cir. 1993) (reversing, observing "The district judge permitted the plaintiffs to introduce these three reconstructed pages into evidence, and the plaintiffs trumpeted the admissions to the jury. Peat Marwick asked the judge to direct plaintiffs to restore the statements to their context; the judge declined . . . Despite Rule 106 the judge refused to allow Peat Marwick to restore the admissions to their context or to inform the jury about the qualifications.").

Here, an incredible unfairness would be worked upon Mr. Amanat if the Government is permitted to argue that Mr. Amanat was speaking his actual mind in GX 2965 when, almost immediately after, both he and Irfan Amanat sent emails to their most trusted advisor indicating that neither of them believed this was an actual expression of Mr. Amanat's state of mind, but rather part of a complex attempt to motivate and influence Irfan Amanat's behavior.

**E.      Even if the Court Excludes Any Part of AX 907, the Court Should Limit the Exclusion to the Parts That the Court Can Not Reconcile With the Applicable Hearsay Exceptions and Admit the Rest of the Document**

As described above, AX 907 is a document with multiple parts. We believe the entirety of the document is admissible for the reasons we have described. To the extent that the Court believes some portion of the document is inadmissible, we respectfully request that the Court exclude only that portion and permit the remainder of AX 907 to be admitted.

**F.      The Entirety of AX 907 Should be Admitted Under the Residual Exception to the Hearsay Rule**

Under the residual exception to the hearsay rule, Rule 807:

> (a) In General. Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:
> (1) the statement has equivalent circumstantial guarantees of trustworthiness;
> (2) it is offered as evidence of a material fact;
> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
> (4) admitting it will best serve the purposes of these rules and the interests of justice.



Fed. R. Evid. 807. For all of the reasons described above, even if the Court concludes that AX 907 is not admissible under Rule 801 and 803, the Court should admit the document under Rule 807. We submit that the question of what the true nature of the relationship was between Irfan and Omar in terms of the Enable discussion is a material question in this trial, and because the jurors will be potentially misled by the admission of GX 2965 alone, admitting the document is in the interests of justice.

## G.     The Other Documents Mr. Amanat Sought To Introduce Should Be Admitted in Their Entirety

The Government has not offered a detailed objection to any of the other exhibits referenced in footnote 6 above, but it has offered general objections to the notion that these are "defendant statements." That is not a basis for the exclusion of this evidence. In particular, we would ask the Court to focus on AX 908, which we attempted to introduce yesterday but reserved after the Government offered a hearsay objection. (Tr. 1461-62). In AX 908, among other relevant language, Mr. Amanat instructed Mr. Maiden to "disclose disclose disclose, to every investor everything: in this case everything we know about the Enable liquidity issues, and the lockup restrictions, etc . . . maiden investors must be told that the Enable funds are tied up until a BESN or KITD sale: it is not a big deal to have restrictions on your investments. I have a lot of restricted stock investments in many different industries." Again, the truth or nontruth of these statements doesn't matter – what matter is that the document reveals in detail that Mr. Amanat was attempting to get Mr. Maiden to disclose everything he had told him about the Enable issues to the Maiden investors. *See, e.g.*, *United States v. Lagunes*, No. 3:12-Cr-67 JD, 2013 WL 97466 at *7 (N.D. Ind. Jan. 8, 2013) ("Statements such as instructions at the time of a transaction are not assertions of fact and thus not hearsay at all."). These statements go right to the heart of the Government's case, and are critical evidence. Similarly critical are the portions of AX 908 where Mr. Amanat is instructing Mr. Isaza Tuzman about how he believes all of the issues with KIT digital should be addressed. The entire document is admissible nonhearsay.

Though the Government has argued we should simply elicit this information from the witness, it is not enough that Mr. Maiden admitted some of this on the stand – Mr. Maiden has been proven a perjurer, and the jury may very well decide to discount the entirety of his testimony. Indeed, the Government often urges the jury to do just that where the credibility of a witness has been sufficiently compromised. If the jury follows that advise, and the Court follows the Government's attempt to lead the Court into error, the jury will be left in their deliberations with the Government's incriminating documents and without the critical documents that go to the defense theory. This would be a miscarriage of justice.



## CONCLUSION

For all of the reasons described herein, we respectfully submit that the Court should deny the Government's motion.

Respectfully submitted,

 /s/  Randall W. Jackson
Randall W. Jackson

CC: All parties