*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*

*New York, New York 10007*

November 13, 2017

BY ECF AND E-MAIL

The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    United States v. Kaleil Isaza Tuzman, S8 15 Cr. 536 (PGG)

Dear Judge Gardephe:

    The Government respectfully submits this letter to further address the admissibility of certain evidence, including financial diagrams, ledgers and meeting agendas, made by cooperating witness and co-conspirator Robin Smyth during the accounting fraud scheme charged in Count Six. The Government presently intends to offer approximately ten exhibits, all of which have been identified for the defense. These exhibits fall into three broad categories: (1) financial documents showing illicit money flows; (2) agendas Smyth prepared in advance of meetings with the defendant in which the co-conspirators discussed the accounting fraud; and (3) statements by Smyth reflecting his state of mind, including his intent and plan, as the fraud grew. As set forth below, categories (1) and (2) are admissible as co-conspirator statements under Rule 801(d)(2)(E) and category (3) is admissible to reflect Smyth's state of mind under Rule 803(3).[1]

## Financial Diagrams and Ledgers

    Government Exhibits 2188-A contains a November 2010 diagram of a round trip transaction, which Smyth discussed with the defendant prior to embarking on a trip to Dubai with the defendant to set up an escrow account used to further the accounting fraud scheme.

---

[1] The financial diagrams and ledgers and the meeting agendas are also admissible as business records under Rule 803(6), as Smyth created them in his capacity as CFO, the records were kept by Smyth in the course of a regularly conducted activity of KITD, and the making of the records was part of KITD's regular practice. *See, e.g.*, *United States* v. *Franco*, 874 F.2d 1136 (7th Cir. 1989) (affirming trial court's admission under Rule 803(6) of "ledger sheet listing deposits and withdrawals, a list of [business's] clients, and a binder detailing activity related to accounts, wire transfers, money orders, and cashier's checks"). Smyth kept notes and records of his legitimate work as CFO alongside notes and records of his fraudulent work.

Government Exhibits 2192-B and 2192-C contain financial ledgers reflecting Smyth's handwritten tally of KITD's round trip transactions, including transactions to pay off fake licenses that were entered into for the sole purpose of inflating the company's financial performance.  The ledgers list various fake clients, the payment terms for those fake perpetual licenses, and the money that KITD had paid (or needed to pay) in round trip fashion to keep the sham transactions hidden from auditors and investors.  Government Exhibits 2112, 2142 and 2153 are electronic ledgers maintained by Smyth in Excel format on his laptop.  GX 2112, for instance, is an electronic version of the handwritten ledgers maintained by Smyth.  It is titled "CFELv2," which stands for "Cash Flow Elephant" – a reference to the code word that the co-conspirators used to discuss the fraud.  GX 2142 is a ledger Smyth presented to the defendant during a meeting in which the co-conspirators discussed the fraud.  GX 2153 is a ledger of KITD's cash holdings, which Smyth caused KITD to prepare for Joe Mullin, the head of the Audit Committee, as he sought to repatriate the company's cash.  The latter document contains multiple false statements about the company's cash accounts and therefore is not offered for its truth.

As the Court previously stated earlier today, "drug ledgers kept by a member of a narcotics conspiracy could be admitted against all members of the conspiracy.  I think we probably could all agree on that.  I suspect that the logic there would be that the records further the goals of all the coconspirators in the drug conspiracy because it's important to keep track of what's been sold for how much, etc.  So ledgers, particularly drug ledgers, I don't have any difficulty in understanding the logic."  (Tr. 2186.)  The Court was correct that ledgers, particularly financial ledgers, are routinely admitted as co-conspirator statements under Rule 801(d)(2)(E).  Indeed, ledgers have been admitted in narcotics conspiracies and fraud cases alike under Rule 801(d)(2)(E).  *See, e.g.*, *United States* v. *Ashraf*, 320 Fed. Appx. 26, 28-29 (2d Cir. 2009) (detecting "no error" in trial court's admission of "drug ledgers" and "a co-conspirator's testimony as to the meaning of the ledgers" because the statements fell within Rule 801(d)(2)(E)); *United States* v. *Caruso*, 225 F.3d 646 (2d Cir. 2000) (affirming trial court's conclusion in mail fraud conspiracy that "ledger entries were made in the course and furtherance of [conspiracy]"); *United States* v. *Donovan*, 55 Fed. Appx. 16, 21 (2d Cir. 2003) (affirming trial court's admission in securities fraud conspiracy trial of a "ledger and . . . list [that] were both made during the conspiracy, as ways to keep track of the commissions to the coldcallers, thereby indicating that the documents furthered the operations and efficiency of the conspiracy"); *United States* v. *SKW Metals & Allows, Inc.*, 195 F.3d 83, 88-89 (2d Cir. 1999) (affirming trial court's admission of co-conspirator's notes of conversations with other members of the price fixing conspiracy "to memorialize information supplied to him . . . and to provide a reference to help [him] carry out his role in the conspiracy").

