UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                  :

   -v.-                                              :          S8 15 Cr. 536 (PGG)

IRFAN AMANAT,                                    :

              Defendant.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


**THE GOVERNMENT'S SENTENCING MEMORANDUM**

AUDREY STRAUSS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Andrea M. Griswold
Joshua A. Naftalis
Daniel M. Tracer
Assistant United States Attorneys
    *-Of Counsel-*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

THE OFFENSE CONDUCT ..................................................................................... 1

    Irfan's Prior SEC Sanction and Bar ........................................................................ 1

    The Scheme to Defraud Maiden Capital Investors ................................................. 2

    The Scheme to Defraud KITD Investors ................................................................ 3

THE GUIDELINES CALCULATION ....................................................................... 4

    A.   ENHANCEMENT BASED ON LOSS AMOUNT – U.S.S.G. §2B1.1(B)(1)(J).............................. 5

    B.   ENHANCEMENT FOR SOPHISTICATED MEANS/SCHEME COMMITTED FROM OUTSIDE THE

    UNITED STATES – U.S.S.G. § 2B1.1(B)(10)(B) OR (C) ........................................... 10

    C.   THE DEFENDANT'S ARGUMENT FOR A MINOR ROLE REDUCTION – U.S.S.G. §3B1.2 ....... 11

THE COURT SHOULD SENTENCE IRFAN TO A GUIDELINES SENTENCE ............. 12

    A.   NATURE AND CIRCUMSTANCES OF THE OFFENSES, SERIOUSNESS OF THE OFFENSES, NEED

    TO PROMOTE RESPECT FOR THE LAW, AND NEED FOR JUST PUNISHMENT ................................ 13

    B.   HISTORY AND CHARACTERISTICS OF THE DEFENDANT ...................................................... 15

    C.   DETERRENCE ........................................................................................................... 16

CONCLUSION ...................................................................................................... 17

## **TABLE OF AUTHORITIES**

**Cases**

Irfan Mohammed Amanat, S.E.C. Release No. 54708 (Nov. 3, 2006), 2006 WL 4958610,

    *appeal denied, Amanat v. S.E.C.*, 269 Fed. App'x 217 (3d Cir. 2008)................................. 1, 2

*Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011) ...................................... 9

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008) ................ 8

*United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008)....................................................... 12

*United States v. Evans*, 744 F.3d 1192 (10th Cir. 2014) ............................................................. 7

*United States v. Genao*, 869 F.3d 136, 141 (2d Cir. 2017).......................................................... 13

*United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994)................................................ 16

*United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009)................................................ 16

*United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007)............................................................... 9

*United States v. Studley*, 47 F.3d 569 (2d Cir. 1995)............................................................... 7, 8

**Statutes**

18 U.S.C. § 3553(a)(1)................................................................................................................ 13

18 U.S.C. § 3553(a)(1) & (2)(A). ................................................................................................ 13

18 U.S.C. § 3553(a)(2)(B)-(C).............................................................................................. 15, 16

**Other Authorities**

Modern Federal Jury Instructions-Criminal P 57.02 (2021)......................................................... 8

U.S.S.G. § 2B1.1(a)(1)............................................................................................................. 5, 9

U.S.S.G. § 2B1.1(b)(1)(J) ........................................................................................................... 5

U.S.S.G. § 2B1.1(b)(10)(B).................................................................................................... 5, 10

U.S.S.G. § 2B1.1(b)(10)(B) & (C) .................................................................................. 5, 10

U.S.S.G. § 2B1.1(b)(2)(20)(A)(ii) ................................................................................... 5

U.S.S.G. § 2B1.1(b)(2)(20)(A)(ii) & (iii) ...................................................................... 5

U.S.S.G. § 2B1.1(b)(9)(C) .............................................................................................. 5

U.S.S.G. § 3D1.2(d) ........................................................................................................ 5

## PRELIMINARY STATEMENT

The Government respectfully submits this sentencing memorandum in advance of sentencing for Irfan Amanat ("Irfan" or the "Defendant") scheduled for August 17, 2021. Irfan is a recidivist fraudster who caused millions of dollars of losses by participating in two securities fraud schemes. Given the defendant's history, the magnitude of his crimes, the risk of further recidivism, and the need to deter others from serious financial fraud, a term of imprisonment within the U.S. Sentencing Guidelines range of 87 to 108 months' imprisonment is necessary and appropriate in this case.