Smyth will testify that he kept the diagrams and ledgers to track the "Back End" – the other code name he and the defendant used to describe the accounting fraud scheme.[2]  He will further testify that he created the documents during the scheme in order to promote the scheme's success and maintain its ongoing operations.[3]  Accordingly, the financial diagrams and ledgers maintained

---

[2] Smyth will explain that the "front end" comprises the company's legitimate transactions.

[3] Earlier today, the defense repeatedly stated that Smyth's notebooks, including GX 2188-A, a document with a diagram of round trip transactions, were "his insurance policy so he can blame Kaleil later." (Tr. 2181). As the Court correctly pointed out, such objections go to weight, not the admissibility of the evidence. (Tr. 2196); *see Caruso*, 225 F.3d at 646, *2 ("The appellants'

by Smyth are clearly admissible as statements made in furtherance of the accounting fraud conspiracy.

### Meeting Agendas

The Government also intends to offer certain meeting agendas that Smyth created in anticipation of meeting with the defendant to discuss the accounting fraud scheme. Specifically, the Government plans to offer a page from 2188-A, which is titled "Kaleil" and contains a list of items for discussion. One of those items reflects a fraudulent transaction in which the defendant and Smyth round tripped company money in connection with the December 2010 sale of a subsidiary.

GX 2190-B and 2190-C are detailed lists of agenda items that Smyth planned to cover in his meetings with the defendant. GX 2190-C is the rough draft of the agenda; GX 2190-B is the final draft. Accounting fraud is literally the fourth item on both agendas. (*See, e.g.*, GX 2190-B ("(4) B.E."); GX 2190-C ("(4) BE").) The twelfth item on GX 2190-B is "DD on what we are saying," which Smyth will explain references the lies the defendant was telling potential acquirers as he sought to take the company private and his doubts that the company would pass subsequent due diligence. The nineteenth item on GX 2190-B is "We are freaking out people" – which Smyth will testify reflects his intention to speak with the defendant about the flurry of fake perpetual licenses and the need to avoid raising concerns with company employees who were unaware of the scheme. The twentieth item on the list is "We are now bringing too many people into it" – which Smyth will testify reflects his plan to speak with the defendant about minimizing the number of people who were likely to learn about their fraudulent scheme. Smyth will testify that he created these lists to keep track of the items he needed to raise with the defendant and to make sure no important items were left unaddressed. Smyth will further testify that he used the agendas during his meetings with the defendant to keep track of the topics.

The law cited above, including *United States* v. *SKW Metals*, makes clear that Smyth's meeting agendas are admissible as co-conspirator statements made in furtherance of the accounting fraud conspiracy. Like the co-conspirator in *SKW Metals*, who used his contemporaneous notes "to provide a reference to help . . . carry out his role in the conspiracy" and "to act as a record and as a guide to future conduct," *id.* at 88-89, Smyth used his meeting agendas as a reference to help ensure that no topic was left unaddressed during his meetings in which the men discussed the scheme. Smyth's agendas, like his ledgers, were "ways to keep track of" important issues for the scheme's success, "thereby indicating that the documents furthered the operations and efficiency of the conspiracy." *Donovan*, 55 Fed. Appx. at 22; *see also United States* v. *Orena*, 32 F.3d 704, 715 (2d Cir. 1994) (approving admission of loansharking records under Rule 801(d)(2)(E) that "included names and numbers with notations such as 'collect,' 'paid,' and 'balance'"); *United States* v. *El-Mezain*, 664 F.3d 467, 507 (5th Cir. 2011) (holding that "internal records such as annual reports, by-laws, organizational charts, and meeting agendas . . . were designed to be in furtherance of" a scheme and "were therefore admissible under Rule 801(d)(2)(E)"). In addition,

---

suggestion that Lambright may have altered the ledger after the scheme was over before turning it over to the government in order to minimize his own culpability, while plausible, goes to the weight to be afforded the ledger entries, not to their admissibility.")

the statements are admissible under Rule 803(3), as they demonstrate Smyth's intention and plan to discuss certain matters with the defendant.