## THE OFFENSE CONDUCT

The Court is well aware of the facts in this case which were proven at two trials, and which overwhelmingly established that the defendant participated in two fraudulent schemes, one targeting the investors in a North Carolina-based hedge fund, Maiden Capital, and the other targeting the shareholders of a publicly-traded media company, KIT Digital.

### *Irfan's Prior SEC Sanction and Bar*

The instant crimes were not Irfan's first violations of the securities laws. On November 3, 2006, Irfan was sanctioned by the U.S. Securities and Exchange Commission ("SEC"), including (a) a bar from "association with any broker or dealer subject to a right to reapply for association after five years to the appropriate self-regulatory organization or, if there is none, to the Commission"; (b) an order to "cease and desist from committing or causing any violations or future violations of Section 10(b) or Rule 10b-5 of the Securities Exchange Act of 1934"; and (c) the imposition of a $60,000 penalty. *See* PSR ¶ 71; Irfan Mohammed Amanat, S.E.C. Release No. 54708 (Nov. 3, 2006), 2006 WL 4958610, *appeal denied, Amanat v. S.E.C.*, 269 Fed. App'x 217 (3d Cir. 2008). These penalties were imposed following a fully litigated enforcement action by the SEC. *See id.*

The sanctions arose from a scheme in which Irfan caused Tradescape Corp., a trading firm started by Irfan's brother (and co-defendant in this case), Omar Amanat ("Omar"), to engage in a large number of fraudulent "wash trades" in order to create the false appearance of high volume trading at Tradescape and thereby qualify for certain rebate payments from the NASDAQ. *Amanat*, 269 Fed. App'x at 219. In affirming these sanctions, the Third Circuit agreed with the SEC's findings that Irfan's violations were "serious and capable of repetition" and that Irfan "posed a risk of violating the securities laws in the future." *Id*. at 220. Indeed, the evidence at trial showed that Irfan continued violating the securities laws through the fraudulent schemes proven in this case just months after the conclusion of the SEC's 2006 enforcement action.

### The Scheme to Defraud Maiden Capital Investors

Beginning in at least 2008, Irfan managed a Dubai-based investment firm called Enable Invest Ltd. ("Enable"). (6/4/2021 Presentence Investigation Report ("PSR") ¶¶ 20-21). As the manger of Enable, Irfan was responsible for Enable's trading and for preparing client account statements reflecting client balances. (*Id.*). From approximately July through September 2008, Enable realized trading losses in excess of $5.5 million and evidence at trial showed that at all relevant times, Enable was insolvent. (*Id*. ¶¶ 36, 46).

In the summer of 2008, Irfan and Omar solicited millions of dollars of investments into Enable from Steven Maiden ("Maiden") who managed a North Carolina-based hedge fund called Maiden Capital. After Maiden Capital invested an initial approximately one million dollars in Enable, Irfan lied to Maiden about how Enable was doing, including by repeatedly telling Maiden that Enable's trading was smooth and profitable. (PSR ¶ 37). In November 2008, Omar solicited another $2 million from Maiden Capital purportedly as a short-term loan to Enable to induce other investments. (PSR ¶ 38). After Maiden Capital made that investment, Omar and Irfan promptly used that money to pay off other Enable investors, including KIT Digital which, as further

described below had previously invested millions of dollars in Enable. (*Id.* ¶¶ 39-41). Over the next few months, Irfan and Omar continued to lie to Maiden, telling him that his investment at Enable was profitable and safe. (*See, e.g.*, Tr. 190; GX-3062-A). Between themselves, however, Irfan and Omar frequently and glibly discussed how Maiden Capital's investment at Enable had been lost. (PSR ¶¶ 43-46; *see also* GX-2939-R; 3067 ("No chance of making redemptions to Steve"); 2975 ("Yes send him back $500K asap. Oh I forgot, we don't have it!!!!!!!!!!"); 2965 ("if maiden suspects fraud of some sort and notifies the authorities I'm cooked")).