### Smyth Intent or Plan Reflective of His State of Mind

Government Exhibits 2188-A, 2189-C and 2190-A each contain statements reflecting, among other things, Smyth's intent and plan at critical junctures in the conspiracy. Under longstanding circuit authority in cases involving co-conspirator statements, "[s]tatements by the declarant that he intends to carry out a plan are clearly admissible under 803(3)." *United States* v. *Cicale*, 691 F.2d 95, 104 (2d Cir. 1982); *see also United States* v. *Paone*, 782 F.2d 386, 390-91 (2d Cir. 1986) (noting that statements by cooperating witnesses "[f]requently . . . may be admitted . . . under the state of mind exception to the hearsay rule").

For instance, in GX 2188-A, immediately next to an agenda item in which Smyth discusses the fact that a co-conspirator is blackmailing KITD in connection with the December 2010 sale of a subsidiary, Smyth wrote "I have lost myself in since 2007." Smyth will testify that this statement referenced his then-present belief, on the eve of the creation of an illicit escrow account to conduct millions of dollars of round trip transactions, that he was engaged in wrongful conduct. The reference is relevant to explain Smyth's state of mind and the steps he then took, which included asking the defendant to speak with Rima Jameel directly to ensure she was willing to help them set up a Dubai-based escrow account for round trip transactions.

Government Exhibit 2189-C contains a list of four items that Smyth wrote to himself in early 2012 after a series of increasingly urgent conversations with the defendant about how to manage the fraud if the defendant were to depart KITD as CEO. The items read:

(1) THE COMMITMENT IS NOT THERE AS K SAID IT WOULD BE
(2) IF K LEAVES AS CEO THAT IS DAY I LEAVE AS CFO[.] I AM NOT SIGNING AS ONLY PERSON WHO KNOWS OF B.E.
(3) ONE ALTERNATIVE IS TO TELL EVERYONE WE HAVE BEEN B.E.'ING WHICH WE HAVE RUN OUT OF OPTIONS
(4) PLAN HAS NOT EVEN BEEN DISCUSSED

These statements are admissible because they reflect Smyth's intention to take steps to ensure he would not be the only person from management falsely attesting to the accuracy of the company's SEC reports. Item (1) is necessary to explain the statements that follow, because Smyth will testify that the lack of a concrete plan to deal with the ever-growing accounting fraud – specifically a commitment from the defendant to find a way out of the fraud – caused Smyth to consider resigning and blowing the whistle. Items (2) and (3) set forth Smyth's intention and plan. Item (4) references Smyth's frustration that he and the defendant still needed to discuss the way forward. The Government does not intend to offer *any* of these statements for their truth. Instead, the Government offers them to explain the actions that Smyth took shortly thereafter, including demanding certain conditions from the defendant in order sign the 2011 10K in March 2012 once the defendant had resigned as CEO. *See, e.g.*, *United States* v. *Mangan*, 575 F.2d 32, 43 n. 12 (2d Cir. 1978) ("Rule 803(3) creates a hearsay exception for '(a) statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive,

design . . . ) . . .,' and the Advisory Committee's comment on this exception stated that the rule of *Hillmon* 'allowing evidence of intention as tending to prove the doing of the act intended, is, of course, left undisturbed.'").

      Finally, Government Exhibit 2190-A includes Smyth's notes reflecting his belief that a $10 million Brazil acquisition, which the defendant had proposed as a potential way to cover up the fraud, was not feasible. Smyth comments that the transaction "cannot be done as the only way it works is if it does not hit the [P&L] & [balance sheet]. The auditors will not accept it if they know. That can only happen if we are dealing with people who know that what we are doing is not kosher, or they are dumb." Like the other Smyth statements which reflect his state of mind and explain his future actions, this statement is not offered for its truth. Instead, it is offered to show that Smyth harbored significant contemporaneous doubts about the defendant's proposed solution and that those doubts caused him to take certain steps, including requesting that the defendant personally inject $8 million into the company to cover up the fraud when there were no other alternatives.

      Respectfully submitted,

      JOON H. KIM
      Acting United States Attorney

By:    /s/
      Damian Williams
      Andrea M. Griswold
      Joshua A. Naftalis
      Assistant United States Attorneys
      (212) 637-2298/1205/2310

cc: Defense Counsel (via ECF)