In or about March 2009, Irfan and Omar revealed to Maiden that the money at Enable was lost and, from that point forth, Irfan worked with Maiden to falsify the value of the Enable investment to Maiden Capital's investors. (PSR ¶¶ 46-47). In particular, from in or about March 2009 through 2012, Irfan provided Maiden with fake account statements so that Maiden could in turn lie to his investors about the value of their investments in Maiden Capital. (PSR ¶¶ 54-57; *see also* GX-1697; 3094; 3089; 3098). As they progressed in the scheme, Irfan even provided Maiden with a template so that he could manufacture false Enable statements by himself to support the net asset value provided to Maiden Capital's investors. (GX-1735). During this time, Irfan and Maiden explicitly discussed the purpose of these false statements, namely, to lie and deceive Maiden Capital's investors. (*See e.g.,* GX-1625; 3103). This fraudulent scheme continued until 2012, when Irfan and his co-conspirators were no longer able to cover the mounting losses and the fraud on Maiden Capital's investors was uncovered. (PSR ¶ 57). Due to Irfan's fraud, investors in Maiden Capital ultimately lost approximately $7.75 million when the fund collapsed. (*Id.* ¶ 58; 2017 Trial Tr. 1168 (Maiden Testimony)).

<u>The Scheme to Defraud KITD Investors</u>

In or around the summer of 2008, Irfan agreed with Omar and Kaleil Isaza Tuzman ("Tuzman"), the CEO of Kit Digital ("KITD"), a publicly-traded media company, that KITD

would invest in Enable in return for Enable making an investment in a special purpose vehicle for KITD controlled by Tuzman.  (PSR ¶¶ 33-34).  As part of their agreement, KITD initially invested approximately $6.5 million in Enable.  (*Id.* ¶ 35).  This investment was represented to KITD's board to be a low risk investment akin to cash, and in fact was treated as cash on KITD's books. (GX-700).  Over the subsequent months, Irfan and Omar returned some of KITD's investment, primarily by using funds from other investors, like Maiden Capital, that, as described above, had been solicited to invest in Enable.  In reality though, Enable was insolvent and any cash that was supposedly being held in KITD's account at Enable – and included as cash on KITD's financial statements – was a sham.  (GX-2999).  As Irfan well knew however, KITD was reporting its cash, including the cash being held at Enable, to its investors as part of its assets in SEC filings to shareholders and the investing public.  (GX-205).

As the scheme progressed, Tuzman asked Irfan to help hide KITD's losses at Enable by providing false audit confirmations to KITD's auditors so that the auditors could not uncover the missing funds and Enable, and thereby ensure that KITD could get a "clean audit."  (PSR ¶ 59; GX-1666).  As part of his involvement in this fraudulent cover-up, Irfan sent various statements and balances to KITD employees showing a KITD balance of approximately $2 million in cash at Enable.  (PSR ¶¶ 59-60; GX-2998).  As Irfan knew, however, these statements were completely false and served to deceive KITD's investors and auditors into believing that KITD had valuable cash sitting at an Enable when, in fact, that money had been lost years earlier.  (*Id.*).  Ultimately, due to Irfan's participation in this scheme, as well as other fraudulent accounting that was being conducted by Tuzman, KITD was forced into bankruptcy and its shareholders sustained substantial losses.

### THE GUIDELINES CALCULATION

The Government respectfully submits that the Guidelines in this case are properly

calculated as follows: Counts One through Three and Six are grouped for Guidelines calculation purposes pursuant to U.S.S.G. § 3D1.2(d) because they depend largely on loss amount. The base offense level for the group is seven pursuant to U.S.S.G. § 2B1.1(a)(1). 18 levels are then added for a total loss amount for Counts One through Three and Six of $3,500,000 to $9,500,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(J). Two additional levels are added because the defendant's conduct violated a court order, namely his 2006 SEC cease and desist order, pursuant to U.S.S.G. § 2B1.1(b)(9)(C). And, finally, two more levels are added because a substantial part of the scheme was committed from outside the United States and because the offense involved sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(10)(B) & (C).

The defendant does not have any criminal history. Accordingly, his offense level is 29 and the defendant is in criminal history category I, yielding an applicable range of 87 to 108 months' imprisonment. This calculation differs from the one set forth in the PSR because the PSR includes a four-point enhancement based on the defendant's association with an investment advisor or broker dealer. (PSR ¶ 82). The Government does not believe that it is appropriate to include a four-level enhancement for the association with a broker or dealer or investment advisor pursuant to U.S.S.G. § 2B1.1(b)(2)(20)(A)(ii) & (iii). Among other things, the Government does not believe that there is sufficient evidence that Enable invested in securities as defined under the securities regulations, inasmuch as, for example, the KITD investment was treated as cash under KITD's accounting and the majority of the funds solicited from Maiden Capital were represented to be a loan with a guaranteed rate of return.

Through his sentencing submission, the defendant objects to various facets of the Guidelines calculation set forth above. For the reasons that follow, these objections are baseless.

## A. Enhancement Based on Loss Amount – U.S.S.G. §2B1.1(b)(1)(J)

Irfan argues that "there is certainly no gain, and arguably no loss" in this case. (Def. Mem.

51).   In particular, Irfan argues that both Maiden Capital and KITD were so infected by other forms of misconduct that it is unfair to attribute any loss to Irfan.  (*Id.*).   This argument should be rejected.  Irfan clearly understood that his conduct would, and did, cause significant harm to Maiden Capital and KITD.

With respect to Maiden Capital, the Court should find that Irfan caused losses of approximately $7.2 million, or the fund's total holding of $7.75 million minus the $550,000 that was wired back to Maiden Capital to distribute to investors.  (PSR ¶ 67).   Indeed, this Court recently held that Omar could be liable for the entirety of the losses sustained by Maiden Capital given Omar's substantial role in dissipating millions of dollars that were invested in Enable.  (Dkt. No. 1179 at 33 ("It is reasonable to hold [Omar] Amanat responsible for the collapse of Maiden Capital, because the evidence showed that he was aware that Maiden Capital was a small fund, and that Maiden's investment in Enable represented a significant portion of Maiden Capital's total assets.")).   The very same is true of Irfan – he fully understood that Maiden Capital would be exposed to a serious risk of collapse and nevertheless lied about its balance at Enable month after month.

Irfan, however, argues that there "is no evidence to suggest that Irfan had any insights into the Maiden Capital holdings, value, losses, gains, investors, frauds, etc." (*Id.* at 53).   This argument strains credulity.  Irfan was a sophisticated financial professional and plainly understood that Maiden Capital held investor money and that if millions of those dollars went missing that would undermine the financial soundness of the fund.   Nevertheless, Irfan repeatedly sent false statements to Maiden to cover up the fact that he had effectively lost millions of dollars through Enable.  Moreover, in communicating about the fraud, Irfan and Maiden explicitly discussed that Irfan's false statements were being provided in order to provide returns to Maiden's investors. (GX-1625; 3103).  In that context, Irfan plainly understood that because the Enable numbers –

which comprised a substantial portion of Maiden Capital's holdings – were illusory, that would cause major financial losses to Maiden Capital, including very likely tanking the entire fund. Put simply, it was foreseeable to Irfan that Maiden Capital would collapse as a result the Enable hole and that Maiden Capital's investors would loss their total $7.75 million of holdings. At the bare minimum, it was foreseeable to Irfan that Maiden Capital investors would lose approximately $2.5 million, which was the amount that Irfan himself was falsely reporting the Enable balance to be in 2012. (GX-1735). Plainly, given that that $2.5 million did not exist, it was likely to cause a loss of at least that amount to Maiden Capital's investors.

The defendant's reliance on *United States v. Evans*, 744 F.3d 1192 (10th Cir. 2014), is misplaced. In *Evans*, the Tenth Circuit found that with respect to the scheme at issue there was no fraud at the outset of the scheme and that the court had to properly set aside any loss that resulted from the actions of a receiver after the fraud. *Id.* at 1196-97. By contrast, Irfan was engaged in fraud from the time he took funds from Maiden Capital in 2008 until 2012 when Maiden Capital collapsed. The fact that the indictment only charged the crime beginning in March 2009, does not bar the Court from taking note of the fact that Irfan was misrepresenting the Enable balances for months prior. In fact, the majority of the funds were used straightaway to pay off KITD in November and December 2008 (GX-650). Accordingly, it was readily foreseeable to Irfan that his actions would threaten the solvency of Maiden Capital and that, at a minimum, lying about the $2.5 million in capital that was supposedly at Enable would result in a loss of that amount to investors.

Contrary to the defendant's arguments, *Studley* also does not change this analysis. In *United States v. Studley*, 47 F.3d 569 (2d Cir. 1995), the Second Circuit simply explained that a defendant could be held liable for the losses caused by the conduct of a co-conspirator when the losses were caused by jointly-undertaken conduct and the losses were reasonably foreseeable. *Id.*

at 574.  With respect to the definition of jointly undertaken criminal conduct, the court in *Studley* clarified that that included "any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others."  *Id.* at 575.  Applying that definition here, Irfan's joint criminal conduct with Maiden effectively included, among other things, an agreement to prop up Maiden Capital through the submission of false account statements.  Maiden Capital's viability depended on these statements and Irfan and Maiden designed and executed this false scheme together.  Accordingly, Irfan can fairly be said to have participated in joint conduct with Maiden.

With respect to KITD, Irfan again argues that no loss was foreseeable because he was not involved in the "proper festival of frauds" happening at KITD.  (Def. Mem. 64.)  Whether or not Irfan appreciated the full scope of fraudulent conduct at KITD however, the evidence at trial plainly established that he knowingly falsified approximately $2 million in holdings at Enable.  (GX-2998).  Thus, at the very minimum, Irfan understood that he was causing a loss to Enable and its investors in that amount.  The Government is not seeking to hold Irfan responsible for any additional amount of loss in connection with KITD.

The remainder of the cases cited by Irfan have no relevance to this case.  For example, *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc*., 552 U.S. 148 (2008), concerns whether or not plaintiffs in a civil securities fraud action can rely on a defendant's participation in a scheme absent any false statement or omission.  This case is wholly inapplicable.  First, *Stoneridge* is a civil case that dealt with the question of liability under Rule 10b-5, not the amount of loss where, as here, liability has already been established by a jury.  Moreover, reliance is not an element of criminal securities fraud, 3 Modern Federal Jury Instructions-Criminal P 57.02 (2021) ("[T]he government is not required to establish that an investor actually was deceived, suffered actual loss or otherwise relied upon the defendant's conduct."), and the holding in *Stoneridge* was based on the fact that there is no aiding and abetting liability in civil cases.

*Stoneridge*, 552 U.S. at 157. By contrast, criminal law provides for aiding and abetting liability under Title 18 and Irfan was charged and convicted of that crime. Accordingly, even under *Stonebridge*'s logic there would be a valid basis to hold Irfan liable for losses occasioned by others. Likewise, in *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), the Supreme Court considered whether an investment advisor could be liable for a false statement contained in the prospectus of one of its client funds. Again, that case was concerned solely questions of liability under Rule 10b-5 whereas here, a jury has already found that Irfan violated the securities laws, including conspiracy to violate Rule 10b-5.[1] *Stoneridge* and *Janus* thus shed no light on the relevant question, namely, what amount of loss is fairly attributable to, and foreseeable from, such a violation. Finally, the defendant's citation to *United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007), is misleading. In *Rutkoske*, the Second Circuit observed that civil principles of "loss causation" – as opposed to principles of liability – could be used to help determine appropriate loss amounts in a criminal case. Here, however, the Government is not attempting to calculate the total decline in KITD stock price that resulted from Irfan's fraud. Instead, and in part to avoid the complications that arise in cases like *Rutkoske*, the Government is conservatively basing loss on the actual amount of money that Irfan caused KITD to lose. In all likelihood, that loss had a ripple effect on KITD's investors above and beyond the $2 million in cash that Irfan defrauded the company of inasmuch as stock prices are usually based on multiples of a company's value, but the Government is not seeking to pursue that calculation here. The Court should hold Irfan accountable for the $2 million in loss that his fraud caused to KITD.

---

[1] Moreover, *Janus's* holding has been substantially narrowed by *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019), which clarified that one can be held liable for disseminating false statements under subsections (a) and (c) of Rule 10b-5 regardless of whether the defendant was the "maker" of those statements.

**B. Enhancement For Sophisticated Means/Scheme Committed From Outside the United States – U.S.S.G. § 2B1.1(b)(10)(B) or (C)**

The defendant also contests the application of a two-level increase, pursuant to U.S.S.G. § 2B1.1(b)(10)(B) or (C).  Under U.S.S.G. § 2B1.1(b)(10), this two-point enhancement is applied if either "a substantial part of the fraudulent scheme was committed from outside the United States" (§ 2B1.1(b)(10)(B)) *or* "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." § 2B1.1(b)(10)(C).  Application Note 9(B) notes that the sophisticated means enhancement is ordinarily applied where the defendant used offshore financial accounts.  Irfan argues that this enhancement does not apply because from 2010 onwards, he resided in the United States and the majority of the accounts at issue were based in the United States.  (Def. Mem. 42)

The two-point enhancement however applies here under both subsections (B) or (C).  The evidence at trial established that Enable was based in Dubai, as was Irfan prior to 2010.  During that time, Irfan founded Enable, managed its trading, and oversaw the substantial losses and/or insolvency that gave rise to the instant offenses.  Indeed, Irfan was still residing in Dubai when he engaged in the March 2009 call where he revealed Enable's losses to Maiden and embarked on a joint scheme to defraud the investors in Maiden Capital.  Likewise, financial records entered into evidence also indicate that Irfan and Enable maintained and used accounts in Dubai.  (GX-693).  Accordingly, a "substantial" part of the scheme was conducted from abroad and a 2-level enhancement is appropriate.

The instant scheme was also sophisticated.  Aside from using overseas trading accounts, Irfan and his co-defendants used sophisticated means to perpetrate and hide this fraud from investors.  For example, they generated false statements to create a phony paper trail for Maiden Capital investors and submitted false audit confirmations to hide KITD's losses at Enable from

10

public company auditors. In addition, beginning after the Enable "hole" was disclosed to Maiden in March 2009, Irfan and his co-defendants attempted to develop a complex "settlement" whereby money would be exchanged between the parties to, among other things, make Maiden Capital whole. (Tr. 244). That "settlement" was implemented though a series of detailed contractual arrangements and side letters designed to cover up the fraud. (GX-1576; 2987). Given the numerous parties and financial transactions involved in this scheme as well as the protracted cover-up, the crime was sophisticated and the 2-level enhancement is warranted on that basis.

### C. The Defendant's Argument for a Minor Role Reduction – U.S.S.G. §3B1.2

Irfan also argues that he should receive a minor role reduction. (Def. Mem. 43). This argument is meritless. The majority, if not all, of the relevant factors weigh against such a reduction. Even when compared against the other participants in the same crimes for which Irfan was charged, Irfan had a substantial and central role. First, Irfan plainly understood the "scope and structure" of the crimes with which he was charged. (Application Note 3(C)(i)). For example, Irfan well-understood that the purpose of his fake statements to Maiden and KITD were to enable those entities to record values and assets on their books that Irfan knew did not exist. That was the entire point of what Irfan was doing when he generated these false statements. Second, Irfan had a critical role in planning and organizing the crime. (Application Note 3(C)(ii)). He was the one who carried the critical work of drafting false statements month after month and audit after audit in order to ensure that no one discovered the money that had been lost and the substantial financial holes that were being created. Third, the defendant had considerable decision-making authority within the scheme. (Application Note 3(C)(iii)). He decided whether and what information to put in false statements and how that information would be shared. In fact, how the false statements were generated was left almost entirely up to Irfan. Fourth, the nature and extent of Irfan's participation in the scheme was extensive. (Application

11

Note 3(C)(iv). Irfan was in on the scam from the beginning in 2008 – even prior to Maiden – and stayed with it for years until the house of cards came crashing down in 2012. Moreover, Irfan's acts were critical to the success of the scheme; without Irfan's fake statements, the fraud would have been unable to last for years undetected. And fifth, while the defendant claims he did not receive a single penny from the scheme (because all the money that went to Enable was ultimately lost), he stood to benefit from it substantially. Irfan's involvement in the scheme allowed him to keep Enable open and prevented him from being chased down by Maiden Capital or KITD investors. Irfan's participation in the scheme also helped create the appearance of success at Enable and Irfan could thereby continue to present Enable as a going concern even years after it was insolvent. To be sure, the Government believes that Irfan is less culpable than his codefendants Omar and Tuzman – both of whom are very serious fraudsters – in the charged crimes, but the Government strongly disputes that Irfan was only a "minor" or "minimal" participant in this multi-year, complex fraud. In many ways, Irfan stood at the center and the intersection of the Maiden fraud and the KITD fraud and the substantial losses at Enable – his fund – led to much of the fraudulent activity in the case. Accordingly, Irfan should not receive any Guidelines reduction based on a minor or minimal role.

### THE COURT SHOULD SENTENCE IRFAN TO A GUIDELINES SENTENCE

Once the Court has calculated the application of the sentencing guidelines, it must consider an appropriate sentence under the totality of factors set forth under Title 18, United States Code, Section 3553(a). While the Court must calculate the Guidelines, it is "emphatically clear that the Guidelines are guidelines-that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). "A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *Id*. at 188. "A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent

review of the sentencing factors, aided by the arguments of the prosecution and defense." *Id*. 189; *United States v. Genao*, 869 F.3d 136, 141 (2d Cir. 2017) ("The sentencing court must make an individualized assessment based on the facts presented."). Under the factors set forth in 18 U.S.C. § 3553(a), the Government respectfully submits that a sentence within the Guidelines range of 87 to 108 months' imprisonment would be sufficient, but not greater than necessary, to serve the goals of sentencing.

### A. Nature and Circumstances of the Offenses, Seriousness of the Offenses, Need to Promote Respect for the Law, and Need for Just Punishment

A sentence within the Guidelines range is necessary in light of the nature and circumstances of the offenses, the seriousness of the offenses, the need to promote respect for the law, and the need for just punishment. *See* 18 U.S.C. § 3553(a)(1) & (2)(A).

Irfan's offenses of conviction were serious. The jury swiftly convicted him of engaging in two fraudulent schemes: (a) the scheme to defraud Maiden Capital's investors (Counts One through Three), and (b) the scheme to defraud KITD's investors, auditors, and the investing public (Count Six). Investors suffered millions of dollars in losses as a result of these brazen crimes. What is more, the defendant's multi-million schemes went on for years, and they were inextricably intertwined—designed to hide the massive frauds that Irfan was perpetrating with his co-conspirators. Accordingly, it is critical that the sentence imposed reflect the seriousness of these crimes and constitute a just and fair punishment for this level of fraud. Throughout his sentencing memorandum, Irfan minimizes his role and mischaracterizes the evidence to suggest that he was less involved in the fraud than he actually was. For example, Irfan repeatedly suggests that he only began involvement in any criminal activity in March 2009. (Def. Mem. 56). However, the fact that the indictment only charged the period beginning in March 2009 does not preclude the Court from looking at all the evidence that Irfan was involved in lies and deception for months

13

prior. As the emails cited above demonstrate, Irfan and Omar spoke frequently and glibly in late 2008 and early 2009 about how they had lost millions of dollars in investor money and during that same period, Irfan was falsely representing to Maiden that Maiden Capital's investment was smooth and profitable. (*See, e.g.*, GX-3062-A; 3067; 2975). Even the manner of their conversation evidenced a cavalier disregard for other people's money and property. (GX-2975 ("Yes send him back $500k asap. Oh I forgot, we don't have it !!!!!!!!")). These brazen emails show that Irfan was completely involved in criminal conduct even before he called Maiden in March 2009 and that he had little regard for investor money that was entrusted to him.

Moreover, Irfan's suggestion that by participating in the March 2009 call, he was just being "honest" (Def. Mem. 35) is flatly contradicted by the evidence. To the contrary, the evidence at trial showed that far from being an honest reckoning, the March 2009 call was the genesis of a massive fraud – it was the first conversation that led to a years' long scheme to falsify statements and lie to investors. (Tr. 249-50). Irfan did not participate in that call to expose the truth; he joined the call because he had grown desperate and needed help with the cover-up.

Irfan also repeatedly, and wrongly, suggests that his role in the scheme was somehow unknowing or that he did not appreciate what he was doing. (*See, e.g.*, Def. Mem. 27, 34-35 ("Irfan's only offense conduct involved emailing account statements to Maiden, and emailing account balance confirmations to the KIT Digital auditors. Irfan unknowingly joined a runaway fraud train in progress.")). This is simply a distortion; it conflicts with the trial evidence and common sense. Irfan knew exactly why he was sending false statements – to defraud investors; and he did not join a runaway train; he helped devise and execute an illegal scheme. Further, contrary to Irfan's arguments, the crime was not "discrete" in time. (Def. Mem. 52). It lasted three years and involved repeated fraud month after month. Each time Irfan generated knew statements or confirmations for auditors, he understood it was wrong and was undeterred. And,

contrary to Irfan's claims, he was not an innocent victim of his brother.  (Def. Mem. 25-27).  Irfan made a deliberate decision to get involved with band of fraudsters and provided the fuel – in the form of fake documents and balances – for years.

The defendant also suggests that it is somehow a mitigating factor that "no one has accused Irfan of stealing any Enable funds" or that there is no evidence that "Irfan stole Maiden Capital's investment."  (Def Mem. at 35, 52).  But the fact that the Government cannot easily prove what ultimately happened to every penny that Irfan lost is simply a consequence of the fact that Irfan squandered that money in Dubai where the Government often has difficulty obtaining reliable and comprehensive records.  The evidence at trial firmly established that Irfan ran Enable, that millions of dollars went to Enable, and that those millions of dollars disappeared.  Irfan's suggestive language about the lack of evidence that he stole the money is empty rhetoric.  Irfan has provided no innocent explanation for how millions of dollars simply disappeared under his watch, and the fact that the Government cannot conclusively show whether Irfan lost all of that money on poor trading decisions or spent it on personal goods is a function of the global reach of the crime rather than a positive reflection on Irfan.  In sum, the serious nature of Irfan's crime call for a more substantial sentence, and one in line with the Guidelines recommendation.

### B.  History and Characteristics of the Defendant

A substantial sentence is necessary in light of the history and characteristics of the defendant.  *See* 18 U.S.C. § 3553(a)(2)(B)-(C).

Irfan's memo refers to him as a "first-time offender."  (Def. Mem. at 68).  But that characterization conveniently omits the fact that Irfan was found by the SEC to have violated the securities laws shortly before he set out to commit the instant offense.  As described above, Irfan is a repeat violator of the securities laws.  His prior SEC enforcement action was insufficient to prevent him from committing the instant crime and his commission of the instant crime was

actually a violation of the prior court order.  Accordingly, the defendant has evidenced a very serious disregard for the law through this offense that is worthy of punishment.

The defendant's memorandum is, understandably, overwhelmingly devoted to the many kind acts and virtues that the defendant has displayed on other occasions.  This crime however reflects another dimension of the defendant; a willingness to break the law to help his brother, solicit investments, and make money.  The Court should take note of this pattern of the defendant in imposing sentence and impose a sentence that is sufficient to truly deter the defendant from engaging in financial crime, whether that is to help his family members, or for personal gain.

### C. Deterrence

A substantial sentence is necessary to afford adequate deterrence and to protect the public from future crimes of this defendant.  *See* 18 U.S.C. § 3553(a)(2)(B)-(C).

As in many white-collar cases, there is a serious need for the sentence imposed here to convey an adequate message of general deterrence.  The sentence imposed must convey the message to the average layperson that crime does not pay.  In particular, complex securities fraud schemes like this one are hard to uncover and resource-intensive to investigate and prosecute. Accordingly, when they are found and proven, they need to serve as a message to other would-be offenders that crime does not pay.  Because investment fraud and securities fraud schemes are both highly lucrative and difficult to detect, significant punishment is highly necessary to deter others from similar conduct.  *See United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."); *United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009) ("[I]t is difficult to imagine a would-be white-collar criminal being deterred from stealing millions of dollars from his company by the threat of a purely

16

probationary sentence.").

Moreover, as noted above, considerations of specific deterrence are also relevant here. Irfan has a history of securities law violations. He has not been deterred from such conduct. A substantial sentence is thus necessary to send the message to white-collar criminals generally and to Irfan specifically that those who commit white collar crimes will be punished.

**CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence on Irfan within the Guidelines range of 87 to 108 months' imprisonment.

Dated:    August 4, 2021
          New York, New York

                                Respectfully submitted,

                                AUDREY STRAUSS
                                United States Attorney

        By:       _____/s/_____
                                Andrea M. Griswold
                                Joshua A. Naftalis
                                Daniel Tracer
                                Assistant United States Attorneys

17